## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| THE TENNESSEE WALKING HORSE NATIONAL CELEBRATION ASSOCIATION; KIMBERLY LEWIS; and TOM GOULD,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF AGRICULTURE; THOMAS VILSACK, in his official capacity as Secretary of Agriculture; ANIMAL AND PLANT HEALTH INSPECTION SERVICE; MICHAEL WATSON, in his official capacity as Administrator of the Animal and Plant Health Inspection Service,<br><br>*Defendants*. | Civil Action No.:  2:24-cv-00143 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND VACATUR

### INTRODUCTION

1.     Plaintiffs The Tennessee Walking Horse National Celebration Association, Kimberly Lewis, and Tom Gould bring this complaint for declaratory and injunctive relief, alleging as follows:

2.     This lawsuit challenges a new rule promulgated by U.S. Department of Agriculture ("USDA" or "Agency") that could wipe out the Tennessee Walking Horse industry.  The rule purports to implement the Horse Protection Act, 15 U.S.C. § 1821 *et seq.* ("HPA"), which prohibits the practice of "soring"—that is, the act of intentionally injuring a horse to enhance the horse's performance in a competition and obtain a competitive advantage in a horse show.  The USDA's

stated goal—to prevent the abhorrent practice of "soring"—is undeniably laudable.  But, at every turn, the draconian measures announced in the new rule bear no rational connection to achieving that goal and exceed the agency's authority under the HPA.  The Agency has taken a scorched earth approach, banning even practices that the Agency *admits* do not cause soring.  In so doing, USDA not only fails to point to scientific evidence providing a rational basis for its decisions, it ignores evidence diametrically opposed to its actions.  The outcome is that the Agency seeks to ban equipment and practices that have been legally permitted for half a century without any regard for the devastating economic consequences its actions will have on an entire industry that provides jobs and enjoyment for tens of thousands of people.  The HPA does not permit this result.

3.      Tennessee Walking Horses are known for their running-walk and proud, high-stepping strut.  Since 1939, thousands of Tennessee Walking Horses have competed at horse shows for fame and prizes.  These shows, both small and large, attract spectators of all ages who come to cheer for their favorite horses and enjoy wholesome fun with their families and friends.

4.      As in any sport, fair competition is necessary to preserve that fun.  To ensure fair competition in horse shows and protect the horses that compete, over 50 years ago Congress passed the HPA to punish an abusive practice called "soring" that was (at that time) a significant problem in the industry.  Soring is a practice used by disreputable trainers who would deliberately make their horses' legs sore in order to exaggerate the horses' gait.

5.      Soring of horses is an abhorrent practice that should be eradicated.  Those who engage in the practice should be punished.  At the same time, those who compete fairly and do not engage in soring should not be collectively punished because of those who do.

6.      In enacting the HPA, Congress made clear that it had twin goals—preventing soring while simultaneously protecting and enhancing fair competition.  The text of the Act makes this

2

clear by stating that "Congress finds and declares that … the soring of horses is cruel and inhumane," and "horses shown or exhibited which are sore, where such soreness improves the performance of such horse, compete unfairly with horses which are not sore."  15 U.S.C. § 1822(1)-(2).

7.      USDA's new rule achieves neither of these goals.  *See* Horse Protection Amendments, 89 Fed. Reg. 39194 (May 8, 2024)) (to be codified at 9 C.F.R. pt. 11) (the "2024 Rule").  Instead, the rule ignores limits on the Agency's authority and takes steps—purportedly in the name of eliminating soring—that will neither eliminate soring nor preserve competition. Among other things, the new rule bans an entire category of competition among Tennessee Walking Horses based on nothing more than admittedly faulty data suggesting that there was a higher incidence of soring taking place in that category of competition.  Rather than staying within the lines Congress set for it and addressing particular practices that actually cause soring, the USDA has arrogated new authority to itself and decided to throw the baby out with the bathwater by banning an entire type of horse show, without regard to the devastating consequences that radical action would have on the industry as a whole.  As addressed more fully in this Complaint, USDA's actions are unlawful for a host of reasons.

8.      *First*, an underlying problem that infects many of USDA's decisions and makes them fundamentally arbitrary and capricious is that the agency relied on data concerning soring violations that is demonstrably unreliable.  For example, USDA decided to ban the use of all action devices (which are chains used on a horse's legs for training and showing) and pads (which help accentuate a horse's gait) based on data purportedly showing that there is a significantly higher incidence of soring among horses that compete using this equipment.  The USDA could rationally base its decisions on a higher *rate* of soring in one category of horses only if it was examining

results based on random samples taken from the categories of horses being compared (those that use action devices and pads and those that do not). But the USDA did not use random samples. Instead, USDA freely admits the data it relies upon to support this ban was obtained from inspection of horses who were already suspected of soring. In other words, the higher percentage of soring that USDA relies upon to support its rule shows only that a high percentage of horses were found to be sore *among horses that were already suspected to be sore.* That is a completely meaningless statistic. In a similar vein, USDA justifies its decision to ban action devices and pads for Tennessee Walking Horses and not other breeds covered by the HPA because it says soring is rare in other breeds. But if offers no data to support this proposition.

9.    *Second*, USDA's decision to ban the use of all action devices and pads is beyond its authority under the HPA and is arbitrary and capricious.

10.    Most importantly, USDA does not dispute that it has no evidence to show that action devices or pads cause soring. That alone is sufficient to establish that the USDA exceeded its statutory authority. The HPA gives the Agency authority to ban only practices that cause soring. But scientific evidence—both old and new—make clear that this equipment does not cause soring.

11.    Nor does the Agency's explanation for its action aid its case. The USDA's sole justification for banning this equipment is that there is a higher incidence of soring violations found among horses that compete using this equipment. In other words, although the equipment concededly does not *cause* soring, the USDA concluded that a higher percentage of owners/trainers who used this equipment were doing *something else* that caused their horses to be sore. And on that basis, the USDA banned the equipment for *everyone*, including the vast majority of owners/trainers who were doing nothing to make their horses sore. That is like saying that there is a higher incidence of doping among baseball players who chew tobacco, acknowledging that

tobacco does not *cause* doping, but banning chewing tobacco in Major League Baseball purportedly in an effort to stamp out doping. USDA's ban is both beyond the scope of USDA's statutory authority—which limits its authority to prohibiting soring—and is arbitrary and capricious.

12.     Worse, the USDA adopted this irrational rule without giving any real consideration to the devastating economic impact it would have on the industry. USDA bans equipment that is essential to the operation of the Performance Division at Tennessee Walking Horse shows—the main attraction at horse shows in the industry. Indeed, the sole difference between the Performance Division and the flat-shod division of competition is the use of action devices and pads. Numerous show owners have said that the new ban would mean that these shows (including the Celebration) could not survive as they currently exist because the main draw of those shows will be gone. USDA casts aside these concerns, but it fails to provide evidence to justify doing so.

13.     *Third*, the new rule bans the use of *any* substance on the legs of a Tennessee Walking Horse during competition, even if that substance has no connection to soring. Once again, the total ban is both beyond the scope of USDA's statutory authority to prevent soring and arbitrary and capricious. Indeed, the USDA total ban includes even substances that are designed to do the *opposite*—to prevent a horse's legs from becoming sore.

14.     USDA justifies its actions by arguing that the total ban is necessary because its prior actions have not stopped a subset of Tennessee Walking Horse owners and trainers from using substances that are prohibited under *existing* rules. But USDA cannot punish the many for the actions of the few, particularly where USDA bases that change on the fact that it *can and has* detected prior violations.

15.     *Fourth*, USDA adopted a new rule purporting to provide criteria for its inspectors to use to determine whether a horse is sore.  This rule replaced the infamous and long-discredited Scar Rule.  The Scar Rule had purported to describe conditions on a horse's skin that inspectors could observe visually and specified that, if an inspector found the conditions present, the horse must be "deemed" sore.  The rule, however, was long subject to criticism that findings were wholly subjective and varied arbitrarily from one inspector to another.  Indeed, only a single finding of soreness was made by a USDA Inspector at the 2017, 2018, or 2019 National Celebration (the marquee event in the industry) when such a finding needed to be confirmed by a second USDA inspector.  And when the USDA commissioned a review by the National Academy of Sciences, NAS found that the criteria the USDA listed could *not* be detected visually and that the rule was unenforceable.

16.     But USDA rejected NAS's call to conduct more research and base any revisions to the Scar Rule on objective criteria grounded in science.  Instead, USDA created a rule that provides even *less* guidance to inspectors and encourages even more subjective decisionmaking as it effectively leaves it to each inspector's unfettered discretion to decide what criteria are sufficient to "deem" a horse sore.  The new rule creates a non-exhaustive list of conditions that it says are "indicative of soring," while at the same time admitting that those conditions "are not, in and of themselves, always necessarily indicative of soring."  89 Fed. Reg. at 39222.  And it ultimately tells inspectors that they should find a horse sore based on "dermatologic conditions *that they* determine are indicative of soring." 2024 Rule § 11.7 (emphasis added).  In effect, USDA provides its inspectors with unfettered discretion to decide what is or is not a sore horse without even any guideposts to use.  As a consequence, it will produce even *more* arbitrary results, because it effectively provides inspectors with no guidance at all.

17.     The rule is not only arbitrary and capricious, it is also unconstitutionally vague—it provides no adequate notice to owners and trainers concerning what criteria will be used to find their horses to be sore, and it imposes no clear guidelines to constrain the unfettered discretion of inspectors. *See Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000) ("Because '[d]ue process requires that parties receive fair notice before being deprived of property,' we have repeatedly held that '[i]n the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability.'") (citation omitted).

18.     *Fifth*, USDA's inspection process does not provide horse owners and trainers with due process.  Most notably, and as found by one court already when considering USDA's existing rules, USDA fails to provide due process because it does not provide owners and trainers with any hearing prior to a horse being disqualified and excluded from a show.  *See McSwain v. Vilsack*, No. 1:16-CV-01234-RWS, 2016 WL 4150036, at *3 (N.D. Ga. May 25, 2016).  Although USDA recognized this problem by requesting public comment to address it, the Agency has failed to actually address the problem in the new rule.  The 2024 Rule still fails to provide any pre-deprivation process.  Owners and trainers whose horses are disqualified pre-show still have no recourse before they are deprived of their recognized property rights.

19.     Worse, the Agency provided only a sham form of process for post-show disqualifications.  The new rule states that owners or trainers may file a challenge within 21 days to appeal a disqualification, at which point the Agency may decide to reverse the decision.  That process is effectively useless.  Even if the owner/trainer wins the appeal, there is no way to retroactively change the fact that the horse was not permitted to compete at the show.  Preventing a horse from competing affects property interests in at least two ways: (i) it prevents trainers from

7

having a chance to win prize money; and (ii) it reduces that horse's value for the owner to sell or breed.

20.     At the same time, the new rule potentially puts owners/trainers in an impossible position.  If they fail to bring a challenge, the disqualification and the underlying basis for it may be deemed beyond challenge.  Given that USDA can file an administrative complaint against horse owners or trainers years after a disqualification, the rule effectively requires owners/trainers to challenge *every* disqualification (even though they can secure no real relief).  If they do not, USDA may argue years later that the disqualification should be treated as final, unreviewable, and beyond challenge, thus leaving those owners and trainers with effectively no defense to an administrative complaint.

21.     *Sixth*, USDA seeks to abolish the participation by the Tennessee Walking Horse industry in the inspection process, which is at odds with Congress's vision of the industry working with USDA to police itself.

22.     In response to 1976 Amendments to the HPA making this vision clear, USDA decided to delegate its authority to private inspectors known as Designated Qualified Persons ("DQPs"), in addition to employing its own Veterinary Medical Officers ("VMOs").  DQPs are licensed by private Horse Industry Organizations ("HIOs").

23.     Now, without evidence or justification, USDA seeks to entirely eliminate the role of DQPs.  It eliminates DQPs and requires a heightened approval process for what USDA dubs "Horse Protection Inspectors" (or "HPIs"), requiring that individuals be veterinarians to qualify. USDA shifts the increased cost of retaining those HPIs to horse show management.

24.     The result of this cost shifting is that the Rule forces a show to opt for inspectors provided by USDA—which it can select at no cost—by making the alternative cost-prohibitive.

*See* 89 Fed. Reg. 39233 (noting that "as third-party contractors, veterinarians authorized as HPIs may indeed charge higher rates than other qualified inspectors without veterinary degrees"). In effect, this system forces the industry out of the picture—which is at odds with Congress's vision of an industry that works with USDA to police itself. Even if it were not at odds with the HPA, USDA's elimination of the DQP program is arbitrary and capricious. It is based on USDA's use of faulty and unreliable data. It shows inconsistent reasoning by requiring that private inspectors have veterinary credentials where USDA inspectors do not. And it purports to rely on decisions from USDA's Office of the Judicial Officer regarding soring, but those cases were not ones in which an Administrative Law Judge made an independent determination that a horse was sore.

25.     *Seventh*, the new Rule is arbitrary and capricious because USDA has failed to consider the devastating economic effect of the rule on the Tennessee Walking Horse industry. In support of its drastic actions, the Agency relies on data that is over a decade old. Reliance on such old data is fundamentally arbitrary.

26.     Nor does USDA consider the ramifications of its ban on equipment that will effectively end the Performance Division of competition. This division is the main draw for the industry and attracts fans and support for most shows, as demonstrated by evidence provided to the Agency in the rulemaking process. USDA waves off these concerns, but it fails to rationally explain any basis for ignoring them.

27.     For all of these reasons, Plaintiffs are entitled to relief. The Court should provide declaratory and injunctive relief to set aside the provisions of the Rule identified above and prohibit Defendants from enforcing it. At the same time, Plaintiffs have repeatedly informed the Agency that they remain willing to work with it to ensure that the twin goals of Congress in enacting the

HPA—preventing soring while preserving and ensuring fair competition in the industry—are achieved.

## PARTIES

28.     Plaintiff The Tennessee Walking Horse National Celebration Association ("TWHNCA" or "Association") is a nonprofit entity that runs the Nation's oldest and most prestigious show for Tennessee Walking Horses. Established in 1939, the National Celebration ("Celebration") is now an eleven-day event drawing more than 100,000 spectators.   The Association also operates two other shows—the Fun Show and the Celebration Fall Classic.

29.     Plaintiff Kimberly Lewis is an owner of 38 Tennessee Walking Horses, all of whom were bred to potentially perform with pads and action devices.  If the new rule were to go into effect, those horses would be unable to compete in the Performance Division of competition, and the value of Ms. Lewis's horses would be wiped out.  Ms. Lewis resides in the Northern District of Texas.

30.     Plaintiff Tom Gould is an owner of two Tennessee Walking Horses, one of which performs with pads and action devices.  If the new rule were to go into effect, that horse will be unable to compete in the Performance Division of competition and its value would be wiped out.  Mr. Gould resides in the Northern District of Texas.

31.     Defendant U.S. Department of Agriculture is an agency of the United States government headquartered in Washington, D.C.

32.     Defendant Tom Vilsack is the Secretary of Agriculture.  His office is located at 1400 Independence Avenue SW, Washington, D.C. 20250.  He is sued in his official capacity.

33.     Defendant Animal and Plant Health Inspection Service (APHIS) is a federal government agency housed within the U.S. Department of Agriculture.  It is headquartered in Riverdale, Maryland.

34.     Defendant Michael Watson is the Administrator of the Animal and Plant Health Inspection Service.  His office is located at 4700 River Road, Riverdale, MD 20737.  He is sued in his official capacity.

## JURISDICTION AND VENUE

35.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1346, and 2201; 5 U.S.C. § 702; and 15 U.S.C. § 1825(d)(6).

36.     Venue is proper under 28 U.S.C. § 1391(e)(1) because at least one Plaintiff resides in this judicial district.

## FACTUAL AND LEGAL BACKGROUND

### I.     The Tennessee Walking Horse Industry

37.     Tennessee Walking Horses are prized for their high-stepping gait, a distinctive walk that is the fruit of careful breeding and patient training.  At exhibitions, Tennessee Walking Horse owners and trainers compete for prize money that is awarded to the horse with the most elegant, high-stepping strut.  These horse shows have attracted spectators of all ages who come from around the world to cheer for their favorite horses and enjoy wholesome fun with their families and friends.

38.     Horse shows benefit not only those spectators who come to enjoy the fun, but local communities as well.  Spectators, horse owners, and trainers who come from out of town provide revenue boosts to the local economy by visiting hotels, restaurants, feed and tack stores, and purchasing fuel for vehicles.  This additional business generates tax revenue for local governments.

Indeed, the former Mayor of Shelbyville, Tennessee, where the Tennessee Walking Horse National Celebration is held every year, stated that "[t]he Celebration is the single biggest economic driver to the City of Shelbyville."  *See* Tennessee Walking Horse Nat'l Celebration Association, Comment Letter on Horse Protection Amendments App. Ex. 46 (Oct. 20, 2023) ("TWHNCA Comment"), https://www.regulations.gov/comment/APHIS-2022-0004-8788.  And shows benefit charities who raise money based on Tennessee Walking Horse shows.  *Id.* at 52.

39.    The Association owns and operates the largest Tennessee Walking Horse show in the country—the Celebration.  The Celebration takes place in Shelbyville, Tennessee each year over eleven days in late summer.  The Celebration has taken place every year since 1939 and each year it crowns the Tennessee Walking Horse World Grand Champion.  The Association also owns and operates the Fun Show, which occurs every year in Shelbyville in the spring, and the Celebration Fall Classic, which occurs every year in autumn in Shelbyville.  The Association's ownership and production of these shows make it the most significant participant in the Tennessee Walking Horse show industry.

40.    Plaintiffs in this matter, like most in the industry, cherish Tennessee Walking Horses.  Indeed, their love of the breed is why they and other participants in the industry train Tennessee Walking Horses, show Tennessee Walking Horses, and put on Tennessee Walking Horse shows and exhibitions.  The Association and industry are committed to assuring the welfare of Tennessee Walking Horses, and of horses in general.  That includes a commitment to eliminating the practice of soring completely.  But that commitment also means ensuring that regulations under the HPA are fair to those who do not engage in soring.

## II.    The Horse Protection Act

41.    Unfortunately, some disreputable trainers have historically avoided the careful training process by using an abusive practice called "soring" to exaggerate a horse's gait.  Soring is an abhorrent process that should be eradicated, and those who engage in the practice should be punished.  At the same time, trainers and owners who do not engage in soring should not be collectively punished because of those who do.

42.    In 1970, at a time when soring was much more prevalent in the industry, Congress passed the Horse Protection Act, 15 U.S.C. § 1821 et seq. ("HPA" or "Act") to combat the practice. In passing the HPA, Congress made clear that the twin goals of the Act were to prohibit the practice of soring horses and simultaneously to protect fair competition.  The text of the Act makes this clear by stating that "Congress finds and declares that ... the soring of horses is cruel and inhumane," and "horses shown or exhibited which are sore, where such soreness improves the performance of such horse, compete unfairly with horses which are not sore."  15 U.S.C. § 1822(1)-(2).  *See also Thornton v. U.S. Dep't of Agric.*, 715 F.2d 1508, 1511 (11th Cir. 1983) ("The Horse Protection Act was adopted to further two public purposes: the altruistic one of protecting the animals from an unnecessary and cruel practice and the economic one of eliminating unfair competition from sored pseudo-champions that could fatally damage the Tennessee walking horse industry.").

43.    Pursuant to 15 U.S.C. § 1824, it is unlawful to (among other things): show or exhibit, in any horse show or horse exhibition, any horse which is sore; enter, for the purpose of showing or exhibiting in any horse show or horse exhibition, any horse which is sore; or, sell, auction, or offer for sale, in any horse sale or auction, any horse which is sore.  *See id*. § 1824(2). Depending on the circumstances, the HPA also makes it unlawful for the management of a horse

show, horse exhibition, horse sale, or horse auction to fail to disqualify any horse that is sore from an event. *See id.* § 1824(3)-(6).

44.     The HPA expressly defines the term "sore."  Specifically, when used to describe a horse, "sore" means:

> (A) an irritating or blistering agent has been applied, internally or externally, by a person to any limb of a horse,
>
> (B) any burn, cut, or laceration has been inflicted by a person on any limb of a horse,
>
> (C) any tack, nail, screw, or chemical agent has been injected by a person into or used by a person on any limb of a horse, or
>
> (D) any other substance or device has been used by a person on any limb of a horse or a person has engaged in a practice involving a horse,
>
> and, as a result of such application, infliction, injection, use, or practice, such horse suffers, or can reasonably be expected to suffer, physical pain or distress, inflammation, or lameness when walking, trotting, or otherwise moving, except that such term does not include such an application, infliction, injection, use, or practice in connection with the therapeutic treatment of a horse by or under the supervision of a person licensed to practice veterinary medicine in the State in which such treatment was given.

15 U.S.C. § 1821(3) (formatting modified).

45.     To combat soring, the Horse Protection Act requires horse inspections.  Under the Act as originally enacted, these inspections were carried out by representatives of the Secretary of Agriculture.  *See* Pub. L. 91-540 § 5, 84 Stat. 1405. Those "in charge of any horse show or exhibition" were tasked only with "keep[ing] such records as the Secretary may by regulation prescribe" and allowing government personnel "access to and opportunity to inspect and copy such records." *Id.* at § 5, 84 Stat. 1406.  Horse show management had no role in selecting or training horse inspectors.

46.     Due to limited personnel and resources, government officials could inspect only a small fraction of the Tennessee Walking Horses shown each year at competitions.  H.R. Rep. No.

14

1174, at 5 (1976).  Congress therefore amended the HPA in 1976 to give show management a significant role in the inspection process.  *See* Pub. L. 94-360, 90 Stat. 915.  For any horse that is sore or that has been deemed sore by a duly appointed inspector, Congress decided that it would be the responsibility of the "management of any horse show or horse exhibition" to ensure that horse is not sold, auctioned, exhibited, or shown in competition.  *Id.* at § 5.

47.    Congress also tasked the Secretary with prescribing regulations to allow "the appointment by the management of any horse show ... persons qualified to detect and diagnose a horse which is sore or to otherwise inspect horses for the purposes of enforcing this act."  *Id.* (codified at 15 U.S.C. § 1823).  While the Secretary could continue to appoint inspectors, Congress envisioned that horse inspections would also be conducted by personnel hired by horse show management, not the Secretary.

48.    In his signing statement, President Ford recognized Congress's intent in passing the amendments to the HPA by stating that real reform could be achieved only by "compelling this industry to police itself."  Statement on Signing the Horse Protection Act Amendments of 1976, 3 PUB. PAPERS 1999, 2013 (July 14, 1976).  Although he wished Congress had done more to place the "onus on the industry," *id.*, he signed the law and his administration pledged to "work with [the] Agriculture [Department] to gain greater support from within the industry for self-policing and compliance." *See* Memorandum for the President from James M. Frey at 5, Office of Management and Budget (July 8, 1976) (recommending President Ford approve the HPA amendments because "the key to a successful program centers around industry involvement").

49.    Thus, the HPA amendments were understood to give private industry a key role in enforcing the Act in coordination with USDA.  *See* 43 Fed. Reg. at 18514 ("The Horse Protection

Act Amendments of 1976 ... significantly increased the responsibilities of management of all horse shows.").

### III.    The U.S. Department of Agriculture And The Horse Protection Program

50.    The HPA gives the Secretary of Agriculture rulemaking authority to "carry out" the Act.  15 U.S.C. § 1828.  Pursuant to this authority, USDA has promulgated regulations governing how and when a horse is determined to be sore and when that horse is disqualified from competition.  USDA has also promulgated regulations for the appointment of horse inspectors and regulations governing recordkeeping requirements for show management.

51.    In response to the 1976 Amendments to the HPA, USDA passed regulations allowing for the appointment of private inspectors known as Designated Qualified Persons ("DQPs") that, in addition to employing its own Veterinary Medical Officers ("VMOs"), would be permitted to inspect horses at shows and determine when they are sore.  DQPs are licensed by private Horse Industry Organizations ("HIOs").  USDA regulations provide that HIOs are certified by the USDA to train and license DQPs.  Both VMOs and DQPs examine horses at competitions in pre- and post-show inspections.

52.    In accordance with the 1976 Amendments and its creation of the DQP Program, USDA recognized that its role was limited to setting inspector standards.  The task of selecting and appointing individuals *meeting* those standards was the task of horse show management.  In other words, as recognized by the Agency, the "intent of Congress and the purpose of this provision [15 U.S.C. § 1823] is to encourage horse industry self-regulatory activity." 43 Fed. Reg. at 18514; *accord* Definition of Terms and Certification and Licensing of Designated Qualified Persons, 44 Fed. Reg. 1558, 1560 (Jan. 5, 1979); *accord* Horse Protection Act; Requiring Horse Industry Organizations to Assess and Enforce Minimum Penalties for Violations, 77 Fed. Reg. 33607,

33608 (June 7, 2012) ("The intent of Congress and the purpose of this provision is to encourage horse industry self-regulatory activity ….")  In response to comments at the time that the DQP program was "unworkable, unnecessary, expensive, and should be dropped," USDA explained that the program was necessary because, otherwise, "the intent and purpose of the Act would not be satisfied."  44 Fed. Reg. at 1560.

53.  USDA also issued a number of regulations governing when horses would be deemed sore and disqualified.  For example, in 1979, it passed the Scar Rule, which sets forth criteria under which USDA will determine that "a horse is sore."  9 C.F.R. § 11.3 (promulgated at 44 Fed. Reg. at 25180).  Also in 1979, USDA issued a regulation banning the use of any substance on a horse's legs, except for lubricants that would prevent a horse from becoming sore due to friction from devices used during a show.  9 C.F.R. § 11.2(c) (promulgated at 44 Fed. Reg. at 25179).  In 1988, USDA enacted a regulation prohibiting action devices—chains, rollers, or other devices placed on the lower portion of a horse's leg—that weigh more than six ounces.  9 C.F.R. 11.2(b)(2) (promulgated at 53 Fed. Reg. at 14782).  The same regulation approved the use of pads and wedges that are currently used today in competition.  *Id.*

**A.  The Scar Rule (9 C.F.R. § 11.3).**

54.  Decades ago, prior to the enactment of the HPA in 1970, "lesions in sore horses were grossly evident and located primarily on the anterior skin of the dorsal and palmar (caudal) pastern regions."  National Academies of Sciences, Engineering, and Medicine, A Review of Methods for Detecting Soreness in Horses 2, 84 (2021), https://doi.org/10.17226/25949 ("NAS Report").  In other words, "[s]cars were very likely present in the lesions seen on sore TWHs before the enactment of the HPA."  *Id.*

55.     In 1979, USDA promulgated the Scar Rule, 9 C.F.R. § 11.3, in response to these

concerns.  The Scar Rule sets out criteria which, if found on a horse following a visual inspection

and palpation of the horse's legs, would require an inspector to deem the horse to be sore.  The

rule provides in relevant part:

> Horses subject to this rule that do not meet the following scar rule criteria shall
> be considered to be "sore" and are subject to all prohibitions of section 5 of the
> Act. The scar rule criteria are as follows:
>
> (a) The anterior and anterior-lateral surfaces of the fore pasterns (extensor
>    surface) must be free of bilateral granulomas, other bilateral
>    pathological evidence of inflammation, and, other bilateral evidence of
>    abuse indicative of soring including, but not limited to, excessive loss
>    of hair.
> (b) The posterior surfaces of the pasterns (flexor surface), including the
>    sulcus or "pocket" may show bilateral areas of uniformly thickened
>    epithelial tissue if such areas are free of proliferating granuloma tissue,
>    irritation, moisture, edema, or other evidence of inflammation.

56.     The Scar Rule was premised on the idea that evidence of soring (scars) would be

observable to the naked eye even if the horse was not currently sore.

57.     In 2017, the USDA and the Tennessee Walking Horse Industry jointly

commissioned a review of USDA's Scar Rule by the National Academy of Sciences, Engineering,

and Medicine.  This review was intended to analyze whether the USDA's regulations were "based

on sound scientific principles" and "can be applied with consistency and objectivity."  NAS Report

at 17.  As NAS recognized, times had changed since the HPA was enacted more than half a century

ago and since the Scar Rule was issued more than 40 years ago, and scars and lesions like those

previously found are rare or non-existent today.

58.     Most importantly, NAS found that the criteria used by the existing Scar Rule were

unreliable and not based in science.  In particular, NAS criticized the Rule's reliance on

identification of a "granuloma."  In NAS's view, not only is there no evidence that granulomas

were present in horses that are "sore" within the meaning of the Act, but the Rule asked inspectors to identify a granuloma through a gross examination when granulomas "cannot be determined to be present by gross examination alone." *Id.* at 83. Because NAS concluded that a "microscopic examination" is "absolutely necessary" to identify granulomas, it found the existing Scar Rule to be unenforceable as written. *Id.*

59.     To ensure that any revisions were based in science, NAS called for studies to determine whether any visually observable conditions on a horse's skin are actually evidence of soring. *See, e.g.*, NAS Report at 10 ("More studies are needed to determine if training practices that can cause soreness in TWHs also result in lichenification … These studies might elucidate at what point, if at all, during training epidermal hyperplasia and lichenification would develop and what particular training practices would cause these conditions."); *id.* ("Studies are also needed to determine if epidermal thickening (hyperplasia) and lichenification are solely caused by the action devices worn by TWHs.").

60.     As discussed below, although USDA has decided to revise the Scar Rule, it has not conducted the additional studies recommended by NAS to determine whether observable conditions on a horse's skin are evidence of soring. USDA has also failed to point to any other scientific evidence to support its actions.

### B.     Disqualification Of Horses Without Due Process.

61.     As noted above, pursuant to 15 U.S.C. § 1823, horse show managers are required to disqualify a horse from competition if it is sore or "if the management has been notified by a person appointed in accordance with [USDA] regulations … or by the Secretary that the horse is sore." *Id.* at § 1823(a). Accordingly, once horse show management is informed by a USDA

appointee that a horse is sore—whether that determination is made pre-show or post-show—management must disqualify that horse.

62.    Through regulation, USDA controls the inspection process by which its appointees examine a horse to determine whether it is sore. Those regulations are set forth in 9 C.F.R. §§ 11.4 ("Inspection and detention of horses") and 11.21 ("Inspection procedures for designated qualified persons").

63.    Critically, these regulations do not provide any type of hearing prior to a horse being disqualified from competition, nor do they provide any mechanism by which an owner or trainer of a disqualified horse can contest the disqualification after the fact. A disqualified horse's trainer or owner may challenge a disqualification only if the disqualification becomes the subject of an administrative complaint, which occurs only if USDA decides in its discretion to bring one. *See* 15 U.S.C. § 1825(b).

64.    In the many cases where USDA disqualifies a horse but does not pursue an administrative complaint, a horse owner and trainer have no recourse whatsoever to challenge that disqualification. And, in many instances, horses are disqualified pre-show, depriving an owner and trainer of *the right to compete at all*.

65.    At least one court has recognized that the lack of any ability to be heard before or after such disqualifications deprives horse owners and trainers of their due process rights. In *McSwain v. Vilsack*, No. 1:16-CV-01234-RWS, 2016 WL 4150036, at *4 (N.D. Ga. May 25, 2016), the court recognized that horse owners and trainers have a liberty and property interest in showing a horse in competition without unreasonable government interference and held that the USDA's inspection process violates those owner and trainers' property interests without adequate

20

due process protection.  *Id.* at *4-*5 (citing *Fleming v. U.S. Dep't of Agric.*, 713 F.2d 179 (6th Cir. 1983)).

66.     The *McSwain* Court held that the owner and trainer plaintiffs there did "not have the opportunity to appeal or otherwise be heard prior to their horse's disqualification."  *Id.* at *5. Although regulations permit USDA to seek a civil or criminal penalty after a violation, the decision whether to pursue a penalty is entirely within USDA's discretion—and USDA historically has rarely sought such penalties.  Thus, the court found that any post-deprivation process provided in connection with a penalty proceeding could not cure the due process violation, because "there is no guarantee of post-deprivation process."  *Id.*  The court concluded, that "[t]he disqualification of [Plaintiffs' horse] marks the point of deprivation and Plaintiffs have no guarantee of either pre- or post-deprivation process."  *Id.*

67.     While *McSwain* highlighted the significant deprivation of due process that occurs when a horse is disqualified pre-show and prevented from competing, horse owners and trainers are deprived of the same due process rights when their horses are permitted to compete but are disqualified post-show.  In either case, USDA does not provide horse owners and trainers with the ability to contest those disqualifications.

## IV.     The 2024 Final Rule.

68.     On May 8, 2024, USDA issued a new rule "amending the horse protection regulations" to purportedly "strengthen the Agency's efforts to protect horses from the cruel and inhumane practice of soring as the Act requires and by so doing eliminate unfair competition."  89 Fed. Reg. at 39194.

69.     Unfortunately, as explained to the Agency in comments submitted by the Association and many others, the new Rule creates new regulations that (i) have no demonstrated

causal relationship to soring, (ii) exceed the USDA's statutory authority, and (iii) will completely wipe out entire areas of legitimate competition. At bottom, the Agency is trying to eliminate the Tennessee Walking Horse competition to prevent soring.

70. This lawsuit raises challenges to specific failures in the 2024 Rule, as addressed below, that make it unlawful.

### A. Unreliable Data Undermines Nearly All Of The Rule's Substantive Changes.

71. One core issue underlies nearly all of the Rule's substantive changes: the Agency's reliance on admittedly unreliable data.

72. As an initial matter, USDA purports to rely on an OIG Report issued fourteen years ago in 2010—which itself relied on data collected from 34 shows in 2008. But that report cannot support a change in regulations now. *See* 89 Fed. Reg. at 39195, 39198. The Agency cannot base a change in the regulatory regime, especially a change as radical as banning all action devices and pads entirely, on data that is fifteen years old. *See, e.g.*, *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1408 (D.C. Cir. 1985) ("Whether or not DOE acted reasonably in issuing rules in 1982 and 1983 based on 1980 information, we think it would be patently unreasonable for DOE to begin further proceedings in the last half of 1985 based on data half a decade old.").

73. Apart from the OIG Report, USDA also purports to rely on data from 2017 to 2022 contained in tables purportedly showing that "incidents of soring remain statistically elevated in the Performance Division of the Tennessee Walking Horse and racking horse industry." *See* 89 Fed. Reg. at 39211.

74. But that data is—by USDA's own admission—unreliable. That is so for at least three reasons.

22

i.      USDA's Data Is Not The Product Of A Random Sample.

75.     *First*, USDA's data is fatally undermined because it is not based on a random sample.  USDA admits this is the case.  In the preamble to the 2024 Rule, USDA acknowledges that the sample of horses inspected by VMOs (from which it makes its findings) was not randomly selected and instead that "that sample presented indications of soring prior to inspection."  89 Fed. Reg. 39197-98.  In other words, the sample of horses was *selected* based on the horses already showing signs of soring.

76.     Of course, "it is an elementary precept of statistics (and common sense) that conclusions cannot be based on examination of a sample drawn from a larger body of data if the sample is not truly random.  Where the sample has not been drawn randomly, selection bias interferes with the reliability of any conclusion based on the sample."  TWHNCA Comment at 12 (citing Sharon L. Lohr, *Sampling: Design and Analysis* 6-10 (3d ed. 2022)).

77.     USDA's assurance that it has *other* data (withheld from public view and not mentioned in the Proposed Rule) that backs up its position cannot save its reliance on the data. *See* 89 Fed. Reg at 39198 ("After 50 years of enforcing the HPA, APHIS has amassed an aggregate body of data indicating the Tennessee Walking Horse and racking horse industry is disproportionately likely to sore their horses, and DQPs in the industry are disproportionately unlikely to detect the soring.").  USDA's assurance that the public can "trust it" is not enough.

78.     Because the data is unreliable, USDA's attempt to issue regulatory changes based on that data is inherently arbitrary.  As discussed below, each of the changes relying on that data should be vacated for this reason.

ii.       USDA's Data Was Obtained By A Subjective Inspection Protocol.

79.     *Second*, USDA's data is unreliable because it was obtained by a subjective inspection protocol that does not yield reproducible results.

80.     As recognized by the NAS Report (and as the Association has warned the Agency for years), the horse inspection process implemented by USDA is so subjective that two inspectors inspecting the same horse can come to widely divergent conclusions about whether or not a horse is sore.  Because the protocol cannot produce repeatable results and is unreliable, USDA cannot use data *obtained* from that protocol as evidence that soring persists.

81.     The unreliability of USDA's current inspection process is demonstrated first and foremost by the fact that USDA's own inspectors cannot agree on whether an individual horse is sore.  As the USDA's administrative law judges have repeatedly noted, "[i]t is not unusual for a horse not to be found sore at one examination but found to be sore at a later examination during the same show."  *In re Timothy Fields and Lori Fields*, 54 Agric. Dec. 215, 219 (1995).  *See also In re Justin Jenne*, 73 Agric. Dec. 501, 508 (2014); *In re: Jackie McConnell, et al.*, 44 Agric. Dec. 712, 725-26 (1985).

82.     Data from inspections backs up these ALJ findings.  For example, at the 2016 Celebration, when a second USDA VMO re-inspected horses after an initial VMO finding of a violation, that second VMO disagreed with the initial decision at a staggering rate.  Specifically, the second VMO disagreed that there was an HPA violation in 22.67% of cases.  And the second VMO made inconsistent findings from those of the first VMO in 52% of cases.  TWHNCA Comment p. 16.  What makes these statistics even more striking is that the second VMO often watched the first VMO conduct his or her inspection.

24

83. The 2016 Celebration findings are bolstered by those made in the NAS Report. As that report explains, USDA implemented a requirement in late 2016 that a horse found in violation of the HPA must be re-inspected by a second VMO, if present. *See* NAS Report at 32. As NAS observed, when this requirement was introduced, "the number of horses found to be unilaterally or bilaterally sore *dramatically declined*." *Id.* (emphasis added). Indeed, as noted by NAS, not a single finding of bilateral soreness was made by a VMO at the 2017, 2018, or 2019 TWH National Celebration, and only one finding of unilateral soreness was made over the same period. *Id.* In other words, when there was a requirement that two inspectors had to *agree* in order to find a horse sore, there were essentially zero findings at the Celebration three years in a row.

84. What the data in the table above and the description in the NAS Report shows is that, when two different inspectors examine the same horse, they cannot agree on the same conclusion a remarkable percentage of the time—up to 52% of the time based on the 2016 data.

85. Of course, a so-called "test" that cannot generate reproducible results—that cannot yield a consistent result when two examiners inspect the same horse—cannot be credited as a reliable way to identify evidence of soring.

            iii.            USDA Points To No Data Regarding Soring (Or The Absence Of Soring) In Other Breeds To Warrant Differential Treatment.

86. *Third*, USDA's decision to treat Tennessee Walking Horses and Racking Horses differently from other breeds covered by the HPA also raises concerns based on faulty use of data. USDA does not point to (and does not appear to have) any data showing violation rates for other breeds to use as a basis for comparison.

87. USDA suggests that it does not need to consider data for other breeds because it (once again) has *other* data that is hidden from public view that supports its position. 89 Fed. Reg. at 39200 ("While all horse breeds are subject to provisions of the Act … USDA has 50 years of

data showing a documented record of soring in these breeds that simply does not exist for other breeds.").  But USDA fails to disclose this data or provide anything to support its position other than an assurance that the public should "trust it."

88.     Because USDA has no data or evidence that soring "simply does not exist for other breeds," 89 Fed. Reg. at 39200, it cannot treat those breeds differently.

**B.     The Ban On Action Devices And Pads Is Contrary To The HPA And Arbitrary And Capricious.**

89.     The 2024 Rule's ban on the use of action devices used by Tennessee Walking Horses and racking horses during competition is both contrary to the HPA and arbitrary and capricious.

i.     <u>The Ban On Action Devices And Pads Is Contrary To The HPA Because It Bans The Use Of Equipment That Has Not Been Shown To Cause Soring.</u>

90.     The HPA grants USDA authority only to prohibit the use of items or practices that cause a horse to suffer (or that can reasonably be expected to cause a horse to suffer) pain, distress, inflammation or lameness when walking, trotting or otherwise moving.  The Act does not prohibit practices or items that do not cause soring, and it does not provide the USDA authority to prohibit practices or items that do not cause soring.

91.     The proposed ban on action devices exceeds USDA's statutory authority because the use of action devices does not cause soring.  USDA actually concedes that action devices do not cause soring.  *See* 89 Fed. Reg. at 39212 ("We did not state in the proposed rule that pads, wedges, action devices, and toe extensions are always necessarily and *per se* associated with soring. While they can cause soring, as we stated in the proposed rule, action devices and pads are sometimes used for proprioceptive purposes during training of Morgans, American Saddlebreds, and other gaited breeds.").

26

92.     The experts and studies on which USDA relies to support its rule further establish that action devices do not cause soring.  *See, e.g.*, *Thermography in Diagnosis of Inflammatory Processes in Horses in Response to Various Chemical and Physical Factors: Summary of the Research from September 1978 to December 1982*, prepared by Dr. Ram C. Purohit, Associate Professor of Veterinary Medicine at Auburn University (the "Auburn Study") ("Thus, it was concluded that the use of 2, 4, and 6 oz. chains for the duration of 2 to 3 weeks did not produce any harmful effects to the horses' legs, with exception to some loss of hair from 6 oz. chains in the pastern areas."); NAS Report at 81 ("Equine veterinarians on the committee noted that skin changes seen on the pasterns of TWHs are not observed on the pasterns of other breeds of horses (Arabians, American Saddlebreds, Morgan horses), which also train with action devices such as chains and rollers but do not wear them when shown at competitions.").

93.     Any lingering doubts are erased by the author of the Auburn study USDA relies on. In describing the study's conclusions, Dr. Ram Purohit explained:

> Regarding action devices, ***the data provided no evidence that chains of eight ounces or less used from three to five weeks in a normal, non-scarred horse produced inflammation or soreness.  Neither the Auburn study nor the [Nelson] study provided any evidence to support the claim that chains of eight ounces or less or pads of three to four inches were the cause of soring***.

TWHNCA Comment App. Ex. 21 (Purohit Aff.) (emphasis added).

94.     Nor can USDA justify the ban on action devices by arguing that it "reduces the motivation ***to apply a chemical irritant to the pastern***."  89 Fed. Reg. at 39214. (emphasis added). That approach exceeds the USDA's limited statutory authority and would permit the Agency to eliminate any practice, however safe in itself, that seems to be associated in some loose statistical way with the members in the industry who engage in *other* practices that are already separately prohibited and that perpetuate soring.

27

95.     USDA's support for the ban on pads is equally lacking.  It cites the Auburn report to suggest that raising a horse's heels through pads alone can result in signs of inflammation.  88 Fed. Reg. at 56938.  But USDA's reliance on the Auburn study to support its ban on pads is once again fatally undercut by statements of the study's author, Dr. Purohit.  In connection with an earlier rulemaking, he explained:

> To the extent that this interim rule and the proposed permanent rule are based upon the Auburn study which I authored, I feel compelled to point out that the principal objectives of our experiment were the study of chemical soring and action devices. Only preliminary observations were made on the effects of pads per se, and no conclusions were drawn.  Any other construction of our data would be a misinterpretation.  ***Horses with normal shoeing and padding that were examined by these evaluation procedures did not provide any evidence of soreness of induced inflammation.***

TWHNCA Comment App. Ex. 21 (Purohit Aff.) (emphasis added).

96.     USDA's former Chief Staff Veterinarian for Horse Protection matters from 1973 to 1978, Dr. Lois Hinson, also stated unequivocally in an affidavit that: "These clinics definitively proved that pads per se do not cause inflammation or soring in the hooves of horses nor do they cause inflammation in the tendons of a horse."  *Id.* App. Ex. 22 (Hinson App.) at 3. *See also* H.R. Rep. No. 91-1597, 91st Cong., 2d Sess. 2-2 (1970), at 3 (explaining that reference to the use of wedges was deleted from the definition of "soring" because wedges "are a normal adjunct to training and do not involve cruel or inhumane treatment.").

97.     There are no published scientific studies concluding that the use of pads *per se* causes horses to be sore.  *See* App. Ex. 18 (2016 Statement of Dr. Paul Stromberg) at ¶¶ 9-13. USDA cites none.

98.     In the absence of any scientific evidence to support the ban on action devices and pads, USDA once again turns to statistical correlation.  USDA argues that "[s]oring is so disproportionately likely in Tennessee Walking Horses and racking horses wearing pads that the

prohibition is necessary in order to prevent soring." 89 Fed. Reg. at 39216. But—again—this logic gets things backwards. Simply showing a *correlation* between horses that compete wearing pads and incidences of soring does not show that pads *cause* soring. By USDA's logic, it could ban saddles because Tennessee Walking Horses and racking horses all wear saddles when competing.

99.     Because USDA's bans exceed their authority under the HPA, they must be vacated.

ii.     The Ban On Action Devices And Pads Is Arbitrary and Capricious.

100.     In addition to exceeding USDA's authority under the HPA, the proposed ban on action devices and pads would be arbitrary and capricious. USDA "offer[s] an explanation for its decision that runs counter to the evidence before the agency" and "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *National Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1110 (D.C. Cir. 2019).

101.     *First* and foremost, the ban is arbitrary and capricious because (as discussed above) the Agency has failed to support its decision with any evidence or reasoned explanation. The failure of USDA to conduct any studies or point to evidence indicating that soring is caused by action devices and pads is a failure to engage in reasoned decisionmaking. Where the only evidence available to the Agency shows that action devices and pads *do not* cause soring, the Agency has failed to provide any rational basis for banning the equipment.

102.     If anything, USDA's rationale—that action devices and pads are used by a large percentage of trainers and/or owners who are also engaged in *separate* practices that cause soring—is undermined by its own data. USDA suggests that its own inspectors reported a 34.1% rate of soring non-compliance within the Performance Division of competition at shows in FY-2022. 89 Fed. Reg. at 39200. Even if that rate accurately reflected the rate of soring incidents

among horses wearing action devices and pads (as discussed above, it does not, both because USDA did not use a random sample of such horses and because its subjective inspection criteria does not provide reliable data), USDA has shown only that 34.1% of horse trainers or owners in the Performance Division did something *other* than using action devices or pads to cause soring.

103.    Of course, USDA does not account for the 65.9% of horse trainers in FY-2022 who (according to this data) were not involved in soring.  By eliminating the entire Performance Division, however, USDA punishes the entire group for the actions of a few.  This form of collective punishment is fundamentally irrational and runs counter to the purposes of the statute. *See* S. Rep. No. 418, 94th Cong., 1st Sess. 3 (1975), U.S. Code Cong. & Admin. News 1976, 1696 ("[USDA's] efforts to eliminate intentional injuring of horses should not be expanded to affect their competitive position within the walking horse class.").

104.    *Second*, USDA's differential treatment of Tennessee Walking Horses and other HPA breeds is arbitrary and capricious.  Indeed, the "law does not permit an agency to grant to one person the right to do that which it denies to another similarly situated." *Marco Sales Co. v. FTC*, 453 F.2d 1, 7 (2d Cir. 1971).  Here, the USDA proposes to ban action devices and pads only on Tennessee Walking Horses and Racking Horses, but not other breeds.

105.    USDA justifies this differential treatment by asserting that the Performance Division for Tennessee Walking Horses "has a disproportionately high incidence of soring relative to other breeds and even to flat-shod Tennessee Walking Horses and racking horses."  89 Fed. Reg. at 39216.  But USDA offers no evidence for its conclusion that other HPA breeds do not sore their horses.  And the Agency has *itself* acknowledged that other breeds *do* engage in soring.  *See* 89 Fed. Reg. at 39212 ("The Act prohibits soring in all breeds of horses, which is why the U.S. Department of Justice was able to successfully prosecute a soring violation in a Spotted Saddle

Horse.").  *See also* TWHNCA Comment at 29 (documenting other instances showing APHIS awareness of soring in other breeds).

106.    Indeed, for this very reason, other breeds have protocols in place to ensure their horses are not sored, protocols that would be unnecessary if soring did not occur in other breeds. See American Quarter Horse Association, *Performance Alteration Testing Procedures* (Oct. 13, 2022), https://perma.cc/G4WS-QB6U ("[I]n an effort to continue protecting the welfare of the American Quarter Horse … [a]ll exhibitors qualified for finals in designated classes will be required to have thermographic images taken of both sides of their horses' neck prior to competing in the finals.").  The American Quarter Horse Association ("AQHA") also maintains a publicly available list identifying individuals who have been disciplined for animal welfare violations.  See TWHNCA Comment App. Ex. 25 (AQHA Disciplinary Actions List) (identifying numerous probations and suspensions due to inhumane treatment of a horse).

107.    Instead of relying on actual data, USDA justifies this unequal treatment "based on our informed knowledge about the practices of all breeds performing or exhibiting in the United States," through which it "know[s] that soring in breeds other than Tennessee Walking Horses and racking horses confers no significant performance advantage and is therefore rarely if ever practiced."  88 Fed. Reg. at 56937.  But USDA's assurances are not a substitute for actual data.

108.    *Third*, and finally, as discussed more fully *infra* in Section IV.G, USDA has completely failed to conduct a proper cost-benefit analysis for the proposed ban on action devices and pads.  That ban is tantamount to prohibiting the entire Performance Division of competition at Tennessee Walking Horse events.  The Performance Division, however, accounts for roughly 70% of entrants at a major show like the Celebration and drives attendance (and therefore revenues) at most shows.  *See* TWHNCA Comment App. Ex. 24 (Wells Decl.) at ¶¶ 12-13. The USDA's

complete failure to consider the impact on the industry of eliminating this entire category of competition demonstrates that the agency "failed to consider an important aspect of the problem" before it.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983).

     iii.  <u>A Ban On All Action Devices And Pads Would Be A Regulatory Taking.</u>

  109.  The Takings Clause of the Fifth Amendment of the U.S. Constitution provides that when the federal government takes private property for a public use, it must provide just compensation.

  110.  Under the Supreme Court's Takings jurisprudence, a taking occurs not only when the government physically invades or takes hold of real or personal property.  It can also occur when government regulation deprives an owner of "all economically beneficial use" of the property.  *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1018 (1992).  Here, if USDA proceeds with the ban, its actions would amount to such a taking because it would destroy all the value in TWHs trained to compete in the Performance Division by essentially banning the sport in which they compete.

  111.  Top-notch horses competing in the Performance Division will sell for as much as $350,000 to $500,000, with a few selling for over $1,000,000.  *See* TWHNCA Comment App. Ex. 27 (Williams Decl.) at ¶ 3.  But, as a practical matter, horses that have been specifically bred and trained to compete with action devices and pads cannot simply be re-trained to compete as a flat-shod horse.  Numerous horse trainers have attested to this fact.  *See* TWHNCA Comment at 32 (citing trainer affidavits).

112. By banning action devices and pads and eliminating the Performance Division entirely, USDA would be eliminating the sport in which horses shown in the Performance Division have been bred and trained to compete. It would thereby wipe out the value of such horses.

113. USDA discounts the numerous affidavits provided by horse trainers indicating that many—if not most—of the horses in the Performance Division would not be able to be retrained to compete following the 2024 Rule taking effect. *See* TWHNCA Comment at 32. In response, the Agency explains that "this and other commenters provided no specific evidence that Performance division horses trained to perform with the use of pads and action devices cannot perform well without them." 89 Fed. Reg. at 39217. But the trainer affidavits attached to and cited in the Association's comment provide exactly that evidence. *See, e.g.*, TWHNCA Comment App. Ex. 30 (Statement of Hannah Pulvers-Myatt) at ¶ 7 ("[O]nly a few TWH performance show horses can flat shod with any level of success. In my opinion, only about one out of every 20 TWH performance horses can successfully transition to becoming a good flat shod TWH show horse.").

114. Because the new rule deprives Performance Division owners and trainers of all value from their horses, it constitutes a regulatory taking.

           **C.**    **The Ban On All Substances Is Contrary To The HPA And Arbitrary And Capricious.**

115. The USDA's proposed ban on all substances is unlawful for many of the same reasons as the proposed ban on action devices and pads. The proposed ban (i) falls outside the USDA's statutory authority under the HPA, and (ii) is arbitrary and capricious based on USDA's failure to provide a reasoned basis for the rule or to support it with substantial evidence.

i.      A Ban On All Substances Is Contrary To The HPA.

116.    As explained above, the HPA empowers APHIS to ban substances, devices, and conduct reasonably expected to cause soring.  *See, e.g.*, 15 U.S.C. § 1824(2) (prohibiting the "showing or exhibiting, in any horse show or horse exhibition, of any horse ***which is sore***") (emphasis added); *id.* § 1823(a) (requiring the management of a horse show or horse exhibition to disqualify any horse "***which is sore***") (emphasis added).

117.    Current regulations prohibit all substances being applied to a horse during the competition other than lubricants on the extremities of horses above the hoof.  *See* 9 C.F.R. § 11.2(c).  Specifically, 11.2(c) provides that "[a]ll substances are prohibited on the extremities above the hoof of any Tennessee Walking Horse" being "exhibited ... except lubricants such as glycerine, petrolatum, and mineral oil, or mixtures thereof," provided that they are (1) "furnish[ed]" by management; (2) "applied only after the horse has been inspected" and "under the supervision of" management; and (3) such lubricant was made available to "Department personnel for inspection."  *Id.*  Because the current regulations prohibit substances regardless of whether they may have a connection to soring, those regulations go beyond the scope of authority granted to USDA by the Act.  The 2024 Rule is subject to the same problem.  It bans all substances—even substances that exist solely to benefit a horse, such as fly sprays.

118.    But the 2024 Rule goes even further by banning something—lubricants—that not only has no connection to soring but is actually used to *prevent* soring.  Lubricants—which are permitted under the current rule—are used routinely with action devices to reduce friction. Reducing friction, of course, helps prevent a horse from becoming sore from any rubbing of the action device.  The current regulations recognize this purpose, as they define a permitted "lubricant" as "mineral oil, glycerin or petrolatum, or mixtures exclusively thereof, that is applied

to the limbs of a horse **solely for protective and lubricating purposes** while the horse is being shown or exhibited at a [Horse Event]." *Id.* § 11.1 (emphasis added).

119.    By expanding the prohibition to include the use of lubricants at all times during competition, USDA now seeks to ban substances that not only have no connection to soring but are actually used to reduce friction and thereby *prevent* a horse from becoming sore.

120.    USDA justifies this scorched earth approach by once again arguing that, since some percentage of Tennessee Walking Horses test positive for prohibited substances, there is a reason to extend the ban to cover a substance that does *not* cause soring. *See* 89 Fed. Reg. at 39920 ("As table 3 in the proposed rule indicates, Tennessee Walking Horses and racking horses showing in the Performance division are disproportionately more likely to test positive for prohibited substances than flat-shod horses, regardless of the year in question, the number of inspections conducted, or other controls applied.").

121.    But this is a non sequitur.  USDA cannot justify a ban on *all* substances because a number of horse owners have violated the *existing* substance ban.  Indeed, this rationale makes no sense.  There is no reason to think that extending the existing ban to cover substances that help prevent a horse from becoming sore will dissuade any bad actors who already violate the prohibited substances rule from continuing to do so.

122.    Regardless, as with the proposed ban on action devices and pads, USDA's proposal rests on the false premise that it has been granted the authority to eliminate any practice that could theoretically have some connection to soring.  Again, that is not what Congress intended with the HPA.

ii.      A Ban On All Substances Is Arbitrary And Capricious.

123.    In addition, the proposed ban on all substances is arbitrary and capricious for several reasons.  *First*, to the extent the USDA points to data showing that there continue to be violations of the existing rule prohibiting substances, that data provides no basis for expanding the prohibition to include currently legal substances that the USDA itself concedes are used to reduce friction and prevent soring.  Indeed, a ban on substances that are designed to ***prevent*** soring makes no sense whatsoever.  *See National Lifeline Ass'n*, 921 F.3d at 1110 (agency action is arbitrary and capricious when it "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

124.    *Second*, USDA's ban is arbitrary and capricious because it is based on flawed data and irrational conclusions drawn from that data.  As noted above in Section IV.A, USDA supports its proposed ban by pointing to data ostensibly showing that prohibited substances were found on a significant percentage of Tennessee Walking Horses wearing action devices and pads.  But, as with the rest of the data USDA purports to rely on, the data supporting the substance ban is flawed and does not show widespread use of prohibited substances.

125.    Most importantly, USDA confirms that its foreign substance data was obtained from a pre-selected sample based on USDA's decision to inspect horses for which it already had a suspicion of soring.  USDA suggests that "it is immaterial that substance testing is not based on a random sample because APHIS does not operate in an environment in which a random sample is warranted, or, indeed, possible."  89 Fed. Reg. at 39220.  But simply because something is not "possible" (and USDA does not explain *why* it cannot conduct random testing) does not make it "immaterial."  By biasing its sample towards violators, USDA effectively ensures that the data will show a higher rate of violations.

36

126.    Even if this data were reliable, it would not support expanding the existing prohibition.  Rather, the ability of USDA to reliably detect prohibited substances counsels against a broader ban to sweep in all substances.  There is no reason to ban all substances when USDA can reliably detect violations of its current rules.  That is particularly true when the majority of owners and trainers do not use prohibited substances and instead use lubricants to the benefit of their horses and would use other non-soring substances (such as fly sprays) for the same reason.  USDA's extended ban once again results in collective punishment of all for the actions of some.

127.    *Third*, USDA's protocol for testing for prohibited substances is fundamentally flawed.  USDA has never provided a definitive list of which substances are banned or provided the levels at which a substance may trigger a violation.  Of course, a violation for an amount of a substance that is so small that it cannot cause a horse to be sore is not rationally connected to the HPA's language regarding the prevention of soring.

128.    Worse, USDA has failed to acknowledge that there are instances in which a permitted substance might nevertheless be flagged as a violation (thereby skewing USDA's data).  For example, in Pulaski, TN, a horse trainer was found to be in violation of the prohibited substance regulation for using Vaseline, a lubricant that is permitted under the existing rules.  TWHNCA Comment App. Ex. 7 (Groover Decl.) at ¶¶ 4-7.

129.    *Fourth*, limiting the expanded substance ban to Tennessee Walking Horses and Racking Horses is arbitrary.  As noted in *supra* Section IV.A.iii, treating Tennessee Walking Horses differently from other HPA breeds is unlawful, particularly in the absence of any evidence demonstrating how often trainers of other breeds are using substances to their horses' detriment.  In fact, in one HPA Breed there have been several instances where the governing organization suspended trainers for "use of a prohibited drug or substance that is a stimulant, depressant,

tranquilizer or sedative which could affect the performance of a horse," which would constitute a violation of the HPA.  *See* TWHNCA Comment App. Ex. 25 (AQHA Disciplinary Actions) at 2.

### D. The Modifications To The Scar Rule Fail To Correct The Defects In The Current Rule, Are Unconstitutionally Vague, And Will Continue To Permit Arbitrary Disqualifications Of Horses.

130.    The modifications to the Scar Rule, now rebranded by USDA as "Dermatologic Conditions Indicative of Soring" (or "DCIS"), fail to correct the defects in the current rule, are unconstitutionally vague, and will continue to promote arbitrary disqualifications of horses.

131.    The 2024 Rule's revision to the Scar Rule tasks inspectors with ensuring the following:

> If an HPI or APHIS representative, upon inspection, finds that any limb of a horse displays one or more dermatologic conditions that they determine are indicative of soring as that term is defined in 15 U.S.C. 1821, the horse shall be presumed to be sore and subject to all prohibitions set forth in 15 U.S.C. 1824. Examples of dermatologic conditions that will be evaluated in determining whether a horse is sore shall include, but are not limited to, irritation, moisture, edema, swelling, redness, epidermal thickening, and loss of hair (patchy or diffuse).

2024 Rule § 11.7.

132.    The modifications to the Scar Rule are flawed for at least four reasons.

133.    *First*, the modifications to the Scar Rule are arbitrary and capricious because they are not based on evidence.  As noted above, in concluding that the existing Scar Rule "as written is not enforceable," NAS made several recommendations to USDA.  NAS Report at 85.  Most importantly, in order to ensure that any future regulations seeking to prevent soring were based on reliable science and provided objective criteria for inspectors, the NAS Report recommended that additional studies be done to see if soring produced observable changes in a horse's skin that could be used as a basis for identifying sored horses.

134.    Specifically, the NAS Report called for studies to determine whether any visually observable criteria from a horse's skin—such as lichenification—are evidence of soring, versus

other non-soring practices.  *See, e.g.*, *id.* at 10 ("More studies are needed to determine if training practices that can cause soreness in TWHs also result in lichenification … These studies might elucidate at what point, if at all, during training epidermal hyperplasia and lichenification would develop and what particular training practices would cause these conditions."); *id.* ("Studies are also needed to determine if epidermal thickening (hyperplasia) and lichenification are solely caused by the action devices worn by TWHs.").   In other words, NAS recognized that lichenification could simply be caused by a horse's training using action devices without the horse actually being sore.  But the salient point is that NAS called for more research, given that there is currently no definitive link between lichenification (which can be visually observed) and soring.  USDA failed to conduct these studies.

135.   Nor does USDA provide any other evidence to establish that the listed "dermatologic conditions" in the new rule are actually reliable evidence of soring.  To the contrary, USDA "emphasizes that the dermatologic conditions listed in the protocol *are not, in and of themselves, always necessarily indicative of soring.*"  89 Fed. Reg. at 39222 (emphasis added).  Instead, USDA argues that they "are indicative based upon the informed determination of a qualified inspector."  *Id.*  Thus, USDA "disagrees that the inspector must be able to conclusively identify the specific cause of the condition."  *Id.*

136.   In other words, as USDA recognizes, all of these dermatologic conditions that USDA lists as "indicative of soring" may appear on the pasterns of horses for reasons having nothing to do with human interaction or soring.  For example, pastern dermatitis is a condition marked by many of the same symptoms listed in the Proposed Rule.  See Danny W. Scott, DVM & William H. Miller, Jr., VMD, Equine Dermatology, 460-61 (Elsevier Science 2011).

137.    *Second*, USDA fails to adequately explain why it has changed prior positions it took relating to the Scar Rule and the link between conditions and soring.  For example, under this rewritten Rule, a horse could be disqualified solely on the basis that it has "patchy" "hair loss" on one leg—even though such hair loss could be the result of many different causes, including the mere friction from an action device without any actual soring.  Indeed, back in 1978 when it was adopting the existing Scar Rule, USDA specifically explained that the existing rule is designed to allow for just such changes:

> The proposed "scar rule" allows for normal changes in the skin that are due to friction.  These changes would allow … the moderate loss of hair in the pastern area caused by the friction generated by an action device.

Horse Protection Regulations, 43 Fed. Reg. 18514, 18519 (April 28, 1978).

138.    Now in the 2024 Rule the USDA has made a 180-degree turn, but it fails to justify the change.  Because USDA previously recognized that it was entirely permissible for a horse's leg to show some signs of friction, it must provide a clear explanation as to why that is now impermissible.  It does not do so.  Disqualifying a horse under the revised Scar Rule for having "patchy hair" when that horse would have been permitted to compete under the existing rule is arbitrary and fundamentally unfair to the horse's owners and trainers.

139.    *Third*, because the new rule does not rely on objective scientific criteria or other evidence, it fails to provide a test that can yield reproducible results by different inspectors and instead guarantees arbitrary and inconsistent results.  The new Scar Rule fails to give inspectors any objective criteria by which to differentiate a true case of soring from a horse presenting accidental injuries, skin conditions, or even sweat caused by competition.  The rule does not even limit inspectors to the enumerated conditions or address whether a condition must cross a certain threshold of severity to qualify as evidence of soring.

140.    Inspectors are instructed to disqualify a horse if there are "dermatologic conditions that *they determine* are indicative of soring."  Such "conditions" are not defined.  Instead, they are ultimately left entirely up to the individual inspector to decide.  Although the new rule provides a non-exhaustive list of examples, the rule makes clear that each of those conditions may or may not be indicia of soring.  *See* 89 Fed. Reg. at 39222 ("[W]e agree with commenters that the dermatological conditions listed in the proposed rule can have other causes and, thus, lead to differential diagnoses.").

141.    For example, under the new rule, an inspector could disqualify as sore a horse displaying mild dryness in its anterior pasterns if that inspector thought dryness was indicative of soring.  That same inspector may later deem another horse presumptively sore because it displays a mild amount of "moisture" on one leg, thus triggering the automatic soring presumption.

142.    But the new Rule offers no guidance as to when a horse's skin is "too dry" or "too wet."  Instead, the new Rule vests in horse inspectors a completely standardless, you-know-it-when-you-see-it authority to designate a horse as sore.  And these determinations are to be made by inspectors who do not even have the training and experience of equine veterinarians (as the NAS Report recommended).

143.    *Fourth*, for all of these reasons outlined above, the revised Scar Rule is also unconstitutionally vague.  At bottom, the rule dictates that soring exists when an "an HPI or APHIS representative, upon inspection, finds that any limb of a horse displays one or more dermatologic conditions *that they determine* are indicative of soring."  But horse owners and trainers have no guidance as to what any individual inspector will or will not determine to be a "condition indicative of soring."  Because what is disqualifying to one inspector may not be disqualifying to another, horse trainers and owners have no guidelines by which they can expect to know whether or not

their horse will be able to compete.  What level of "irritation," "moisture," or "patchy" hair will lead to a disqualification is left in the eye of the beholder.  The natural consequence of a standard-less rule is that there is no adequate notice given to those affected by it.

144.    Dr. Stromberg aptly summarizes the problems with the new Rule:

> In short, the vague and subjective nature of the new rule makes it even worse and more arbitrary than the existing Scar Rule.  It will inevitably lead to more inconsistent application and disqualification of horses that are not sore, particularly given that the examiners applying the rule would not be experienced equine veterinarians.

*Id.*  App. Ex. 13 (Stromberg Decl.) at ¶ 20. Although his comments were on the Proposed Rule, they apply equally to the final 2024 Rule.

145.    In other words, the revised rule fails to provide due process because it does not provide horse owners and trainers "with ascertainable certainty" the standards by which he will be judged before he is deprived of any property interest.  *See Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000) ("Because '[d]ue process requires that parties receive fair notice before being deprived of property,' we have repeatedly held that '[i]n the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability.'") (citation omitted).

### E.    The Inspection Process Under the HPA Rule Does Not Provide Horse Owners And Trainers With Due Process.

146.    The 2024 Rule fails to provide horse owners and trainers with due process for at least two reasons.

147.    *First*, the rule does not provide for a meaningful opportunity to be heard by horse owners and trainers before they are disqualified.  The 2024 Rule perpetuates the due process problems with the existing rule that at least one court has found fail to provide horse owners and

trainers with constitutionally required process. *See McSwain v. Vilsack*, No. 1:16-CV-01234-RWS, 2016 WL 4150036, at *3 (N.D. Ga. May 25, 2016).

148.    As noted above, USDA does not currently provide any type of hearing prior to a horse being disqualified from competition.  USDA, itself, recognized that this existing scheme failed to provide horse owners and trainers with due process. 88 Fed. Reg. at 56935.

149.    In seeking public comment on the Proposed Rule, USDA specifically sought input on how to solve the obvious due process problem in the current rules. *Id.*

150.    Unfortunately, the 2024 Rule fails to provide the constitutionally required process. Horses may still be disqualified and prevented from competing at all without an opportunity to appeal that disqualification.   Instead, USDA concludes, "[b]ecause of these statutory considerations [to prevent soring], and because commenters could not provide a meaningful way to allow for a pre-show hearing following an inspection resulting in disqualification, we consider the appeals process in this final rule, which allows for prompt post-disqualification appeal, due process regarding the deprivation caused by disqualification." 89 Fed. Reg. at 39206.

151.    But the Due Process Clause requires more of the government, particularly where "the nature of the interest—[a horse trainer's] ability to show [a horse]—is such that post-deprivation process cannot serve to fully make [the horse trainer] whole." *McSwain*, 2016 WL at *6.  USDA cannot delegate its constitutional obligations to commenters and then wash its hands of any responsibility when it decides those commenters do not offer it a solution.

152.    *Second*, USDA's attempts to provide post-show process fall well short of what is constitutionally necessary.  The new rule states that owners and trainers may file a challenge within 21 days to appeal a disqualification, at which point the Agency may decide to reverse the decision. But that process is effectively useless.  Even if an owner or trainer wins an appeal, there is no way

to retroactively change the fact that the horse was not permitted to compete at the show.  Owners or trainers lose the ability to claim prize money.  But, more importantly, a Tennessee Walking Horse's value is directly tied to its ability to compete, where it gains the attention and notoriety that makes it attractive to sell or breed.  Post-show relief cannot remedy that violation, much as an Olympic athlete who was banned from competing cannot be made whole through an after-the-fact acknowledgement that the decision was wrong.

153.    Worse, the new rule potentially puts owners/trainers in an impossible position by effectively requiring them to bring a challenge in *every* case to avoid any argument in an enforcement proceeding that they have waived the right to contest any aspect of the disqualification.  Given that USDA can file an administrative complaint against horse owners or trainers years after a disqualification, USDA may argue years later that any unchallenged disqualification should be treated as final, unreviewable, and beyond dispute, thus leaving those owners and trainers with effectively no defense to the complaint.

154.    USDA should not attempt to set up a system that makes it easier for the Agency to pursue penalty proceedings by forcing owners and trainers to bring appeals or be potentially deemed to have waived all challenges.  At the very least, all challenges should remain open to a defendant in a later penalty proceeding without regard to whether the defendant brought a prior appeal.

### F.    Abolition Of The DQP Program Is Contrary To The HPA And Is Arbitrary And Capricious.

155.    The elimination of the DQP Program violates the HPA and is arbitrary and capricious.

### i.    Eliminating the DQP Program Violates the HPA.

156.    As discussed above, when amending the HPA in 1976, Congress envisioned an industry that will work with USDA to police itself.  As USDA itself explained in implementing the DQP amendments, the "intent of Congress and the purpose of this provision [15 U.S.C. § 1823] is to encourage horse industry self-regulatory activity." 43 Fed. Reg. at 18514.

157.    The 2024 Rule is inconsistent with the "intent" and "purpose" of the HPA.  It eliminates DQPs and requires a heightened approval process for USDA inspectors, requiring individuals to be veterinarians to qualify.  Although veterinary technicians and persons employed by State and local government agencies to enforce animal welfare laws may be authorized, that is only the case if USDA determines there is an insufficient pool of veterinarians.

158.    The 2024 Rule permits a show to choose a USDA appointed inspector at no cost. But the "choice" afforded to a show manager is illusory.  USDA coerces management to accept USDA inspectors at all horse shows by making the alternative cost prohibitive.  The cost of hiring a privately employed veterinarian of a show's choice (which would still force the show to pick from a pre-approved list of certified USDA HPIs) versus accepting a free inspector hand-picked by USDA effectively forces shows to choose the latter.

159.    USDA concedes the point.  It "acknowledge[s] that as third-party contractors, veterinarians authorized as HPIs may indeed charge higher rates than other qualified inspectors without veterinary degrees."  89 Fed. Reg. 39233.  USDA "disagree[s], however, that the rule incentivizes management to accept only an APHIS representative to conduct inspections because of the costs associated with a veterinarian." *Id.*  In the Agency's view, USDA's ability to authorize non-veterinarians as HPIs (which only occurs if there is not a sufficient pool of actual veterinarians) means that "management could then likely contract at a lower cost than a veterinarian HPI." *Id.* at 39234.

45

160.     But the power to choose whether to appoint non-veterinarian HPIs rests solely with USDA.  In other words, USDA disagrees that shows will be *forced* to use APHIS representatives because USDA *might* decide to appoint (cheaper) non-veterinarians.  This assurance—based on a hypothetical situation that may or may not happen—is not a response at all to what USDA acknowledges is a legitimate concern raised by the Association.  The decision on whether to lower the bar requiring veterinarian HPIs—and the financial consequences of it to show managers—is left entirely in USDA's hands.

161.     In addition, USDA does not account for the injury that may occur to a horse show if an HPI gets sick or is unable to appear.  Under those circumstances, unless a horse show had lined up a second HPI (and provided compensation to that HPI), show management would have to assume all risk of any potential violations.  That is in contrast to the existing system of DQPs, in which horse show management is able to have enough DQPs on hand to ensure that 100% of horses are inspected.

162.     Thus, rather than establishing a means for the industry to police itself as Congress intended, USDA is proposing to eliminate self-regulatory activity. That scheme turns the Act on its head.  The Proposed Rule undermines the "intent and purpose of the Act"—namely, to "encourage horse industry self-regulatory activity."  44 Fed. Reg. at 1560.

        ii.        <u>Eliminating the DQP Program Is Arbitrary And Capricious.</u>

163.     Besides being contrary to the Act, the Proposed Rule's elimination of the DQP Program is arbitrary and capricious.

164.     *First*, the rationale for getting rid of the existing DQP program is that USDA's data shows that VMO inspections find a higher violation rate than DQP inspections. As discussed

above, that data is unreliable and cannot supply a reasoned basis for USDA's decision. *See supra* Section IV.A.

165.    *Second*, insofar as the 2024 Rule demands that private inspectors have veterinary credentials but USDA inspectors do not, the 2024 Rule displays inconsistent reasoning.  "A long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently." *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996).  It is inconsistent—and therefore arbitrary—for the agency to insist that private horse inspectors must have doctoral training in veterinary medicine while its own representatives do not need any credential besides agency employment to inspect horses for soring.

166.    Relatedly, the 2024 Rule lacks a principled basis for excluding professional horse trainers and farriers from its new regime of licensed inspectors.  As explained above, the 2024 Rule states that, when veterinarians are in short supply, the USDA will license veterinary technicians and local animal welfare officials.  But neither vet techs nor local animal welfare personnel have greater claim to accurately detect soring in horses than professional horse trainers and farriers.

167.    Indeed, in many instances, vet techs and animal welfare officials (say, for instance, the town dogcatcher) will have far *less* equine or even large-animal experience.  There is no reason to suspect that these individuals will consistently outperform professional horse trainers and farriers at inspecting horses for soring—especially if both receive the same USDA training.

168.    *Third*, USDA's reliance on decisions from the USDA Office of the Judicial Officer ("OJO") is unwarranted.  In the Proposed Rule, USDA justified the elimination of DQPs by stating that decisions of the USDA's OJO "include accounts of exhibitors showing sored horses that had

been inspected and cleared by DQPs, cursory inspections or use of incorrect methods by DQPs, and exhibitors attempting to avoid violations by having another person acknowledge responsibility." 88 Fed. Reg. at 56928.

169.    But USDA does not cite any cases containing such accounts.  *See* TWHNCA Comment at 47.  Three of the cases cited are unsuccessful challenges to default judgments that contain no discussion of the underlying examinations.  88 Fed. Reg. at 56928 at n.12 (citing *In re Rocky Roy McCoy*, 75 Agric. Dec. 193 (2016); *In re Tracy Essary*, 75 Agric. Dec. 204 (2016); *In re Randall Jones*, 74 Agric. Dec. 133 (2015)).  And, in the fourth, the presiding ALJ expressed significant concerns about the credibility of the VMO but nevertheless found herself "bound by legal precedent" to uphold the VMO's findings, concluding: "In so finding, I am mindful of the words of Fulton J. Sheen: 'the big print giveth, and the fine print taketh away." *In re Justin Jenne*, 73 Agric. Dec. at 14.

G.    **USDA's Economic Analysis Is Deficient And Fails To Consider The Devastating Effect Of The Proposed Rule On The Industry, Including Small Businesses.**

170.    As the Agency acknowledges, pursuant to Executive Orders 12866 and 13563, it is required to prepare an economic analysis with a cost-benefit analysis, weighing the purported benefits of the rule with the effect the rule would have on the $3.2 billion industry, the 20,000 jobs it creates, and the economy at large.  *See, e.g.*, Legislative Hearing to Protect Consumers and Strengthen the Economy before the Subcomm. on Consumer Protection and Commerce, H. Comm. Energy and Comm., 117th Cong. (May 26, 2022) (Statement from the Tennessee Walking Horse Breeders' & Exhibitors' Association Regarding H.R. 5441), https://perma.cc/Q99A-WNB5.

171.     Although USDA purports to have conducted such an analysis, that analysis is incomplete and unsound.  Indeed, with respect to the impact of the 2024 Rule on small businesses, the analysis is wholly insufficient.

> i.     The USDA's Cost-Benefit Analysis Is Wholly Unreliable Because It Is Based On Data That Is Over A Decade Old.

172.     As an initial matter, USDA failed to obtain or collect any new data to support its analysis.  Instead, it relies on a 2012 Expert Elicitation that was previously used (and commented on) in support of an earlier rule the Agency attempted to promulgate in 2017.  USDA justifies its current reliance on data that is more than a decade old because "detailed, more recent information on the Tennessee Walking Horse and racking horse industry is not readily available." *Regulatory Impact Analysis & Final Regulatory Flexibility Analysis of the Final Rule, Horse Protection Amendments*, RIN 0579-AE70, APHIS-2022-0004 at 3-4 (April 2024) (hereinafter "2024 Regulatory Impact Analysis").

173.     But there is no indication that the data in the 2012 Elicitation, which is over a decade old, accurately reflects the state of the industry.  *See Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1408 (D.C. Cir. 1985) ("Whether or not DOE acted reasonably in issuing rules in 1982 and 1983 based on 1980 information, we think it would be patently unreasonable for DOE to begin further proceedings in the last half of 1985 based on data half a decade old.").  USDA cannot justify the use of twelve-year-old data on the ground that it did not receive additional data in public comments.  The USDA cannot shift the burden to provide the data for a mandatory economic analysis to public commenters.

174.     USDA was not powerless in this regard.  As the Association noted in its Comments, the Agency did not ask it to help it prepare data.  TWHNCA Comment at 48 n.19.

ii.      USDA's Cost-Benefit Analysis Fails To Account For The
Devastating Effect That The Ban On Pads And Action Devices
Would Have On The TWH Industry.

175.     Critically, the analysis for the 2024 Rule fails to account for the devastating effect that the total ban on pads and action devices would have on the Tennessee Walking Horse industry. Indeed, the ban could end up destroying the industry altogether because it would eliminate the Performance Division of the industry.

176.     Horses competing in the Performance Division are trained with and exhibited while using action devices and pads.  TWNCA Comment App. Ex. 24 (Wells Decl.) at ¶ 13.  At a show like the National Celebration, approximately 70% of the horses are historically shown using action devices and pads.  *Id.* ¶ 12.  And the Performance categories at shows are also the most popular and draw the most spectator interest, as members of the public are drawn to shows to see the most athletic horses.

177.     The Association provided evidence from a number of sources on this point:

- "The TWH show circuit is primarily driven by attendees' interest in performance show horses. If performance show horses are no longer able to compete, many shows would shut down, which means that the flat-shod divisions in those shows would also shut down, leaving no room for flat shod TWHs to compete."  *Id.* App. Ex. 28 (Statement of Carrie Martin) at ¶ 9.

- "At TWH shows, the performance divisions are the biggest draw and attract a high level of interest from the audience."  *Id.* App. Ex. 29 (Statement of Chad Williams) at ¶ 5.

- "At TWH horse shows, the performance divisions are the biggest draws because members of the public attend horse shows to watch the most athletic horses. Those of us who show TWHs in the pleasure divisions rely on the performance horse divisions to bring in fans and sponsors to the shows to keep the shows going."  *Id.* App. Ex. 30 (Hannah Pulvers-Myatt Statement) at ¶ 5.

178.    Indeed, the horses that compete to be World Grand Champion at the Celebration are all horses trained and shown with action devices and pads.  *Id.* App. Ex. 24 (Wells Decl.) at ¶ 10.

179.    The ban on pads and action devices would effectively eliminate the biggest draw to these shows.  Many shows would not be economically viable and would cease to function if the Performance Division were eliminated.  *Id.* at ¶ 13.

180.    In its Comments on the Proposed Rule, the Association included statements by managers from twelve horse shows who indicated that the bans would make it impossible for their shows to continue.  *See* TWHNCA Comment at 50.

181.    The elimination of the Performance Division would also have broad-reaching effect on a number of individuals.

182.    The elimination of the Performance Division would remove the primary source of revenue for horse trainers.  As one trainer put it:

> The Proposed Rule, if adopted as a final rule, would likely cause me to lose my job as a horse trainer or at least negatively impact my business such that I would have to restructure it to focus only on training horses for recreational riding … [which] would eliminate the large majority of my income.

TWHNCA Comment App. Ex. 28 (Statement of Carrie Martin) at ¶ 10.

183.    Horse trainers who are deprived of the opportunity to potentially win titles means that their services as a trainer will become less desirable.  Their marketability depends on the success of their horses.

184.    The elimination of the Performance Division would impact horse owners.  The data relied on by USDA indicates that the median revenue for owners per show ranges from $8,600 to $9,800, depending on the region.  2024 Regulatory Impact Analysis at 7.  And the lifetime revenue solely from breeding per horse ranges from $5,800 to $9,200 across all regions.  *Id.*  While the

Association disputes the accuracy of these numbers (which, for breeding, is likely significantly higher), USDA's own data indicates that the elimination of the Performance Division would also greatly diminish a horse's value as a sire or dam to breed other horses.

185.    As already discussed, the elimination of the Performance Division would affect horse shows and the many who work at those shows.  For example, the Celebration has generated $24,036,785 since 2017.  *See* TWHNCA Comment App. Ex. 24 (Wells Decl.) at ¶ 14.  That money, in turn, goes to pay for the salaries of employees who work to produce the Celebration.  *Id*.  In addition, show managers will necessarily need to hire new staff to satisfy all reporting requirements under the regulations, as those responsibilities were previously handled by HIOs. *See* 89 Fed. Reg. at 39241 ("The final rule will remove all regulatory responsibilities and requirements for horse industry organizations and associations (HIOs).").

186.    The elimination of the Performance Division would affect local governments and communities.  Horse shows can generate substantial revenue for local communities.  Shows bring in both spectators and horse owners and trainers from out of town, which in turn provide revenue boosts to the local hotel and restaurant industries.  The additional business generates tax revenue for local governments.  For example, the former Mayor of Shelbyville, TN stated that "[t]he Celebration is the single biggest economic driver to the City of Shelbyville."  TWHNCA Comment App. Ex. 46 (Statement of Wallace Cartwright).

187.    The elimination of the Performance Division would affect charities who raise money during Horse shows.  For example, eight local charities with missions for disabled veterans, youth sports, low-income families, and troubled youth all raised funds during the 2023 Celebration.  *See* TWNCA Comment App. Ex. 24 (Wells Decl.) at ¶ 16.  Many of these can fund

their organization for an entire year based on the funds raised during the 11 days of The Celebration. *Id.*

188.    Finally, the elimination of the Performance Division would hurt the viability of the Tennessee Walking Horse as a breed, itself.  To the extent horses become less viable to show, they become less valuable to own.  An economic value cannot be placed on the breed itself.

189.    In short, USDA seeks to eliminate the main attraction across the entire Tennessee Walking Horse industry without performing any realistic economic analysis of the impact that decision would have.

iii.   USDA's Cost-Benefit Analysis Fails To Account For The Substantial Impact The Proposed Rule Would Have On The Greater U.S. Economy.

190.    The economic impact of the 2024 Rule extends beyond the Tennessee Walking Horse industry itself.  As explained by The Chesapeake Group ("TCG"), the TWHs have an impact on the greater U.S. economy.  As TCG explains, impacts to one industry have ripple effects on other business sectors within the economy.  *See* TWHNCA Comment App. Ex. 47 (TCG Economic Analysis) at 2.  Based on its calculations, TCG estimates (conservatively) that "the total economic impact on the U.S. economy of the Tennessee Walking Horses is $1.84 billion" annually.  *Id.* at 12.  And, more specifically, "TCG estimates that the national and local impacts of the show TWH segment contribute between $718 million and $902 million annually to the economy."  *Id.*

191.    As TCG notes, USDA's economic analysis fails to take account of these greater impacts.  *Id.* at 13 ("The work upon which APHIS suggestions are made did not consider anything other than the direct impacts.").  And TCG concludes that "[w]hen coupled with the suggested regulatory changes, the existing challenges will likely destroy the TWH segment of the horse industry as we know it."  *Id.  See also id.* ("Simply eliminating the economic impact of the show

53

horses is only the first level of impact. For those not participating in show and event activity, the supply of 'premier' stock would diminish, and demand would decline for TWH in general in a short time.").

192.    The sum total of USDA's analysis in response is a single inadequate sentence that dismisses these concerns with the assertion that "[t]he rule is not expected to adversely impact communities in which HPA-covered events involving Tennessee Walking Horses and racking horses because such events are expected to continue; owners are motivated to show their prized horses and will continue to participate in shows and other HPA-covered events."  2024 Regulatory Impact Analysis at 10.

193.    Not only is this cursory response to TCG's detailed analysis insufficient, it is simply wrong.  Among other things, the Association has provided evidence indicating this is not the case, including declarations by twelve horse show owners.  TWHNCA Comment at 50.  USDA cannot dismiss these concerns with an unsupported assertion that horse shows will continue.

iv.    USDA Admits That It Does Not Know Whether The Proposed Rule Would Have A Disproportionate Effect On Small Entities.

194.    The Regulatory Flexibility Act ("RFA") requires an agency promulgating a rule to consider the effect of the Proposed Rule on small businesses and entities, and to design mechanisms to minimize any adverse consequences. *See* 5 U.S.C. § 601 *et seq.* The Agency must either certify that the rule, if promulgated, would not have a significant economic impact on a substantial number of small entities, or must issue an initial regulatory flexibility analysis ("IRFA") at the same time that it publishes the notice of the proposed rulemaking.  5 U.S.C. §§ 603, 605.

195.    USDA admits that "[t]he entities affected by this rule are likely small by Small Business Administration standards."  2024 Regulatory Impact Analysis at v.  Under the RFA, the

term "small entity" means a "small business," "small organization," or "small governmental jurisdiction." 5 U.S.C. § 601(6).

196.    Despite acknowledging that the entities affected by the new Rule are small businesses, USDA issues an IRFA based on data that is, by its own admission, incomplete.  It simply concludes: "We cannot certify that this rule would have no disproportionate impact on small entities, but at this time have found no evidence that it would have such impacts."  2024 Regulatory Impact Analysis at 16.

197.    This failure to comply with its legal obligations does not qualify as "reasoned decision-making" under the APA.  That is particularly true where the rulemaking affects a $3.2 billion industry that is comprised mainly of small businesses.

**COUNT ONE**

**Violation of 5 U.S.C. § 706**

**Ban on Action Devices And Pads In Excess of Statutory Authority**

198.    Plaintiffs restate and incorporate by reference each and every allegation of the preceding paragraphs.

199.    The language of the HPA explains in clear terms that it is intended to prohibit the soring of horses.  The Act does not prohibit practices or items that do not cause soring, and it does not provide the USDA authority to prohibit practices or items that do not cause soring.

200.    The proposed ban on action devices and pads exceeds the USDA statutory authority because the use of this equipment does not cause soring.  USDA concedes that this is the case.  *See* 89 Fed. Reg. at 39212 ("We did not state in the proposed rule that pads, wedges, action devices, and toe extensions are always necessarily and *per se* associated with soring. While they can cause soring, as we stated in the proposed rule, action devices and pads are sometimes used for

55

proprioceptive purposes during training of Morgans, American Saddlebreds, and other gaited breeds.").

201.    Absent action by this Court, Plaintiffs, as well as all Tennessee Walking Horse owners, trainers, and others in the industry will suffer injury.  The ban on action devices and pads will result in the elimination of the Performance Division, the main attraction in the industry. Horse shows will be shut down as a result of the new rule.  Employees will lose their jobs.  The impact to local communities and the economy writ large will be substantial.  And the horses owned by Plaintiffs Lewis and Gould will become substantially less valuable.

## COUNT TWO

## Violation of 5 U.S.C. § 706

## Ban on Action Devices And Pads As Arbitrary And Capricious Agency Action

202.    Plaintiffs restate and incorporate by reference each and every allegation of the preceding paragraphs.

203.    In addition to exceeding USDA's authority under the HPA, the proposed ban on action devices and pads would be arbitrary and capricious.  USDA "offer[s] an explanation for its decision that runs counter to the evidence before the agency" and "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *National Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1110 (D.C. Cir. 2019).

204.    USDA has failed to support its decision with any evidence or reasoned explanation. The data relied upon by USDA to show soring was either (i) fourteen years old or (ii) not based on a random sample of horses competing in the Performance Division.  Such unreliable data provides no support for a ban on action devices and pads.

205.    In addition, the only reliable evidence before the Agency shows that action devices and pads do *not* cause soring.  Where this is the only evidence before it, the Agency has failed to provide any rational basis for banning the equipment.

206.    USDA's differential treatment of Tennessee Walking Horses and other HPA breeds is also arbitrary and capricious.  Here, the USDA proposes to ban action devices and pads only on Tennessee Walking Horses and Racking Horses, but not other breeds.  But the Agency both (i) lacks evidence showing an absence of soring in other breeds, and (ii) has *itself* acknowledged that other breeds *do* engage in soring.

207.    USDA has also completely failed to conduct a proper cost-benefit analysis for the proposed ban on action devices and pads.  The USDA's complete failure to consider the impact on the industry of eliminating this entire category of competition demonstrates that the agency "failed to consider an important aspect of the problem" before it.  *State Farm*, 463 U.S. at 43.

208.    Absent action by this Court, Plaintiffs, as well as all Tennessee Walking Horse owners, trainers, and others in the industry will suffer injury.  The ban on action devices and pads will result in the elimination of the Performance Division, the main attraction in the industry.  Horse shows will be shut down as a result of the new rule.  Employees will lose their jobs.  The impact to local communities and the economy writ large will be substantial.  And the horses owned by Plaintiffs Lewis and Gould will become substantially less valuable.

## COUNT THREE

### Violation of 5 U.S.C. § 706

### Ban on Action Devices And Pads As A Regulatory Taking

209.    Plaintiffs restate and incorporate by reference each and every allegation of the preceding paragraphs.

210.     The Takings Clause of the Fifth Amendment of the U.S. Constitution provides that when the federal government takes private property for a public use, it must provide just compensation.

211.     Here, if USDA proceeds with the ban, its actions would amount to such a taking because it would destroy all the value in TWHs trained to compete in the Performance Division by essentially banning the sport in which they compete.

212.     As a practical matter, horses that have been specifically bred and trained to compete with action devices and pads cannot simply be re-trained to compete as a flat-shod horse. Numerous horse trainers have attested to this fact.  *See* TWHNCA Comment at 32 (citing trainer affidavits).

213.     Thus, by banning action devices and pads and eliminating the Performance Division entirely, USDA would be eliminating the sport in which horses shown in the Performance Division have been bred and trained to compete.  It would thereby wipe out the value of such horses.

214.     Because it amounts to a regulatory taking, the ban on action devices and pads is unconstitutional.

215.     Absent action by this Court, Plaintiff horse owners would be injured by the Rule because their horses which compete in the Performance Division would be deprived of all economic value.

## COUNT FOUR

### Violation of 5 U.S.C. § 706

### Ban on All Substances In Excess of Statutory Authority

216.    Plaintiffs restate and incorporate by reference each and every allegation of the preceding paragraphs.

217.    The language of the HPA explains in clear terms that it is intended to prohibit the soring of horses.  The Act does not prohibit practices or items that do not cause soring, and it does not provide the USDA authority to prohibit practices or items that do not cause soring.

218.    The proposed ban on all substances exceeds the USDA statutory authority because it prohibits substances that have no relation to soring and may actually prevent soring.

219.    Absent action by this Court, Plaintiffs, as well as all Tennessee Walking Horse owners, trainers, and others in the industry will suffer injury.  The ban on all substances harms those horse owners and trainers who are trying to use substances to actually prevent soring and horse discomfort.  In turn, that will damage legitimate competition within the industry.

## COUNT FIVE

### Violation of 5 U.S.C. § 706

### Ban on All Substances As Arbitrary And Capricious Agency Action

220.    Plaintiffs restate and incorporate by reference each and every allegation of the preceding paragraphs.

221.    In addition to exceeding USDA's authority under the HPA, the proposed ban on all substances would be arbitrary and capricious.  USDA "offer[s] an explanation for its decision that runs counter to the evidence before the agency" and "is so implausible that it could not be ascribed

59

to a difference in view or the product of agency expertise." *National Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1110 (D.C. Cir. 2019).

222.    To the extent the USDA points to data showing that there continue to be violations of the existing rule prohibiting substances, that data provides no basis for expanding the prohibition to include currently legal substances that the USDA itself concedes are used to reduce friction and prevent soring.  Indeed, a ban on substances that are designed to ***prevent*** soring makes no sense whatsoever.

223.    USDA's ban is also arbitrary and capricious because it is based on flawed data and irrational conclusions drawn from that data.  USDA supports its proposed ban by pointing to data ostensibly showing that prohibited substances were found on a significant percentage of Tennessee Walking Horses wearing action devices and pads.  But, as with the rest of the data USDA purports to rely on, the data supporting the substance ban is flawed and does not show widespread use of prohibited substances.  Most importantly, USDA confirms that its foreign substance data was obtained from a pre-selected sample based on USDA's decision to inspect horses for which it already had a suspicion of soring.

224.    USDA's protocol for testing for prohibited substances is also fundamentally flawed.  USDA has never provided a definitive list of which substances are banned or provided the level at which a substance would cause a violation or the levels at which a substance may trigger a violation.

225.    Limiting the expanded substance ban to Tennessee Walking Horses and Racking Horses is also arbitrary.  The HPA applies to all breeds equally.  APHIS, however, narrows the substance ban to only a subset of horses, while offering no evidentiary support for its conclusion that other breeds are not sored.  Given that APHIS acknowledges that soring is not limited to

Tennessee Walking Horses and Racking Horses, the disparate treatment of Tennessee Walking Horses in the Proposed Rule reflects irrational discrimination unsupported by any sound justification.

226.    Absent action by this Court, Plaintiffs, as well as all Tennessee Walking Horse owners, trainers, and others in the industry will suffer injury.  The ban on all substances harms those horse owners and trainers who are trying to use substances to actually prevent soring and horse discomfort.  In turn, that will damage legitimate competition within the industry.

### COUNT SIX

### Violation of 5 U.S.C. § 706

### Modifications To The Scar Rule As Arbitrary And Capricious Agency Action

227.    Plaintiffs restate and incorporate by reference each and every allegation of the preceding paragraphs.

228.    USDA "offer[s] an explanation for its decision that runs counter to the evidence before the agency" and "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *National Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1110 (D.C. Cir. 2019).

229.    The modifications to the Scar Rule are not based on evidence.  USDA rejected NAS's calls for additional studies to be done to identify objective criteria upon which horse inspectors could identify soring.  And USDA concedes that the "dermatologic conditions indicative of soring" are all conditions which may or may not actually be indicative of soring.  89 Fed. Reg. at 39222.

230.    USDA also fails to adequately explain why it has changed prior positions it took relating to the Scar Rule and the link between conditions and soring.  For example, because USDA

previously recognized that it was entirely permissible for a horse's leg to show some signs of friction, it must provide a clear explanation as to why that is now impermissible.  It does not do so.

231.    Because the new rule does not rely on objective scientific criteria or other evidence, it fails to provide a test that can yield reproducible results by different inspectors.  Inspectors are instructed to disqualify a horse if there are "dermatologic conditions that *they determine* are indicative of soring."  Such "conditions" are not defined.  Instead, they are ultimately left entirely up to the individual inspector to decide.  Although the new rule provides a non-exhaustive list of examples, the rule makes clear that each of those conditions may or may not be indicia of soring.  *See* 89 Fed. Reg. at 39222 ("[W]e agree with commenters that the dermatological conditions listed in the proposed rule can have other causes and, thus, lead to differential diagnoses.").  The new rule will lead to arbitrary and irrational disqualifications that have no connection whatsoever to actual soring of horses.

232.    Absent action by this Court, Plaintiffs, as well as all Tennessee Walking Horse owners, trainers, and others in the industry will suffer injury.  The modifications to the Scar Rule will lead to more arbitrary disqualifications of horses, harming legitimate competition within the industry.

## COUNT SEVEN

### Violation of 5 U.S.C. § 706

### Modifications To The Scar Rule In Violation Of The Fifth Amendment Due Process Clause (Void for Vagueness)

233.    Plaintiffs restate and incorporate by reference each and every allegation of the preceding paragraphs.

234.     The modifications to the Scar Rule fail to provide a test that can yield reproducible results by different inspectors.  Inspectors are instructed to disqualify a horse if there are "dermatologic conditions that *they determine* are indicative of soring."  Such "conditions" are not defined.  Instead, they are ultimately left entirely up to the individual inspector to decide.  Although the new rule provides a non-exhaustive list of examples, the rule makes clear that each of those conditions may or may not be indicia of soring.  *See* 89 Fed. Reg. at 39222 ("[W]e agree with commenters that the dermatological conditions listed in the proposed rule can have other causes and, thus, lead to differential diagnoses.").  The new rule will lead to arbitrary and irrational disqualifications that have no connection whatsoever to actual soring of horses.

235.     "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required ... This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  The Due Process Clause to the Constitution requires (i) standards that provide *notice* about what is being prohibited, and (ii) criteria that constrain the decisionmaker so that he or she cannot make an arbitrary or wholly subjective decision.  The new rule fails to do either.  It will lead to arbitrary and irrational disqualifications that have no connection whatsoever to actual soring of horses.

236.     As a result, the new rule is unconstitutionally vague and thus void under the Fifth Amendment's Due Process Clause.

237.     Absent action by this Court, Plaintiffs, as well as all Tennessee Walking Horse owners, trainers, and others in the industry will suffer injury.  Plaintiffs will be subject to an unconstitutionally vague rule whenever they try to show their horses.

**COUNT EIGHT**

**Violation of 5 U.S.C. § 706**

**Disqualification of Horses Without Review In Violation Of
The Fifth Amendment's Due Process Clause**

238.    Plaintiffs restate and incorporate by reference each and every allegation of the preceding paragraphs.

239.    The 2024 Rule violates the Due Process Clause of the Fifth Amendment because it permits USDA to deprive trainers and owners of their "constitutionally protected interest in showing [horses] without unreasonable government interference." *McSwain*, 2016 WL 4150036 at *4.

240.    "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation omitted).

241.    The 2024 Rule does not provide for a meaningful opportunity to be heard by horse owners and trainers before they are disqualified before even having a chance to compete.

242.    USDA fails to demonstrate why it is not feasible to provide horse owners and trainers with pre-deprivation process.  At least one court has found that such process is required before disqualifying a horse.  *McSwain*, 2016 WL at *6.  *See also id.* ("Here, the Court finds that the factors weigh in favor of requiring pre-deprivation process."); *Zinermon v. Burch*, 494 U.S. 113, 132 (1990) ("In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking.").

243.    The 2024 Rule also fails to provide due process because it does not provide horse owners and trainers "with ascertainable certainty" the standards by which they will be judged before they are deprived of any property interest.

244.    The standards for what constitute an HPA violation under both the existing regulations and those in the 2024 Rule are so vague that they do not provide adequate notice, particularly the revised Scar Rule's reference to amorphous "dermatologic conditions."  88 Fed. Reg. at 56957.

245.    Absent action by this Court, Plaintiffs, as well as all Tennessee Walking Horse owners, trainers, and others in the industry will suffer injury.  Horses in the industry will continue to be subject to disqualifications, and their owners and trainers have no meaningful way to be heard and challenge these qualifications.  Horse shows will suffer because of this arbitrary system.

**COUNT NINE**

**Violation of 5 U.S.C. § 706**

**Abolition Of The DQP Program In Excess Of Statutory Authority**

246.    Plaintiffs restate and incorporate by reference each and every allegation of the preceding paragraphs.

247.    When amending the HPA in 1976, Congress envisioned an industry that will work with USDA to police itself.  As USDA itself explained in implementing the DQP amendments, the "intent of Congress and the purpose of this provision [15 U.S.C. 1823] is to encourage horse industry self-regulatory activity." 43 Fed. Reg. at 18514.

248.    The 2024 Rule is inconsistent with the "intent and purpose of the Act."  It eliminates DQPs and coerces management to accept USDA inspectors at all horse shows by making the alternative—hiring USDA approved veterinarian HPIs—cost prohibitive.

249.    Even if the industry were not effectively forced to use USDA representatives, the new HPIs are *de facto* USDA agents because USDA would have the ability to direct and control them.  Specifically, USDA would have the following authority:

- HPIs would have to apply to USDA for a license and have to be approved by APHIS to obtain a license. 2024 Rule § 11.19 (a).

- USDA would be able to revoke the licenses of any HPI who fails to follow the inspection procedures in the regulations—inspection procedures which USDA establishes—or "who otherwise fails to perform duties necessary for APHIS to enforce the Act and regulations."  *Id.* § 11.19 (d).

- USDA would establish the training program for HPIs and train them, including instructing them on how to apply the examination protocol established by USDA.  *Id.* § 11.19 (b).

250.    Thus, rather than establishing a means for the industry to police itself as Congress intended, USDA is proposing to eliminate self-regulatory activity.

251.    Absent action by this Court, Plaintiffs, as well as all Tennessee Walking Horse owners, trainers, and others in the industry will suffer injury.  The elimination of the DQP program will harm the ability of the industry to police itself, which itself will harm legitimate and fair competition.

## COUNT TEN

## Violation of 5 U.S.C. § 706

### Abolition Of The DQP Program As Arbitrary And Capricious Agency Action

252.    Plaintiffs restate and incorporate by reference each and every allegation of the preceding paragraphs.

253.    USDA "offer[s] an explanation for its decision that runs counter to the evidence before the agency" and "is so implausible that it could not be ascribed to a difference in view or

the product of agency expertise." *National Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1110 (D.C. Cir. 2019).

254.    USDA's rationale for getting rid of the existing DQP program—that VMO inspections find a higher violation rate than DQP inspections—is based on unreliable data and cannot supply a reasoned basis for USDA's decision.  In particular, the data (i) is not based on a random sample, (ii) is the result of a subjective inspection process that does not yield reproducible results.

255.    In addition, insofar as the 2024 Rule demands that private inspectors have veterinary credentials but USDA inspectors do not, the 2024 Rule displays inconsistent reasoning. It is inconsistent—and therefore arbitrary—for the agency to insist that private horse inspectors must have doctoral training in veterinary medicine while its own representatives do not need any credential besides agency employment to inspect horses for soring.  Any credential or qualification imposed on private persons seeking to serve as horse inspectors must equally apply to USDA representatives.

256.    USDA's reliance on decisions from the USDA Office of the Judicial Officer ("OJO") is unwarranted.  In the Proposed Rule, USDA justified the elimination of DQPs by stating that decisions of the USDA's OJO "include accounts of exhibitors showing sored horses that had been inspected and cleared by DQPs, cursory inspections or use of incorrect methods by DQPs, and exhibitors attempting to avoid violations by having another person acknowledge responsibility." 88 Fed. Reg. at 56928.  But the USDA failed to cite any cases showing that a judicial officer reviewing and independently deciding that a DQP's decisions were wrong.

257.    Absent action by this Court, Plaintiffs, as well as all Tennessee Walking Horse owners, trainers, and others in the industry will suffer injury.  The elimination of the DQP program

will harm the ability of the industry to police itself, which itself will harm legitimate and fair competition.

## COUNT ELEVEN

### Violation of 5 U.S.C. § 706

### Failure To Consider Economic Impacts Of The Rule As Arbitrary And Capricious Agency Action

258.    Plaintiffs restate and incorporate by reference each and every allegation of the preceding paragraphs.

259.    An agency rule is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

260.    The 2024 Rule is arbitrary and capricious because USDA bases it on unreliable economic data that is more than a decade old.  Its analysis for this rule largely repeats—at times verbatim—the analysis it previously conducted over seven years ago.  Nor did USDA seek assistance from the Tennessee Walking Horse industry to gather new economic data.

261.    USDA's failure is particularly striking given the devastating effect that the ban on action pads and devices will have on the Tennessee Walking Horse industry.  As evidence provided to the Agency shows, numerous horse shows will be forced to shut down and the industry itself may be unable to survive.  USDA's failure to provide any analysis or justification for such broad reaching action is inherently arbitrary.

262.    Nor does USDA account for the impact of the 2024 Rule on the greater U.S. economy.  As explained by The Chesapeake Group, the ripple effects of the rule will be substantial. USDA's failure to consider these effects is a failure to consider "an important aspect of the problem."

263.    USDA acknowledges that "[t]he entities affected by this rule are likely small by Small Business Administration standards," but later concedes that it "cannot certify that this rule would have no disproportionate impact on small entities."  2024 Regulatory Impact Analysis at 16.  Its failure to do so is arbitrary.

264.    Absent action by this Court, Plaintiffs, as well as all Tennessee Walking Horse owners, trainers, and others in the industry will suffer injury.  As detailed in evidence provided to the Agency, the 2024 Rule will have a substantial economic impact on the Tennessee Walking Horse industry.

## COUNT TWELVE

### Violation of 5 U.S.C. § 604

### Failure To Comply With The Regulatory Flexibility Act

265.    Plaintiffs restate and incorporate by reference each and every allegation of the preceding paragraphs.

266.    The Regulatory Flexibility Act ("RFA") requires agencies to provide "a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."  5 U.S.C. § 604(a)(6).

267.    Agencies must show that they have made "a 'reasonable, good-faith effort' to carry out the mandate of the RFA." *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 625 (5th Cir. 2000) (quotation omitted).

268.    Here USDA has failed to make a reasonable good-faith effort to comply with the RFA because it asserts in conclusory fashion that it "cannot certify that this rule would have no disproportionate impact on small entities, but at this time have found no evidence that it would have such impacts." 2024 Regulatory Impact Analysis at 16.

269.    Plaintiff the Tennessee Walking Horse National Celebration Association is injured because it is a small entity disproportionately impacted by the new rule.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court order the following relief:

a.   Declaratory relief stating that the 2024 Rule's ban on action devices and pads (i) is in excess of USDA's statutory authority; (ii) is arbitrary and capricious, and (iii) constitutes a regulatory taking depriving owners of Tennessee Walking Horses who compete in the Performance Division from all economic value.

b.   An injunction preliminarily and permanently preventing Defendants from enforcing the 2024 Rule's ban on action devices and pads.

c.   Vacate and set aside the 2024 Rule's ban on action devices and pads.

d.   Compensation for the regulatory taking of Plaintiffs' horses who compete in the Performance Division in an amount to be proved at trial.

e.   Declaratory relief stating that the 2024 Rule's ban on the use of all substances on Tennessee Walking Horses (i) is in excess of USDA's statutory authority; and (ii) is arbitrary and capricious.

f. An injunction preliminarily and permanently preventing Defendants from enforcing the 2024 Rule's ban on the use of all substances.

g. Vacate and set aside the 2024 Rule's ban on the use of all substances.

h. Declaratory relief stating that the 2024 Rule's modifications to the Scar Rule are (i) unconstitutionally void as vague, and (ii) arbitrary and capricious.

i. An injunction preliminarily and permanently preventing Defendants from enforcing the 2024 Rule's modifications to the Scar Rule.

j. Vacate and set aside the 2024 Rule's modifications to the Scar Rule.

k. Declaratory relief finding that the 2024 Rule is unconstitutional to the extent it (i) permits the disqualification of horses without affording the horse's owner or trainer an opportunity for meaningful review of the determination, including a pre-deprivation hearing; (ii) requires horse owners or trainers to submit an appeal after the fact, at which point the opportunity to compete has been lost, or risk having USDA argue that a prior disqualification is admitted evidence of soring; and (iii) fails to provide horse owners and trainers with ascertainable certainty of the standards by which they will be judged before being deprived of any property interest.

l. An injunction preliminarily and permanently preventing Defendants from enforcing the 2024 Rule to the extent it violates the due process rights of Plaintiffs and other horse owners and trainers.

m. Vacate and set aside the 2024 Rule to the extent it violates the due process rights of Plaintiffs and other horse owners and trainers.

n. Declaratory relief stating that the 2024 Rule's abolition of the DQP Program (i) is in excess of USDA's statutory authority; and (ii) is arbitrary and capricious.

o.  An injunction preliminarily and permanently preventing Defendants from enforcing the 2024 Rule's abolition of the DQP Program.

p.  Vacate and set aside the 2024 Rule's abolition of the DQP Program.

q.  Declaratory relief stating that (i) the 2024 Rule is arbitrary and capricious in that it fails to consider the substantial economic impacts the Rule will have on the Tennessee Walking Horse industry and the greater economy at large; and (ii) USDA's failure to consider the impact of the rule on small entities is a failure to abide by its obligations under the Regulatory Flexibility Act.

r.  An injunction preliminarily and permanently preventing Defendants from enforcing the 2024 Rule.

s.  Vacate and set aside the 2024 Rule.

t.  Attorneys' fees and costs.

u.  Any other relief which this Court may deem just and proper.


July 1, 2024                                        Respectfully submitted.

                                                   /s/ *John V. Coghlan*

MARVIN W. JONES
Texas Bar No. 10929100                             PATRICK F. PHILBIN*
Sprouse Shrader Smith                              JOHN V. COGHLAN*
701 S Taylor St., #500                             CHASE HARRINGTON*
Amarillo, TX 79101                                 Torridon Law PLLC
(806) 468-3344                                     801 Seventeenth Street NW, Suite 1100
marty.jones@sprouselaw.com                         Washington DC 20006
                                                   (202) 249-6900
                                                   pphilbin@torridonlaw.com
                                                   jcoghlan@torridonlaw.com
                                                   charrington@torridonlaw.com

                                                   *Application for admission pro hac vice
                                                   forthcoming