**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | |
|---|---|
| THE TENNESSEE WALKING HORSE NATIONAL CELEBRATION ASSOCIATION; KIMBERLY LEWIS; and TOM GOULD, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF AGRICULTURE; THOMAS VILSACK, in his official capacity as Secretary of Agriculture; ANIMAL AND PLANT HEALTH INSPECTION SERVICE; MICHAEL WATSON, in his official capacity as Administrator of the Animal and Plant Health Inspection Service, <br><br> *Defendants*. | Civil Action No.: 2:24-cv-00143 |

**BRIEF IN SUPPORT OF THE HUMANE SOCIETY OF THE UNITED STATES'**
**<u>MOTION TO INTERVENE</u>**

# **TABLE OF CONTENTS**

I.     Background ........................................................................................................ 2

A.     HSUS's Long Campaign to End Horse Soring ........................................................ 2

B.     Legal Framework and Regulatory Evolution.......................................................... 6

II.     Argument.........................................................................................................11

A.     HSUS Is Entitled to Intervene As a Matter of Right Pursuant to Rule 24(a)(2). ........................11

        1. HSUS's Motion to Intervene is Timely. ............................................................ 12

        2. HSUS Has a Direct, Substantial, and Legally Protectable Interest in this Action................. 15

        3. Disposition of this action may impair HSUS's ability to protect its interests. ...................... 17

        4. HSUS' interests are not adequately represented by existing parties..................................... 18

B.     In the alternative, this Court should permit HSUS to intervene under Rule 24(b)..................... 20

Conclusion and Prayer ............................................................................................. 20

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*All. for Hippocratic Medicine v. U.S. Food and Drug Administration,*
  2024 WL 1260639 (N.D. Tex Jan. 12, 2024) ................................................................. passim

*Brumfield v. Dodd,*
  749 F.3d 339 (5th Cir. 2014) ........................................................................... 12,18,19

*City of Hous. v. Am. Traffic Sols., Inc.,*
  668 F.3d 291 (5th Cir. 2012) ......................................................................................... 17

*DeOtte v. Nevada,*
  20 F.4th 1055 (5th Cir. 2021) ...................................................................................... 15

*Edwards v. City of Houston,*
  78 F.3d 983 (5th Cir. 1996) ................................................................................. passim

*Franciscan All., Inc. v. Azar,*
  414 F. Supp. 3d 928 (N.D. Tex. 2019) .................................................................. 17,20

*Fund for Animals, Inc. v. Norton,*
  322 F.3d 728 (D.C. Cir. 2003) ...................................................................................... 19

*Humane Soc'y of the United States v. United States Dep't. of Ag.,*
  474 F. Supp. 3d 320 (D.D.C. 2020), <u>rev'd and remanded,</u> 41 F.4th 564 (D.C. Cir. 2022).. 10,19

*Humane Soc'y of the United States, et al. v. United States Dep't. of Ag., et al.,*
  41 F.4th 564 (D.C. Cir.), <u>reh'g denied,</u> 54 F.4th 733 (D.C. Cir. 2022).....................1,10,11,16,17

*John Doe No. 1 v. Glickman,*
  256 F.3d 371 (5th Cir. 2001) .................................................................................. 14,17

*Jones v. Caddo Par. Sch. Bd.,,*
  735 F.2d 923(5th Cir. 1984) ......................................................................................... 14

*La Union del Pueblo Entero v. Abbott,*
  29 F.4th 299 (5th Cir. 2022) ............................................................................... passim

*Lelsz v. Kavanagh,*
  710 F.2d 10040 (5th Cir. 1983) .................................................................................. 14

*NextEra Energy Capital Holdings, Inc. v. D'Andrea,*
  No. 20-50168, 2022 WL 17492273 (5th Cir. Dec. 7, 2022) ......................................... 13,14,15

*Sierra Club v. Espy,*
  18 F.3d 1202 (5th Cir. 1994) ................................................................................. 12,13

*Stallworth v. Monsanto Co.,*
  558 F.2d 257 (5th Cir. 1977) ................................................................. 12,14

*Texas v. U.S.,*
  805 F.3d 653 (5th Cir. 2015) ...................................................... passim

*U.S. v. Allegheny-Ludlum Industries, Inc.,*
  517 F.2d 826 (5th Cir. 1975) ............................................................. 12

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Com'n,*
  834 F.3d 562 (5th Cir. 2016) ....................................................... 13,15,17

**Statutes**

15 U.S.C § 1522 .......................................................................... 9,16

15 U.S.C. § 1821 ............................................................................. 6

15 U.S.C. § 1822 ............................................................................. 6

15 U.S.C. § 1823 ............................................................................. 6

15 U.S.C § 1824 ............................................................................. 6

15 U.S.C § 1825 ............................................................................. 6

15 U.S.C § 1828 ............................................................................. 9

**Rules**

Horse Protection Amendments, 89 Fed. Reg. 39194 (May 8, 2024) (amending 9 C.F.R. §
  11) ...................................................................................... passim

9 C.F.R. § 11 ............................................................................... 1

9 C.F.R. § 11.7 ............................................................................. 7

Horse Protection; Licensing of Designated Qualified Persons and Other Amendments, 81
  Fed. Reg. 49112 (July 26, 2016) ........................................................ 10

Horse Protection; Licensing of Designated Qualified Persons and Other Amendments, 88
  Fed. Reg. 47068 (July 21, 2023) ........................................................ 11

Fed. R. Civ. P. 24 .................................................................. passim

**Other**

Application for Now *That's* A Walking Horse!: 2018 Grant and Recognition Program, The
  Humane Soc'y of the United States,
  https://www.humanesociety.org/sites/default/files/docs/2018-now-thats-a-walking-
  horse.pdf ............................................................................... 4

Ariana Sawyer, *USDA announces strict changes to end soring of Tennessee walking horses*,
  The Tennessean (Jan. 13, 2017),
  https://www.tennessean.com/story/news/local/2017/01/13/usda-announces-strict-
  changes-end-soring-tennessee-walking-horses/96556290/ .................................................... 4

Humane Soc'y of the United States,
  *Tennessee Walking Horse Abuse*, Youtube, (August 28, 2012),
  https://www.youtube.com/watch?v=vZTIbwaibOE ............................................................. 3

*Humane Society of the United States Denounce USDA Plan to Withdraw 2017 Rule to
  Protect Horses from Soring*, Sierra Sun Times (July 23, 2023),
  https://goldrushcam.com/sierrasuntimes/index.php/news/local-news/48017-humane-
  society-of-the-united-states-denounce-usda-plan-to-withdraw-2017-rule-to-protect-
  horses-from-soring.......................................................................................................... 4

Keith Dane, *Alexander, Blackburn should protect Tennessee Walking Horses from soring |
  Opinion*, The Tennessean (Sep. 25, 2020),
  https://www.tennessean.com/story/opinion/2020/09/25/alexander-blackburn-should-
  protect-walking-horses-soring/3524844001/ ........................................................... 4

Keith Dane, *Could this be the end of cruel soring at Tennessee walking horse
  'Celebrations'?*, HSUS (Sep. 3, 2024), https://www.humanesociety.org/blog/cruel-
  horse-soring-tennessee-walking-show......................................................................... 4

Mary Beth Sweetland, *Humane Society defends horse soring investigation,* The Tennessean
  (Sep. 23, 2015),
  https://www.tennessean.com/story/opinion/contributors/2015/09/23/humane-society-
  defends-horse-soring-investigation/72649586/ ........................................................ 4

Press Release, *USDA moves to end the cruel "Big Lick" for horses*, Humane Soc'y of the
  United States (Apr. 29, 2024), https://www.humanesociety.org/news/usda-moves-end-
  cruel-big-lick-horses; *see also* Dane Decl. .......................................................... 4

*Soring in Horses*, AVMA, (Feb. 15, 2012),
  https://www.humanesociety.org/resources/what-horse-soring (last visited Oct. 8, 2024) ...... 3

*Soring: Unethical and Illegal,* AVMA, (May 2013)
  https://www.avma.org/sites/default/files/resources/soring_in_horses_factsheet.pdf ............. 3

Suzanne Robertson, *Humane Society Asks Attorney General to Investigate Horse-Soring*,
  Tenn. B. Assoc. (May 25, 2012),
  https://www.tba.org/?pg=LawBlog&blAction=showEntry&blogEntry=10954 ................... 4

HPI Application, Horse Protection Act, United States Dept. of Ag.,
  https://www.aphis.usda.gov/hpa (under "Horse Protection Inspectors") (last modified
  Sept. 12, 2024). . ................................................................................................... 8

The Humane Soc'y of the United States, *Undercover: Horses Abused at Top Training Barn,*
  Youtube (Aug. 25, 2015),
  https://www.youtube.com/watch?app=desktop&v=yDygeHVZ6qw. ................................... 5

*The Humane Society of the United States Investigates Cruel Training of Tennessee Walking Horses: Investigative Report,* The Humane Soc'y of the United States, https://www.humanesociety.org/sites/default/files/docs/investigation-report-tn-cruel-training-walking-horse.pdf (last visited Oct. 8, 2024)............................................................ 5

USDA Office of the Inspector General, Audit Rep. 33601-2-KC, *Animal and Plant Health Inspection Service Administration of the Horse Protection Program and the Slaughter Horse Transport Program,* 2, 10-11 (Sept. 2010). ................................................................ 7

*What is horse soring?*, The Humane Society of the United States, https://www.humanesociety.org/resources/what-horse-soring (last visited Oct. 8, 2024) ... 2,3

## INTRODUCTION

The Humane Society of the United States ("HSUS") respectfully requests that this Court grant its motion to intervene in this matter as of right pursuant to Fed. R. Civ. P. 24(a)(2) or, in the alternative, grant permissive intervention pursuant to Fed. R. Civ. P. 24(b). This Motion is timely as it is being filed before the parties have filed substantive motions, HSUS has a direct and substantial interest in this matter that will be harmed if the Plaintiffs succeed, and HSUS's interests are not adequately represented by an existing party.

This lawsuit challenges the revision of important horse protection regulations intended to eradicate the cruel and barbaric practice of horse "soring" in the Tennessee Walking Horse industry – changes HSUS has expended numerous resources advocating for over the course of many years. With the promulgation of the new regulations at issue in this case, HSUS was able to declare a significant victory in the long and resource-intensive fight to combat soring. Horse Protection Amendments, 89 Fed. Reg. 39194 (May 8, 2024) (amending 9 C.F.R. § 11) (hereinafter, "Final Rule")

The Final Rule replaces a failed regulatory system through which the Tennessee Walking Horse industry was tasked with regulating itself, and a system which allowed for devices to be utilized on horses' feet and legs that exacerbate the horses' pain. It is no stretch to say that HSUS's advocacy was a proximate cause of promulgation of this Final Rule. A prior similar rule finalized in January 2017 was unlawfully withdrawn by the federal government at the outset of the Trump Administration, and the government defended that withdrawal into the Biden Administration. Successful litigation by HSUS and its members vacated that withdrawal, ultimately remanding the matter to the United States Department of Agriculture ("USDA"). *See Humane Soc'y of the United States, et al. v. United States Dep't. of Ag., et al.,* 41 F.4th 564 (D.C. Cir.), reh'g denied, 54 F.4th

1

733 (D.C. Cir. 2022). During this process, in which HSUS and USDA did not always or often agree on what steps the agency should take, HSUS took the position that USDA was *required* to promulgate rules that were more protective than the status quo in order to accomplish Congress' objectives in the Horse Protection Act. This position is clearly germane to the claims made by Plaintiffs in this case. If Plaintiffs are successful in their attempts to set aside the Final Rule, HSUS and its members – many of whom own and love Walking Horses – will suffer substantial, concrete and perceptible harm as will, of course, the horses.

## BACKGROUND

### A.  HSUS's Long Campaign to End Horse Soring

Since its founding in 1954, HSUS – the nation's largest animal protection organization – has worked to combat animal abuse and exploitation and promote the protection and welfare of animals. To that end, and on behalf of its members, HSUS engages in public education, investigations, direct animal care and rescues, legislative advocacy, and litigation.

HSUS has deployed all these tools in service of its decades-long campaign to end the soring of gaited show horses. Unscrupulous trainers, owners, and exhibitors rely on this cruel and inhumane practice as a shortcut to artificially induce or exaggerate these horses' high-stepping or "big lick" gait – prized in some competitions – and bypass the otherwise laborious and expensive training such gaits would require.

Soring involves the infliction of pain on a horse's limbs and forefeet to alter its natural gait. *See What is horse soring?*, The Humane Society of the United States, https://www.humanesociety.org/resources/what-horse-soring (last visited Oct. 8, 2024) (hereinafter, "HSUS, What is Soring?"). Although methods vary, several practices are common. Some trainers slather their horse's pasterns with caustic chemicals (such as mustard oil), wrap the pasterns tightly with plastic to "cook" the chemicals into the flesh, causing intense pain, and then

when the horse is ridden affix heavy "action devices" (like metal rollers or chains) over the seared tissue to exacerbate the pain. *See Soring in Horses*, AVMA, (Feb. 15, 2012), https://www.avma.org/sites/default/files/resources/soring_horses_bgnd.pdf. They also force their horses to wear heavy, high heel-like stacked shoes. Still others cut their horses' hooves down to the delicate tissue; over-tighten metal hoof bands or jam in hard objects, sharp objects, or putty between the horses' pads and soles to cause excessive pressure on the foot. *See* Humane Soc'y of the United States, *Tennessee Walking Horse Abuse*, YouTube, (August 28, 2012), https://www.youtube.com/watch?v=vZTIbwaibOE (interview with former horse trainer and convicted horse sorer Barney Davis) (hereinafter, "Barney Davis Interview"). Many rely on all or a combination of these approaches. Once sored, the horse will experience intense pain when his forefeet touch the ground. As a result, he will lift his feet up quickly and thrust them forward. This pain response produces the sought-after gait. *See id.; see also* HSUS, What is Horse Soring?, *supra*.

This pain also produces long-term side effects, including laminitis, stress colic, broken hooves, and sometimes even death. *See Soring: Unethical and Illegal,* AVMA, (May 2013) https://www.avma.org/sites/default/files/resources/soring_in_horses_factsheet.pdf; *see also* Barney Davis Interview, *supra*. Some horses hurt so much they cannot eat or require such high doses of pain medicine that they cannot stand or leave their stall, and ultimately must be put down. *See id.*

HSUS is the primary national advocacy organization driving the campaign to end this horrifying practice, drawing upon all the tools at its disposal to do so. *See* Decl. of Keith Dane ¶ 4 (hereinafter, "Dane Decl."), App. at 3-4. HSUS has undertaken significant public education campaigns regarding the cruelty of soring, including by presenting at conferences, drafting and

publishing informative blogs, opinion editorials, email alerts to members, and press releases concerning the harms that soring inflicts on horses as well as on honest competition.[1] HSUS representatives frequently speak with media and are featured in articles related to soring and Tennessee Walking Horses.[2]

Further, HSUS supports breed and industry organizations that promote the natural gait and humane treatment of gaited show horses. For example, through the program "Now *That's* a Walking Horse!," HSUS partnered with industry organizations to demonstrate that gaited horses and events that feature them are exciting, fun, and lucrative – without soring. *See* Application for Now *That's* A Walking Horse!: 2018 Grant and Recognition Program, The Humane Soc'y of the United States, https://www.humanesociety.org/sites/default/files/docs/2018-now-thats-a-walking-horse.pdf. Thus, it is no surprise that HSUS counts among its members horse owners and exhibitors who do not sore their horses (and whose interests are harmed by the participation of sored horses in competition), who have associated with HSUS to represent their interests.

---

[1] *See* Keith Dane, *Could this be the end of cruel soring at Tennessee walking horse 'Celebrations'?*, HSUS (Sep. 3, 2024), https://www.humanesociety.org/blog/cruel-horse-soring-tennessee-walking-show; Suzanne Robertson, *Humane Society Asks Attorney General to Investigate Horse-Soring*, Tenn. B. Assoc. (May 25, 2012), https://www.tba.org/?pg=LawBlog&blAction=showEntry&blogEntry=10954; Mary Beth Sweetland, *Humane Society defends horse soring investigation,* The Tennessean (Sep. 23, 2015), https://www.tennessean.com/story/opinion/contributors/2015/09/23/humane-society-defends-horse-soring-investigation/72649586/; Press Release, *USDA moves to end the cruel "Big Lick" for horses*, Humane Soc'y of the United States (Apr. 29, 2024), https://www.humanesociety.org/news/usda-moves-end-cruel-big-lick-horses; *see also* Dane Decl., App. at 3.

[2] *See, e.g.,* Ariana Sawyer, *USDA announces strict changes to end soring of Tennessee walking horses*, The Tennessean (Jan. 13, 2017), https://www.tennessean.com/story/news/local/2017/01/13/usda-announces-strict-changes-end-soring-tennessee-walking-horses/96556290/; *see also* Keith Dane, *Alexander, Blackburn should protect Tennessee Walking Horses from soring | Opinion*, The Tennessean (Sep. 25, 2020), https://www.tennessean.com/story/opinion/2020/09/25/alexander-blackburn-should-protect-walking-horses-soring/3524844001/; *Humane Society of the United States Denounce USDA Plan to Withdraw 2017 Rule to Protect Horses from Soring*, Sierra Sun Times (July 23, 2023), https://goldrushcam.com/sierrasuntimes/index.php/news/local-news/48017-humane-society-of-the-united-states-denounce-usda-plan-to-withdraw-2017-rule-to-protect-horses-from-soring.

HSUS has also used its resources to assist in law enforcement investigations at the request of law enforcement officials, and has undertaken its own undercover investigations to identify, expose, and bring to justice perpetrators of horse soring. For example, in 2012, an HSUS undercover investigation led to the arrest, indictment on 52 counts (including felonies), and ultimate guilty plea of a notorious trainer. *See* Dane Decl., App. at 4; *The Humane Society of the United States Investigates Cruel Training of Tennessee Walking Horses: Investigative Report,* The Humane Soc'y of the United States, https://www.humanesociety.org/sites/default/files/docs/investigation-report-tn-cruel-training-walking-horse.pdf (last visited Oct. 8, 2024). A similar investigation into horrific soring committed by yet another training establishment confirmed that every horse in training had been sored. *See* The Humane Soc'y of the United States, *Undercover: Horses Abused at Top Training Barn,* Youtube (Aug. 25, 2015), https://www.youtube.com/watch?app=desktop&v=yDygeHVZ6qw. HSUS also offers rewards to bring horse abusers to justice and fields reports from those with eyewitness accounts and evidence of soring. *See* HSUS, What is Soring, *supra.* More recently, our undercover investigator witnessed and documented rampant soring at one of the oldest and most successful training stables in the industry. *See* Dane Decl., App. at 4.

In addition, and particularly relevant here, HSUS vigorously advocates for and pursues legislative and regulatory change to combat soring. This includes working tirelessly to bring about the amendments to the horse protection regulations manifested in the Final Rule at issue in this case (as described more fully below). *See* Dane Decl., App. at 6.

HSUS undertakes these efforts on its own behalf, as well as on the behalf of its members – all of whom care about the welfare of the horses, and many of whom specifically love and own

gaited horses, participate in events, or otherwise have a personal stake in eradicating this practice. *See* HSUS Member Declarants, App. at 162-182.

### B.  Legal Framework and Regulatory Evolution

In 1970, Congress passed the Horse Protection Act, followed by the Horse Protection Act Amendments of 1976 (together the "HPA" or the "Act," codified at 15 U.S.C. § 1821 et seq.), to end "cruel and inhumane" horse soring and to prevent disreputable trainers from competing unfairly. *See* 15 U.S.C. § 1822 (1)-(2). To achieve those aims, the HPA prohibits the showing, exhibition, sale, or auction of sore horses. *See* 15 U.S.C. § 1824 (1)-(2). Show management is primarily responsible for enforcing those prohibitions, including by disqualifying sored horses from competing. *See* 15 U.S.C. §§ 1823(a) (requiring show management to disqualify sored horses from competition), 1824 (prohibiting show management's failure to disqualify sored horses).

To aid in the identification and disqualification of sored horses, the HPA provides show management with the option to appoint "persons qualified to detect and diagnose" sored horses. 15 U.S.C. § 1823(c). The HPA incentivizes show management's appointment of these qualified persons: where show management appoints them, management is insulated from direct liability for HPA violations and need not independently evaluate whether a horse is sored. 15 U.S.C. § 1824(5). But where management declines to do so, it may be held directly liable. *See* 15 U.S.C. § 1824(3). USDA is also empowered under the HPA to independently inspect any horse at any show or exhibition, and to detain horses suspected of being sored. 15 U.S.C. §§ 1823(e) (permitting inspection), 1825(e)(1) (permitting detention), 1823(a) (requiring disqualification where notified of sored horses by USDA inspector).

The HPA delegates rulemaking authority to the USDA, which in turn has delegated administration of the Act to the agency's Animal Plant Health Inspection Service ("APHIS").

Under the regulations that have been in effect for decades, and which the Final Rule at issue in this case amends, the "persons" who could be appointed were called "designated qualified persons." *See* 9 C.F.R. § 11.7. Those "designated qualified persons" – who were paid, trained, and licensed by the Walking Horse industry – were notorious for having conflicts of interest and resulting substandard performance. Inspectors were often other horse trainers, owners, or exhibitors (or their relatives), who had clear incentives not to rigorously enforce the law; they might not get hired as inspectors in other shows, and they were naturally wary of penalizing exhibitors who might be inspecting their own horse at a future show. *See* USDA Office of the Inspector General, Audit Rep. 33601-2-KC, *Animal and Plant Health Inspection Service Administration of the Horse Protection Program and the Slaughter Horse Transport Program,* 2, 10-11 (Sept. 2010) (hereinafter, "OIG Report"). As a result—and as detailed in the 2010 OIG Report, which followed a multi-year investigation into over one thousand horse shows—the regulatory regime had "inherent conflict[s] of interest" and resulted in dramatic under-enforcement. OIG Report, *supra* at 2, 10. The OIG Report indicates that the regulatory regime was failing to meet the commands of Congress through the HPA.

Moreover, APHIS' recent analysis of performance by DQPs when APHIS is present at shows compared to when APHIS is absent suggests that DQPs consistently "pass" horses during inspections that they likely know would not pass if inspected by an APHIS official. *See* Final Rule, *supra* at 39197. Thus, it is clear that the regulatory framework has been inadequate for carrying out the goals of the HPA. *See id*. at 39198 ("After 50 years of enforcing the HPA, APHIS has amassed an aggregate body of data indicating the Tennessee Walking Horse and racking horse industry is disproportionately likely to sore their horses, and DQPs in the industry are

disproportionately unlikely to detect the soring."). More than half a century after the HPA came into being, the horrific practice of soring has persisted.

Under the Final Rule, however, the failed system of self-regulation will finally be eradicated. Now, the persons show management may appoint will be known as "Horse Protection Inspectors" or "HPIs" and will be independently trained by USDA. *See* Final Rule, *supra* at 39245 (defining HPIs). The new rule sets forth minimal, sensible criteria for serving as an HPI. *See id.* at 39251. Under these regulations, APHIS screens, trains, and authorizes HPIs for appointment. *Id.*[3] For example, tasked with detecting and diagnosing injured horses, HPIs will be veterinarians, veterinary technicians, or state or local government employees with demonstrated experience with horses. *See* Final Rule, *supra* at 39251. Entrusted to realize the HPA's essential purpose of eliminating soring, HPIs may not have previously violated the HPA. *See id.* Because industry corruption has undercut the HPA's effectiveness, HPIs may not have demonstrated dishonesty. *See id.* The Final Rule also prohibits the use of certain "action devices" that are known to be associated with soring and that exacerbate the horses' pain. *See id.* at 39195.

Detection of soring is not always straightforward and soring is often intentionally concealed through the use of masking agents. *See* Barney Davis Interview, *supra; see also* Final Rule, *supra* at 39207, 39219. Thus, in addition to requiring that HPIs work from a baseline of veterinary training and horsemanship, the Final Rule establishes a clear process for horse inspection and criteria for identifying sore horses during inspection. *See* Final Rule, *supra* at 39222 (establishing presumption of soring where dermatologic conditions indicative of soring, outlined in a non-exhaustive list, are present), 39223 (detailing inspection and detention of sore horses).

---

[3] The HPI application window opened on June 7, 2024, to ensure that HPI training and authorization can occur prior to February 1, 2025. Horse Protection Act, United States Dept. of Ag., https://www.aphis.usda.gov/hpa (under "Horse Protection Inspectors") (last modified Sept. 12, 2024).

Across its years of leadership on this issue, HSUS has worked tirelessly – and expended an extraordinary amount of time and resources – to bring about the regulatory reforms finally put in place with the Final Rule. It has been, and still is, HSUS's position that the prior regulatory framework violated the HPA because it failed "to carry out the provisions of [the HPA]." 15 U.S.C. § 1828 ("The Secretary is authorized to issue such rules and regulations as he deems necessary to carry out the provisions of this chapter"). Accordingly, in August 2010, HSUS petitioned the USDA to amend the HPA regulations to more effectively carry out the goals of the HPA. *Petition for Rulemaking*, Humane Soc'y of the United States, et al. (Aug. 4, 2010), App. at 9-57. Shortly thereafter, in September 2010, the OIG issued its scathing report detailing the failings of the self-regulation scheme and recommending that the USDA abolish the DQP system and "establish by regulation that inspectors will be independent, USDA-accredited veterinarians." OIG Report, *supra* at 17.

In February 2015, HSUS followed up with a supplemental Petition to USDA that sought two key reforms, both highly relevant here. *Supplemental Petition for Rulemaking to Amend Regulations Under the Horse Protection Act*, Humane Soc'y of the United States (Feb. 18, 2015), App. at 61-98. First, HSUS asked the agency to "[a]bolish the industry-regulated inspection scheme, and the corresponding use of Designated Qualified Persons ("DQPs"), and replace it with an inspection scheme administered and regulated by the Agency, which eliminates the conflicts of interest inherent in the current system," and second, HSUS asked the agency to "Prohibit the use of all action devices, horseshoe 'stacks,' 'performance packages,' and other soring techniques on breeds of horses known to be subject to soring with this equipment to achieve an exaggerated 'big lick' gait." App. at 99-102.

9

Consistent with HSUS's 2015 Petition and with OIG's recommendations, in 2016, USDA published a proposed rule that would have replaced the HIO-administered scheme with USDA-licensed and trained inspectors and prohibited the use of all action devices, pads, wedges, equipment and foreign substances with no purpose other than to cause horse soring. *Horse Protection; Licensing of Designated Qualified Persons and Other Amendments*, 81 Fed. Reg. 49112 (July 26, 2016). APHIS stated in the proposed rule that it agreed "with the OIG's conclusion that the current program of HIOs training and licensing DQPs is not adequately detecting soring or promoting enforcement of the Act" and believed that the proposed changes were "necessary" to satisfy the HPA's statutory mandate. *Id. at* 49115.

HSUS submitted extensive comments on the proposed rule. Humane Soc'y of the United States, et al., *Comments Regarding Proposed Rule "Horse Protection: Licensing of Designated Qualified Persons and Other Amendments,"* APHIS-2011-0009-0001, Oct. 25, 2016, App. at 103-142. 5. In January 2017, USDA posted a signed final rule to its website and announced its upcoming publication in the Federal Register. However, before the rule was published in the Federal Register, and pursuant to the newly inaugurated President's Chief of Staff's order, the Office of Federal Register withdrew the rule from publication and USDA took no further action on the rulemaking. *See Humane Soc'y of the United States, et al. v. United States Dep't. of Ag., et al.,* 41 F.4th 564, 565, 567 (D.C. Cir.), reh'g denied, 54 F.4th 733 (D.C. Cir. 2022). Following unsuccessful attempts to convince the agency to reinstate the rule, HSUS – along with its sister organization the Humane Society Legislative Fund and several individuals – sued the agency for unlawfully withdrawing the rule. *Humane Soc'y of the United States v. United States Dep't. of Ag.*, 474 F. Supp. 3d 320, 324 (D.D.C. 2020), rev'd and remanded, 41 F.4th 564 (D.C. Cir. 2022). The District Court dismissed the case, but the D.C. Circuit Court of Appeals found that USDA had

violated the Administrative Procedure Act when it withdrew the final rule without notice and comment procedures. *Humane Soc'y of the United States, et al.,* 41 F.4th 564.

Following this ruling, USDA did engage in notice and comment procedures to formally withdraw the 2017 rule, during which it committed to engaging in a new rulemaking process to update and upgrade the regulations. *See* Horse Protection; Licensing of Designated Qualified Persons and Other Amendments, 88 Fed. Reg. 47068 (July 21, 2023). That is exactly what the agency did when it *finally* – at long last and following a comment period in which HSUS submitted extensive comments – promulgated the Final Rule at issue in this case. *See* Humane Soc'y of the United States, et al., *Comments Regarding Proposed Rule "Horse Protection: Horse Protection: Amendments to the Horse Protection Regulations,"* APHIS-2022-0004, Oct. 20, 2023, App. at 143-160.

This lengthy campaign that HSUS has undertaken to advocate for the regulations now finally about to be implemented through the Final Rule required a *substantial* investment of resources – resources that were diverted from HSUS's other animal protection endeavors. If Plaintiffs succeed in their effort to set aside the Final Rule, two decades of HSUS's advocacy efforts and resource expenditures will be for naught.

## II.    ARGUMENT

### A.  HSUS Is Entitled to Intervene as a Matter of Right Pursuant to Rule 24(a)(2).

Rule 24(a)(2) of the Federal Rules of Civil Procedure sets out the requirements for intervention as of right. Under that rule, on "timely motion," the court:

> must permit anyone to intervene who…claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2).

11

Accordingly, applicants must be permitted to intervene when they: (1) submit a timely application; (2) have an interest in the subject of the litigation; (3) are so situated that disposition of the action may impair their ability to protect that interest; and (4) their interest may be inadequately represented by existing parties. *See, e.g., Sierra Club v. Espy,* 18 F.3d 1202, 1204 (5th Cir. 1994) (granting motion to intervene, and noting that federal agency had broader interests to address than movant); *All. for Hippocratic Med. v. United States FDA*, No. 2:22-CV-223-Z, 2024 WL 1260639, at *4 (N.D. Tex. 2024) (granting intervention as of right, and noting that a party seeking to intervene need only show that if they cannot intervene, there is a possibility that their interest could be impaired or impeded). This test demands a "flexible" case-by-case analysis using a "practical rather than technical yardstick." *Edwards v. City of Houston*, 78 F.3d 983, 999 (5th Cir. 1996) (en banc) (citing *U.S. v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826, 841 (5th Cir. 1975)); *see also Brumfield v. Dodd*, 749 F.3d 339, 341 (5th Cir. 2014).

Rule 24(a) is framed in broad mandatory terms that favor intervention. Fed. R. Civ. P. 24(a) (The courts "must permit anyone [that meets Rule 24(a)(2)'s requirements] to intervene") (emphasis added). The Fifth Circuit heeds this command by liberally construing Rule 24(a)(2). *See, e.g.*, *Brumfield*, 749 F.3d at 341. Thus, although movants bear the burden of establishing their right to intervene, this burden is "minimal." *See La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 305 (5th Cir. 2022). At this stage, the court takes the movant's factual allegations as true. *Id.*

HSUS satisfies each of the Rule 24(a)(2) requirements.

1. <u>HSUS's Motion to Intervene is Timely</u>.

Rule 24(a) does not set deadlines by which parties must seek leave to intervene. Instead, to evaluate timeliness, the Fifth Circuit developed a four-factor inquiry that weighs: (1) the length of time that movant waited to file; (2) the prejudice to existing parties from any delay; (3) the

prejudice to the movant if intervention is denied; and (4) any unusual circumstances. *See Sierra Club*, 18 F.3d at 1204-08; *Stallworth v. Monsanto Co.*, 558 F.2d 257, 264-67 (5th Cir. 1977); *Edwards,* 78 F.3d at 999-1006. Such inquiry should not be used as a "tool of retribution to punish the tardy would-be intervenor;" instead, this inquiry should serve as "a guard against prejudice." *Sierra Club*, 18 F.3d at 1205. Thus, this Court should permit intervention "where no one would be hurt and greater justice could be attained." *Id.* (internal citation and quotations omitted). Here, there is no prejudice to existing parties resulting from the limited period between the Plaintiffs' filing of this action and HSUS's Motion. Yet HSUS would suffer serious prejudice if this Court denies its Motion.

HSUS is filing this Motion within a few months of the case being filed, and before the parties have filed any substantive motions. Defendants have not yet answered the Complaint.[4] Courts routinely deem motions to intervene timely if filed within several months of an intervenor learning of the case or its interests in the action. *See, e.g., Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*, 834 F.3d 562, 565-66 (5th Cir. 2016) (motion to intervene timely when filed three months after defendant filed its answer following denial of motion to dismiss); *NextEra Energy Capital Holdings, Inc. v. D'Andrea*, No. 20-50168, 2022 WL 17492273, at *3 (5th Cir. Dec. 7, 2022) (unreported) (motion to intervene timely when filed within two months of plaintiffs bringing suit and before defendants filed responsive pleadings).

Second, intervention will not prejudice the existing parties. Prejudice to existing parties generally arises from interruption to discovery, motions, and trial phases of litigation – where intervenor seeks delay or reconsideration of phases of litigation that have already been completed. *See Wal-Mart Stores, Inc.*, 834 F.3d at 565-66 (motion was timely when made before discovery

---

[4] The Court granted Defendants' motion to file their Answer, if necessary, 30-days after this Court's ruling on the parties' cross-motions for summary judgment, for which briefing is set to begin on October 18.

progressed). Where intervention occurs before litigation of major issues, courts routinely find no prejudice to existing parties. *NextEra Energy*, 2022 WL 17492273 at *3 ("Intervention this early before discovery and before litigation of major issues would not cause extensive prejudice or delay."); *John Doe No. 1 v. Glickman*, 256 F.3d 371, 378 (5th Cir. 2001) (motion timely when made before trial). Here, HSUS seeks leave to intervene three months into the litigation, prior to responsive pleadings or litigation of major issues.

Moreover, HSUS's intervention will not cause delay in the existing briefing schedule. HSUS is prepared to file a motion for summary judgment and supporting memorandum on November 12, 2024, at the same time the Defendants will be filing their Motion pursuant to the existing Scheduling Order. Accordingly, there is no prejudice resulting from intervention.

With regard to the third timeliness factor, by contrast, denying HSUS's motion as untimely would gravely prejudice HSUS and its members. As the above timeline demonstrates, HSUS has worked for years to bring about the important protections for horses made possible by the Final Rule. Not only does HSUS want to protect that interest by being heard as a fully participating party at this stage, but the inability to appeal an adverse ruling would also be prejudicial to HSUS's interests. *See Glickman*, 256 F.3d at 379. Should the agency lose this case and decide not to appeal, thus continuing the totally ineffective regulatory regime, HSUS would be back to square one, having to expend additional resources to again advocate for regulations that comply with the goals and mandates of the HPA and protects HSUS's and its members interests. This would amount to grave prejudice to HSUS. Therefore, HSUS satisfies the third *Stallworth* factor and its motion is timely.[5]

---

[5] The final "unusual circumstances" factor is inapplicable here. Unusual circumstances may point toward finding intervention timely where, for example, a dilatory would-be intervenor makes a "convincing" showing "that for reasons other than lack of knowledge he was unable to intervene sooner." *Jones v. Caddo Par. Sch. Bd.*, 735 F.2d 923, 937 (5th Cir. 1984); *see also Lelsz v. Kavanagh*, 710 F.2d 1040, 1047 (5th Cir. 1983).

2. <u>HSUS Has a Direct, Substantial, and Legally Protectable Interest in this Action</u>.

HSUS's members' interests as beneficiaries of the Final Rule and HSUS's interests as one of the leading advocates for the Final Rule over the course of many years, including a multi-year litigation effort against USDA, easily satisfy the "interest" requirement of Rule 24(a)(2). The requirement for a would-be intervenor to have an interest in the action is met when the movant shows a "direct, substantial, legally protectable interest in the proceedings." *DeOtte v. Nevada*, 20 F.4th 1055, 1068 (5th Cir. 2021) (internal quotation marks omitted) (quoting *Edwards*, 78 F.3d at 1004). "What is important is 'whether the intervenor has a stake in the matter that goes beyond a generalized preference that the case come out a certain way[.]'" *Id.* (quoting *Texas v. U.S.*, 805 F.3d 653, 657 (5th Cir. 2015). And while an interest that is "purely 'ideological, economic, or precedential'" is insufficient, a case involving "a public interest question" that is "brought by a public interest group," the "interest requirement may be judged by a more lenient standard." *La Union del Pueblo Entero*, 29 F.4th at 305–06 (quoting *Texas*, 805 F.3d at 657); *see also All. for Hippocratic Med.*, 2024 WL 1260639 at *4 ("The interest requirement may be judged by a more lenient standard if the case involves a public interest question"). Notably, an interest does not have to be "legally enforceable" to be protectable. *Id*. at *3 (quoting *NextEra Energy* 2022 WL 17492273 at *3). An interest is "legally protectable" if "it is of the type that the law deems worthy of protection, even if the intervenor . . . would not have standing to pursue her own claim." *Id*; *see Texas*, 805 F.3d at 659.

As the leader and engineer of the national campaign to end horse soring, having devoted numerous years and resources to specifically bringing about the Final Rule, HSUS has "substantial" and "legally protectable" interests in this proceeding. *See Wal-Mart Stores, Inc.*, 834 F.3d 562 at 567 (noting that "'public spirited' civic organizations that successfully petition for

adoption of a law may intervene to vindicate their 'particular interest' in protecting that law"). Indeed, HSUS is heavily relying on the Final Rule to finally ensure the protection of horses as the HPA intended, reduce HSUS's need to continue to devote substantial resources to investigating and exposing soring activities, allow HSUS to devote its resources to other important animal protection matters, and protect its members' interests in fair competition. *See, generally,* Dane Decl., App. at 8. This is not unlike the interests found to be sufficient by the Fifth Circuit in *La Union del Pueblo Entero*, where political committees were found to have a sufficient interest in a lawsuit challenging election laws that would impact their use of resources and their members' activities. The Fifth Circuit found the groups' interest sufficient "because many of the claims brought by the plaintiffs could affect the Committees' ability to participate in and maintain the integrity of the election process in Texas." *La Union Del Pueblo Entero,* 29 F.4th at 306. Similarly, if the Plaintiffs here succeed in setting aside the Final Rule, HSUS's ability to maintain and achieve the integrity of horse shows – without soring as the HPA intended – will be dramatically impacted.

HSUS members who own walking horses and refuse to engage in soring also have legally protectable interests in fair competition. Indeed, the D.C. Circuit in HSUS's lawsuit against USDA held that HSUS's members had standing in their own right. *See Humane Soc'y of the United States,* 41 F.4th at 568 ("the Humane Society's members allege precisely the competitive harm Congress sought to eliminate with the Horse Protection Act"); *see also* 15 U.S.C. § 1522 ("the Congress finds and declares that. . . horses shown or exhibited which are sore, where such soreness improves the performance of such horse, compete unfairly with horses which are not sore"). HSUS's members who own walking horses would like to show their horses; however, as a former trainer and convicted HPA violator explained, when a sored horse competes against a healthy horse, the sored horse will always win. *See* Barney Davis Interview, *supra*. Protecting HSUS's members'

interests in fair competition is an interest "worthy of protection." *Texas*, 805 F.3d at 659; *see also Wal-Mart Stores, Inc.*, 834 F.3d 567 (finding protectable interest where intervenor association was a beneficiary of the challenged regulatory scheme).

        3.   <u>Disposition of this action may impair HSUS's ability to protect its interests.</u>

Under Rule 24(a), the court "must permit anyone to intervene who… is so situated that disposing of the action *may* as a practical matter *impair or impede* the movant's ability to protect its interest." Fed. R. Civ. P. 24(a) (emphasis added). Though the impairment must be "practical" and not merely "theoretical," HSUS need only show that if it cannot intervene, there is a *possibility* that their interest could be impaired or impeded. *La Union del Pueblo Entero*, 29 F.4th at 307. Real-world consequences outside the courthouse constitute sufficient impairment, such as when the resolution of an action may result in a nonprofit's "money and time [being] spent in vain." *City of Hous. v. Am. Traffic Sols., Inc.*, 668 F.3d 291, 294 (5th Cir. 2012); *see also La Union del Pueblo Entero*, 29 F.4th at 307 (finding impairment when disposal of action may result in changes to legal landscape that may require nonprofits to expend resources to prepare for, adapt to, and educate the public regarding that change); *Glickman*, 256 F.3d at 380 (finding impairment when disposal of action would prevent nonprofit "from ever being heard in a lawsuit that has the potential to end its quest to compel" desired government action); *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 937 (N.D. Tex. 2019) (finding impairment when nonprofits' members may suffer harm).

There can be little question that the disposition of Plaintiffs' claims "may" seriously impair HSUS's interests – in fact it is extremely likely. HSUS's interests, as discussed above, are in ensuring the implementation of the Final Rule which will, in turn, significantly reduce its need to devote resources to investigating, publicizing, and combating soring. *See Humane Soc'y of the United States*, 41 F.4th at 568 (D.C. Circuit finding that HSUS suffered injury when forced to

redirect its resources to combatting soring as a result of withdrawal of final rule). In addition, the Rule will go a long way toward ensuring fair competition in walking horse shows, benefitting HSUS's members who own or wish to own sound walking horses. If Plaintiffs obtain their requested relief and the Final Rule is set aside, HSUS would lose all of these benefits of the Rule, and put it back to square one in its long battle to protect walking horses as the HPA intended. HSUS satisfies the "impairment" prong of the analysis.

4.   HSUS' interests are not adequately represented by existing parties.

Finally, no party adequately represents the HSUS's interests. This requirement is "minimal," and is satisfied upon a showing that representation of the intervenor's interests "may be inadequate." *Edwards*, 78 F.3d at 1005 (internal citation and quotation marks omitted). The Fifth Circuit has "created two presumptions of adequate representation," one presumption arising when an existing party is a "governmental body or officer charged by law" with representing the intervenor's interests, and the second when the "would-be intervenor has the same ultimate objective" as a party to the lawsuit. *Id.* However, HSUS overcomes these presumptions readily. HSUS has an "adversity of interest" with the agency because it can demonstrate that "its interest is in fact different from that of the [governmental entity] and that the interest will not be represented by [it]." *Texas*, 805 F.3d at 661.

To show adversity of interest, an intervenor need only show that "their interests may not align precisely" with one of the existing parties. *Brumfield*, 749 F.3d at 345; *All. for Hippocratic Med.*, 2024 WL 1260639 at *6. That is certainly the case here. First, USDA is a federal agency that represents a broad array of citizens' interests and is not only concerned with protecting the horses and HSUS's members' interests. It may decide to balance numerous considerations in determining whether and how vigorously to defend the Final Rule, including, potentially, the

18

interests of industry. HSUS, in contrast, is only concerned with protecting horses and its members' interests by ensuring that the Final Rule accomplishes what the HPA intended: protection of horses and fair competition. *See, e.g., Brumfield*, 749 F.3d at 346 (finding parents whose children received school vouchers under a Louisiana law were entitled to intervene in a lawsuit brought by the federal government to stop the voucher program because although the State of Louisiana and parents both "vigorously oppose[d] dismantling the voucher program," State had *more extensive interests* to take into consideration); *Texas*, 805 F.3d at 661 (allowing intervention and recognizing that federal government's interests were *broader than those of the intervenors* and thus were not perfectly aligned); *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 737 (2003) ("[agency's] obligation is to represent the interests of the American people…while the [purported intervenor's] concern is for Mongolia's people and natural resources.").

Moreover, given the history of the agency's action on the issue before the Court, it almost should go without saying that HSUS's and the Defendants' interests are not perfectly aligned and that the Defendants, at an absolute minimum, "may" not adequately represent HSUS's interests. Indeed, HSUS sued the USDA because it withdrew a rule very similar to the one at issue here. Compl. ¶ 1, *Humane Soc'y of the United States, et al. v. United States Dep't. of Ag., et al.* 474 F. Supp. 3d 320 (D.D.C. 2020) (No. 1:19-cv-02458-BAH). Importantly, HSUS has consistently taken the position, including in its lawsuit against USDA, that the agency was *statutorily obligated* to promulgate new, more protective regulations in order to accomplish Congress' objectives under the HPA. Thus, HSUS will argue that the current Final Rule is not only well within the agency's authority but is *necessary* to produce a regulatory regime that is true to the letter and best understanding of the purposes of the HPA. Given this history, it cannot be presumed that USDA's defense will align squarely with, or adequately represent, the interests of HSUS. As such, HSUS

has met the "minimal" burden to demonstrate that the existing parties' representation "may be inadequate." *Edwards*, 78 F.3d at 1005.

   **B.  In the alternative, this Court should permit HSUS to intervene under Rule 24(b).**

If the Court finds that HSUS does not have a right to intervene under Fed. R. Civ. P. 24(a), HSUS respectfully requests that this Court grant permissive intervention under Fed. R. Civ. P. 24(b). Courts may permit intervention where the movant "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). In considering a motion for permissive intervention, the Court also considers whether the motion is timely and whether the proposed intervention will "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3); *see also Franciscan All., Inc.*, 414 F. Supp. 3d at 934. As described above, there will be no undue delay in the proceedings or prejudice to the parties if HSUS were to intervene in this action. Moreover, HSUS certainly has a defense to the Plaintiffs' claims that shares a common question of law or fact with the main action – i.e., whether the agency's promulgation of the Final Rule was lawful. Accordingly, if the Court denies HSUS's request for intervention as of right, it requests that the Court exercise its discretion to permit intervention under Fed. R. Civ. P. 24(b).

## <u>CONCLUSION AND PRAYER</u>

HSUS prays that this Court grant its request to intervene in this matter as a Defendant and for such other and further relief to which HSUS is entitled.

Respectfully submitted,

Kimberly D. Ockene
D.C. Bar No. 461191
kockene@humanesociety.org
The Humane Society of the United States
1255 23rd Street, NW, Suite 450
Washington, D.C. 20037
Tel: (202) 285-1388
*pro hac admission pending*

Matt W. Sherwood
State Bar No. 24066063
msherwood@mwlawfirm.com
MCCARN & WEIR, P.C.
905 S. Fillmore St., Suite 530
Amarillo, TX 79101
Tel: (806) 350-5395
Fax: (806) 350-5388

By: /s/ Matt W. Sherwood
      Matt W. Sherwood

**ATTORNEYS FOR HUMANE SOCIETY OF THE UNITED STATES**

## <u>CERTIFICATE OF SERVICE</u>

      This is to certify that on the 14th day of October, 2024, the foregoing document was served on counsel for all parties via the federal court e-service program.

/s/ Matt W. Sherwood
Matt W. Sherwood

21