# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

THE TENNESSEE WALKING HORSE NATIONAL CELEBRATION ASSOCIATION; KIMBERLY LEWIS; and TOM GOULD,

    *Plaintiffs*,

v.

U.S. DEPARTMENT OF AGRICULTURE; THOMAS J. VILSACK, in his official capacity as Secretary of Agriculture; ANIMAL AND PLANT HEALTH INSPECTION SERVICE; MICHAEL WATSON, in his official capacity as Administrator of the Animal and Plant Health Inspection Service,

    *Defendants*.

**Civil Action No.: 2:24-cv-00143**

---

**Brief for the State of Tennessee as Amicus Curiae in Support of Plaintiffs**

JONATHAN SKRMETTI
  *Tennessee Attorney General*
HARRISON GRAY KILGORE*
JACOB DURST
  *Strategic Litigation Counsel*
JOSHUA D. MINCHIN*
  *Honors Fellow*

OFFICE OF THE TENNESSEE
  ATTORNEY GENERAL
P.O. BOX 20207
Nashville, Tennessee 37202
(615) 360-0351
Harrison.Kilgore@ag.tn.gov

\* Application for admission pro hac vice pending

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF INTEREST ............................................................................................. 1

INTRODUCTION ................................................................................................................ 2

BACKGROUND .................................................................................................................. 2

ARGUMENT ........................................................................................................................ 4

    I.  USDA's Process for Disqualifying Sore Horses Is Unlawful ...................... 4

       a.  The "Scar Rule" is unlawful, and the 2024 Rule makes it worse. ......... 5

       b.  USDA's disqualification process violates due process. ......................... 8

    II.  USDA's Unpredictable Rules Harm Tennessee's Local Traditions and Economy. ............................................................................................................. 11

CONCLUSION .................................................................................................................. 13

# TABLE OF AUTHORITIES

**Cases**                                                       **Page(s)**

*City of Arlington v. FCC*,
  569 U.S. 290 (2013) .............................................................................................. 5

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.*,
  779 F.3d 258 (5th Cir. 2015) ................................................................................ 6

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) .............................................................................................. 8

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012) ......................................................................................... 8, 9

*FCC v. Prometheus Radio Proj.*,
  592 U.S. 414 (2021) .............................................................................................. 5

*Logan v. Zimmerman Brush Co.*,
  455 U.S. 422 (1982) .............................................................................................. 8

*Martin v. U.S. Dep't of Agric.*,
  57 F.3d 1070 (6th Cir. 1995) ................................................................................ 6

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ............................................................................................ 10

*McSwain v. Vilsack*,
  No. 1:16-cv-1234-RWS, 2016 WL 4150036 (N.D. Ga. May 25,
  2016) .............................................................................................................. 2, 10

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................................ 7

*Nat'l Pork Producers Council v. U.S. Envtl. Prot. Agency*,
  635 F.3d 738 (5th Cir. 2011) ................................................................................ 6

*Trinity Broad. of Fla., Inc. v. FCC*,
  211 F.3d 618 (D.C. Cir. 2000) ......................................................................... 4, 9

*Zinermon v. Burch*,
  494 U.S. 113, 132 (1990) ...................................................................................... 8

**Statutes**

5 U.S.C. § 706(2)(A) ................................................................................................4

5 U.S.C. § 706(2)(B) ................................................................................................4

15 U.S.C. § 1821 *et seq.* ..........................................................................................1

15 U.S.C. § 1821(3) .......................................................................................... 3, 5, 6

15 U.S.C. § 1822(1) .................................................................................................3

15 U.S.C. § 1822(2) .................................................................................................3

15 U.S.C. § 1823(a) ............................................................................................. 3, 5

15 U.S.C. § 1828 ......................................................................................................3

**Regulations**

9 C.F.R. § 11.3 ................................................................................................ 5, 7, 9

43 Fed. Reg. 18,514 (April 28, 1978) ......................................................................7

88 Fed. Reg. 56,935 (Aug. 21, 2023) ..................................................................... 10

89 Fed. Reg. 39,194 (May 8, 2024) ................................................................*passim*

**Other Authorities**

Chesapeake Group, Inc., *Economic Impact of the Tennessee Walking
    Horse Industry* (Oct. 2023), *available at* https://perma.cc/HH5B-
    WSMP ............................................................................................................... 11

Cynthia Miranda, *Longview family wins World Grand Championship for
    second year in row at Tennessee horse show*, KETK News (Sept. 6,
    2022), *available at* https://perma.cc/9WB3-EQS5. ......................................... 12

Hannah Medford, *Tennessee Walking Horses*, Master's Thesis, East
    Tennessee State University, 10 (May 2019), *available at*
    https://perma.cc/NN4B-W4ZX ..................................................................... 2, 11

Julia Masters, *Q&A: Big Machine Music City Grand Prix returns for a
    third year; what's new*, Nashville Business Journal (Feb. 22, 2023) ...................... 12

Mike Organ, *2023 Music City Bowl produced $23 million on Nashville's economy*, The Tennessean (Mar. 27, 2024) ............................................................. 11

National Academies of Sciences, Engineering, and Medicine, *A Review of Methods for Detecting Soreness in Horses* 84 (2021), https://doi.org/10.17226/25949 ............................................................... 6, 7, 12

National Walking Horse Association, *NWHA Sanctioned/Affiliated Events and Shows*, https://nwha.com/event-page (last visited Nov. 6, 2024). ....................................................................................................... 12

*Tennessee Walking Horse*, Horse Canada, *available at* https://perma.cc/ZQW9-DNFW ......................................................................... 2

The Walking Horse Report, *TWHNC Continues 75 Year Tradition of Crowning World Champions And Giving Back To The Community* (Aug. 21, 2013), *available at* https://perma.cc/R2A5-79XC ............................. 11

## STATEMENT OF INTEREST

*Amicus* the State of Tennessee has deep historical, cultural, and economic ties to the Tennessee Walking Horse. Created in Tennessee more than a century ago, the breed can traverse both the craigs of Appalachia and the moist morasses of the Mississippi River Valley, and since 2000, it has served as the state horse. Every year, fans from across the country enjoy the Tennessee Walking Horse's signature high-step gait at horse shows and competitions held in the Volunteer State and elsewhere. And Tennessee is home to riders, trainers, breeders, and others whose livelihoods depend on the Tennessee Walking Horse industry. Thus, the State has a keen interest in ensuring the humane treatment of this important state symbol and in fostering fair competitions showcasing its unique character.

But the U.S. Department of Agriculture's ("USDA") rules implementing the Horse Protection Act, 15 U.S.C. § 1821 *et seq.* ("HPA"), neither eliminate practices that are harmful to Tennessee Walking Horses nor preserve competition, and the agency's recently promulgated Horse Protection Amendments, 89 Fed. Reg. 39,194 (May 8, 2024) ("2024 Rule"), only make matters worse. *Amicus* thus submits this brief in support of Plaintiffs' Motion for Summary Judgment. *See* Dkt. Nos. 28, 29.

1

# INTRODUCTION

The Tennessee Walking Horse embodies the Tennessee equine industry. Neither as fast as an Arabian nor as large as a Clydesdale, the Tennessee Walking Horse is "known and prized for [its] 'high-step gait,' which can be created through breeding and training." *McSwain v. Vilsack*, No. 1:16-cv-1234-RWS, 2016 WL 4150036, at *1 (N.D. Ga. May 25, 2016) (citation omitted). Because of their skill, dependability, and pleasant disposition, Tennessee Walking Horses have often been featured in films and TV shows. *See Tennessee Walking Horse*, Horse Canada, https://perma.cc/ZQW9-DNFW. But Tennessee Walking Horses really shine when they strut their stuff at competitions held across the country.

These competitions display the best of Tennessee's proud equine heritage. But in recent years, USDA has applied vague anti-soring rules to disqualify show participants on the spot with no recourse. Tennessee now writes in support of Plaintiffs' challenge and in defense of predictable competition rules that will promote fair play, robustly protect the safety of all horse-show participants, and ensure the continued prosperity of Tennessee's proud tradition and local economies.

# BACKGROUND

For more than 70 years, Tennessee Walking Horses "have been the focus of horse shows" across the country. *See* Hannah Medford, *Perceptions of Soring in Tennessee Walking Horses*, Master's Thesis, East Tennessee State University, 10 (May 2019), https://perma.cc/NN4B-W4ZX. But, as in any competition, the prospects of fame

2

and prizes sometimes drive disreputable participants to employ unsavory tactics to gain an advantage. And nothing is more abhorrent to Tennessee Walking Horse competitors than "soring"—an abusive practice in which a trainer uses either physical or chemical means to deliberately make their horses' legs sore to exaggerate their signature gait.

In 1970, Congress passed the HPA with twin goals—preventing soring while protecting and enhancing fair competition. In addition to being "cruel and inhumane," soring makes competition "unfair[]" for participants who use skill and training—instead of cruel shortcuts—to elicit a winning gait. 15 U.S.C. § 1822(1)-(2). Thus, horse show organizers "*shall* disqualify any horse from being shown or exhibited (1) which is sore or (2) if the management has been notified" by a qualified inspector "that the horse is sore." *Id.* § 1823(a) (emphasis added).

USDA, which is tasked with implementing the HPA, s*ee id.* § 1828, recently promulgated the 2024 Rule to "strengthen [its] efforts to protect horses from the cruel and inhumane practice of soring … and by so doing eliminate unfair competition." 89 Fed. Reg. at 39,194. But by retaining (or compounding) many of the flaws in USDA's current process for disqualifying sore horses, the 2024 Rule advances neither of the HPA's dual aims. Instead of assessing whether a horse is sore using the definition Congress provided, 15 U.S.C. § 1821(3), the 2024 Rule merely revises the disreputable "Scar Rule," 89 Fed. Reg. at 39,221-22, 39,247, a rule which USDA's own experts say is an unscientific means for determining whether a horse is sore that cannot be applied consistently because of its fundamentally vague and subjective criteria. This means that

3

sore horses may go undetected while legitimate competitors are wrongly disqualified.

Worse still, trainers whose horses are disqualified under the arbitrary and vague revised Scar Rule have effectively no recourse. The 2024 Rule does not provide a hearing prior to a horse being disqualified. Instead, it allows a disqualified owner or trainer to appeal a disqualification within 21 days. 89 Fed. Reg. at 39,245 (9 C.F.R. § 11.5). Of course, by that time the competition is long over, the prizes have been handed out, and the record basis for the disqualification is cold. This scheme exceeds USDA's statutory authority, tramples constitutional protections, and violates the Administrative Procedure Act ("APA").

## ARGUMENT

### I. USDA's Process for Disqualifying Sore Horses Is Unlawful.

Courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The same goes for any agency action that is "contrary to constitutional right." *Id.* § 706(2)(B). USDA's process for disqualifying sore horses is both. The Scar Rule, as modified by the 2024 Rule, lacks evidence or reasoning. Indeed, USDA fails to remedy critiques from its own experts about the rule's lack of scientific rigor or concrete standards. That alone raises due process concerns because trainers lack "ascertainable certainty" about the standards they must meet, *see Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000), but the due process problems in USDA's disqualification process double given trainers' inability to effectively challenge a

4

disqualification under these vague standards.

### a. The Scar Rule is unlawful, and the 2024 Rule makes it worse.

**1.** It is basic administrative law that agencies must follow Congress's directions, *see City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013), and that agency actions must "be reasonable and reasonably explained," *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021). Yet USDA's Scar Rule for determining whether a horse is sore, 9 C.F.R. § 11.3, violates both tenets.

Congress defined "sore" to include specific physical and chemical methods used by a person that cause a horse to "suffer, or can reasonably expected to [cause] physical pain or distress, inflammation, or lameness when walking, trotting, or otherwise moving." 15 U.S.C. § 1821(3). So the statute requires two things to conclude that a horse is sore. First, a person must take specific actions. Second, because of those actions, a horse must either "suffer[], or can be reasonably expected to suffer, physical pain or distress, inflammation, or lameness when walking, trotting or otherwise moving." *Id.*

However, the Scar Rule does away with these requirements. Instead, USDA *requires* inspectors to disqualify horses as sore if they observe certain characteristics on the horse's skin, including "granulomas," "evidence of inflammation," or "excessive loss of hair." 9 C.F.R. § 11.3; 15 U.S.C. § 1823(a). Thus, a horse can be determined "sore" under the Scar Rule without any proof of the trainer misconduct Congress requires. After all, hair loss and inflammation may be caused by skin conditions that have natural, non-human causes. But the HPA is only intended to punish horse owners and

5

trainers for soreness inflicted by artificial means. *See Martin v. U.S. Dep't of Agric.*, 57 F.3d 1070, at *6 (6th Cir. 1995) (holding that soreness caused by natural means does not constitute "soring" because the Act requires that soring "be caused by artificial means"). And USDA cannot "create from whole cloth new liability provisions." *Contender Farms, L.L.P. v. U.S. Dept. of Agric.*, 779 F.3d 258, 272 (5th Cir. 2015) (quoting *Nat'l Pork Producers Council v. U.S. Envtl. Prot. Agency*, 635 F.3d 738, 753 (5th Cir. 2011)).

Worse still, the Scar Rule's extra-statutory rubric is unscientific and arbitrary. It was developed in a bygone era, when "[s]cars were very likely present in the lesions seen on sore [Tennessee Walking Horses]." National Academies of Sciences, Engineering, and Medicine, *A Review of Methods for Detecting Soreness in Horses* 2, 84 (2021), https://doi.org/10.17226/25949 ("NAS Report"). More recently, the National Academy of Sciences, Engineering, and Medicine criticized the rule's rubric. For example, there is no evidence that granulomas are present in horses that are "sore" according to § 1821(3). *Id.* at 83. And, in any event, granulomas "cannot be determined to be present by gross examination alone"; a "microscopic examination" is "absolutely necessary." *Id.* In sum, the Scar Rule instructs inspectors to disqualify horses for features with no proven tie to soring and which the inspector cannot possibly detect. As the NAS report recognized, this makes the rule "[un]enforceable" as written, because rather than guaranteeing "consistent" interpretation and application, decisions ultimately fall to the whims of individual inspectors. *Id.*

**2.** USDA knew of these problems before it promulgated the 2024 Rule, because

6

the NAS Report specifically instructed that "[m]ore studies are needed to determine" whether certain criteria were actually linked to soring. *See* NAS Report at 10. Even so, the agency largely retained the Scar Rule—flaws and all—without any new evidence to support the rule's criteria. *See* 89 Fed. Reg. at 39,247 (9. C.F.R. § 11.7). Inspectors must assess whether a horse has a "Dermatologic Condition[] Indicative of Soring," and if the horse has "one or more" such condition, it is deemed "sore." *Id.* USDA provided a non-exclusive list of conditions that inspectors may "evaluate," but it "emphasize[d] that the dermatologic conditions listed in the protocol"—including irritation, swelling, and redness—"*are not, in and of themselves, always necessarily indicative of soring*" because these conditions "can have other causes[.]" 89 Fed. Reg. at 39,222 (emphasis added). And the modified rule doubles down on allowing inspectors to make idiosyncratic calls unbounded by objective standards. *See* 89 Fed. Reg. at 39,247 (9. C.F.R. § 11.7) (empowering an inspector to disqualify a horse "display[ing] one or more dermatologic conditions *that they determine* are indicative of soring" (emphasis added)). This is paradigmatic arbitrary and capricious decisionmaking. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) ("[A]n agency rule would be arbitrary and capricious if the agency has … entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency.").

In yet another unlawful twist, USDA fails to adequately explain certain changes to the Scar Rule. For example, USDA's previous position was that the Scar Rule allows

7

for normal changes in the skin that are due to friction." Horse Protection Regulations, 43 Fed. Reg. 18,514, 18,519 (April 28, 1978). So, "the moderate loss of hair in the pastern area caused by the friction generated by an action device" would not trigger disqualification. *Id.* Under the 2024 Rule, on the other hand, a horse could be disqualified solely on the basis that it has "patchy" "loss of hair" on one leg—even though such hair loss could be the result of friction from an action device without any actual soring. 89 Fed. Reg. at 39,427. While agencies may change positions, they first must explain their switch, particularly once a prior position has engendered regulated parties' reliance. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-16 (2009). Yet USDA fails to justify, or even recognize, this 180-degree turn.

### b. USDA's disqualification process violates due process.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required. ... This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Due process also requires that a government deprivation of property be preceded by adequate process, *Zinermon v. Burch*, 494 U.S. 113, 132 (1990), although post-deprivation process may be sufficient where there exists a "necessity of quick action by the State or the impracticability of providing any predeprivation process," *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982). USDA's process for disqualifying sore horses violates both of these due process requirements.

8

**1.** Because the Scar Rule allows inspectors to deem a horse "sore" based on arbitrary, unscientific metrics, the rule is so fundamentally vague that individual trainers cannot know or predict what USDA will or will not consider to be sore. For example, an inspector *must* report a horse as sore based on "bilateral evidence of abuse indicative of soring including, but not limited to, excessive loss of hair." 9 C.F.R. § 11.3. But "bilateral evidence indicative of soring" is undefined. And the NAS Report and other experts, *see, e.g.*, Dkt. 29 at 36-37, suggest that what limited evidence indicative of soring USDA relies on is unscientific and incapable of consistent application. *Id.* at 10.

Unfortunately, instead of making the Scar Rule less vague, the 2024 Rule's modifications doubled down on its arbitrary standards. Now a horse must be deemed sore whenever "an HPI or APHIS representative, upon inspection, finds that any limb of a horse displays one or more dermatologic conditions *that they determine* are indicative of soring." 89 Fed. Reg. at 39,247 (emphasis added). Without specific guidance on what "dermatologic conditions … are indicative of soring" or how to assess the conditions enumerated in the 2024 Rule, what is disqualifying to one inspector may not be disqualifying to another, and therefore, horse trainers and owners lack guidelines by which they can expect to know whether their horse will be able to compete. The level of "irritation," "moisture," or "patchy" hair sufficient for disqualification is left in the eye of the beholder. That leaves those affected by the rule without adequate notice of what "conduct . . . is forbidden or required," in violation of due process. *Fox Television Stations*, 567 U.S. at 253; *see also Trinity Broad. of Fla.*, 211 F.3d at 628.

9

**2.** These problems fuel a second due process violation: trainers and owners have no means to challenge a disqualification under the Scar Rule's vague and arbitrary standards. In *McSwain*, the court recognized that Tennessee Walking Horse trainers and owners have a property right to show their horses, and disqualification constitutes government interference with that right that must abide due process limits. 2016 WL 4150036, at *4. Thus, USDA must give trainers and owners the "opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). But USDA does not provide any type of hearing prior to a horse being disqualified from competition. Without a "guarantee of either pre- or post-deprivation process," USDA's disqualification scheme violates the Fifth Amendment. *McSwain*, 2016 WL 4150036, at *5.

Yet again, the 2024 Rule does nothing to improve these issues, even though USDA, itself, recognized that this existing scheme failed to provide horse owners and trainers with due process. 88 Fed. Reg. 56,935 (Aug. 21, 2023) (specifically seeking input on how to solve the obvious due process problem with trainers' inability to appeal a disqualification). Horses may still be disqualified and prevented from competing at all without a pre-deprivation opportunity for review. USDA's solution was to create a post-competition appeals process. 89 Fed. Reg. at 39,206. But "the nature of the interest—[a horse trainer's] ability to show [a horse]—is such that post-deprivation process cannot serve to fully make [the horse trainer] whole." *McSwain*, 2016 WL 4150036, at *6. Even if an owner or trainer wins an appeal, there is no way to retroactively change

10

the fact that the horse was not permitted to compete at the show. Owners or trainers lose the ability to claim prize money, or to gain the attention and notoriety that enhance a horse's value. The Due Process Clause requires more. *See id.*

## II. USDA's Unpredictable Rules Harm Tennessee's Local Traditions and Economy.

Given the Tennessee Walking Horse's historical and cultural ties to the State, it is unsurprising that Tennessee hosts many of the largest and most popular competitions showcasing the state horse. By casting a shadow over competitors' and spectators' ability to predict and enjoy how a competition will proceed, USDA's haphazard approach to regulation harms Tennessee's proud traditions and local economies.

The Tennessee Walking Horse industry "generate[s] millions of dollars in annual revenue." *See* Medford, *Perceptions of Soring in Tennessee Walking Horses*, at 10. Indeed, some estimates place the value of Tennessee Walking Horse shows at "between $718 million and $902 million annually." *See* The Chesapeake Group, Inc., *Economic Impact of the Tennessee Walking Horse Industry*, 12 (Oct. 2023), *available at* https://perma.cc/4SBR-2UV7. These beneficial effects flow to towns throughout Tennessee.

For example, the annual Tennessee Walking Horse National Celebration held in Shelbyville, Tennessee, draws more than 100,000 fans from across the United States and contributes around $38 million to Tennessee's economy—more than the Music City Bowl or the Music City Grand Prix. The Walking Horse Report, *TWHNC Continues 75 Year Tradition of Crowning World Champions And Giving Back To The Community* (Aug.

21, 2013), https://perma.cc/R2A5-79XC ("The Celebration is the single biggest economic driver to the City of Shelbyville."); Mike Organ, *2023 Music City Bowl produced $23 million on Nashville's economy*, The Tennessean (Mar. 27, 2024), https://perma.cc/7YEX-UZ64; Julia Masters, *Q&A: Big Machine Music City Grand Prix returns for a third year; what's new*, Nashville Business Journal (Feb. 22, 2023), https://perma.cc/WWR8-T9WQ. In all, Tennessee Walking Horse competitions contribute approximately $45 million to local economies around the Volunteer State. *See* NAS Report 12.

The stars of these shows are the horses who come from far and wide to compete.[1] Yet without predictable rules and their fair application, each show's composition is left to the whims of USDA officials. The result will disincentivize investment and participation in shows. That in turn will reduce the shows' quality, prestige, and attendance. Tennessee's local economies—many of which depend on shows for small-business and revenue boosts—will bear the brunt of this downturn. And the same is true of local economies in Texas. After all, the Lone Star State also hosts numerous Tennessee Walking Horse competitions each year. *See, e.g.*, National Walking Horse Association, *NWHA Sanctioned/Affiliated Events and Shows*, https://nwha.com/event-page (last visited Nov. 6, 2024). Ensuring USDA turns square corners and obeys basic due-process limits is thus not merely a matter of legal principles.

---

[1] A Texas family's Tennessee Walking Horse recently won the World Grand Championship at the Tennessee Walking Horse National Celebration two years in a row. *See* Cynthia Miranda, *Longview family wins World Grand Championship for second year in row at Tennessee horse show*, KETK News (Sept. 6, 2022), https://perma.cc/9WB3-EQS5.

## CONCLUSION

For all these reasons, this court should grant Plaintiffs' Motion for Summary Judgment.


Respectfully submitted,

          **JONATHAN SKRMETTI**
            *Tennessee Attorney General*

          */s/ Harrison Gray Kilgore*
          HARRISON GRAY KILGORE*
          JACOB DURST
            *Strategic Litigation Counsel*
          JOSHUA D. MINCHIN*
            *Honors Fellow*
          OFFICE OF THE TENNESSEE
            ATTORNEY GENERAL
          P.O. Box 20207
          Nashville, Tennessee 37202
          (615) 360-0351
          Harrison.Kilgore@ag.tn.gov

          *Counsel for the State of Tennessee*

          * Application for admission pro hac vice pending

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via the Court's electronic filing system on this 8th day of November 2024 on the following:

**Allyson Scher**
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20005
202-514-9836
allyson.r.scher@usdoj.gov


**Cristen Cori Handley**
U.S. Department of Justice Civil Division
1100 L Street NW
Washington, DC 20005
202-305-2677
Email: cristen.handley@usdoj.gov

*Counsel for Defendants*


                                          */s/ Harrison Gray Kilgore*
                                          Harrison Gray Kilgore

                                          *Counsel for the State of Tennessee*