## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| THE TENNESSEE WALKING HORSE NATIONAL CELEBRATION ASSOCIATION *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE *et al.*, <br><br> Defendants. | Case No. 2:24-cv-143 <br><br><br> District Judge Matthew J. Kacsmaryk |

## DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................1

I.      The Prohibition of Action Devices and Pads is Consistent With the HPA and is
        Reasonable and Reasonably Explained (Counts I-III)............................................1

        A.      The Prohibition of Action Devices and Pads is Consistent With the HPA..................2

        B.      The Prohibition of Action Devices and Pads is Reasonable and Reasonably
                Explained. ...............................................................................................4

                1.      APHIS's Decision is Well-Supported By Evidence and a Reasoned
                        Explanation. ...............................................................................4

                2.      APHIS Considered Reliable Data in Prohibiting Action Devices and
                        Pads. ........................................................................................5

                3.      APHIS Considered Whether the Prohibition of Action Devices and
                        Pads Constituted a Regulatory Taking and Concluded It Did Not...............11

II.     The Prohibition of Substances is Consistent With the HPA and is Reasonable and
        Reasonably Explained (Counts IV-V) ...................................................................13

        A.      The Prohibition of Substances is Consistent With the HPA.........................13

        B.      The Prohibition of Substances is Reasonable and Reasonably Explained..................14

III.    The "Dermatologic Conditions Indicative of Soring" ("DCIS") Provision is
        Reasonable, Reasonably Explained, and Clear (Counts VI-VII)............................15

        A.      The DCIS Provision is Reasonable and Reasonably Explained.....................16

        B.      The DCIS Provision is Clear. ...................................................................18

IV.     The Rule Affords Adequate Due Process (Count VIII). ........................................20

V.      The Horse Protection Inspector ("HPI") Program Represents a Lawful Exercise of
        APHIS's Statutory Authority and is Reasonable (Counts IX and X)......................23

        A.      The HPI Program is Authorized Under the HPA.........................................23

        B.      The HPI Program is Reasonable and Reasonably Explained. ......................24

VI.     APHIS Reasonably Concluded that the Rule's Benefits Justify its Costs (Count XI). ...........26

        A.      The Cost-Benefit Analysis Reasonably Addressed the Rule's Projected
                Impacts on the Tennessee Walking Horse Industry. ...................................26

B.      The Cost-Benefit Analysis Reasonably Addressed the Rule's Projected Impacts on the Greater U.S. Economy...................................................................28

C.      The Cost-Benefit Analysis Appropriately Relied on the Most Recent, Available Information. ..................................................................................28

VII.    The Rule is Consistent With the Regulatory Flexibility Act (Count XII)................................29

VIII.   To The Extent Plaintiffs Are Entitled to any Relief, that Relief Should Be Limited to Plaintiffs and to the Provisions of the Rule that the Court Concludes Are Unlawful.............29

CONCLUSION.................................................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*10 Ring Precision, Inc. v. Jones,*
   722 F.3d 711 (5th Cir. 2013) ...........................................................................................26

*Alenco Comm'ns, Inc. v. FCC,*
   201 F.3d 608 (5th Cir. 2000) ...........................................................................................29

*Bruckner Truck Sales, Inc. v. Guzman,*
   No. 2:23-CV-097, 2024 WL 903441 (N.D. Tex. Feb. 27, 2024) ....................................17

*Burlington Truck Lines, Inc. v. United States,*
   371 U.S. 156 (1962) ..........................................................................................................5

*Carlson v. Postal Regul. Comm'n,*
   938 F.3d 337 (D.C. Cir. 2019) .........................................................................................29

*Chiquita Brands Int'l Inc. v. SEC,*
   805 F.3d 289 (D.C. Cir. 2015) .........................................................................................17

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) ........................................................................................................30

*FCC v. Prometheus Radio Project,*
   592 U.S. 414 (2021) ..........................................................................................................9

*Fleming v. USDA,*
   713 F.2d 179 (6th Cir. 1983) ...........................................................................................16

*Fulmen Co. v. Off. of Foreign Assets Control,*
   547 F. Supp. 3d 13 (D.D.C. 2020) .....................................................................................5

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) ................................................................................................... 18, 19

*Grocery Servs., Inc. v. USDA Food & Nutrition Serv.,*
   Civ. A. No. H-06-2354, 2007 WL 2872876 (S.D. Tex. Sept. 27, 2007) ..........................29

*Hendrick Med. Ctr. v. Azar,*
   950 F.3d 323 (5th Cir. 2020) .............................................................................................1

*Huawei Techs. U.S.A., Inc. v. FCC,*
   2 F.4th 421 (5th Cir. 2021) ...................................................................................26, 27, 28

*In re: Justin Jenne,*
   No. 13-0080, 2014 WL 4948794 (U.S.D.A. July 29, 2014) ....................................... 8, 25

*In re: Justin R. Jenne,*
    74 Agric. Dec. 358 (U.S.D.A. July 17, 2015) ........................................................................25

*In re: Timothy Fields and Lori Fields,*
    54 Agric. Dec. 215 (U.S.D.A. Jan. 6, 1995) ..........................................................................25

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024) ...................................................................................................... 3, 13

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ....................................................................................................... 20, 21

*McClelland v. Katy Indep. Sch. Dist.,*
    63 F.4th 996 (5th Cir.) .................................................................................................. 18, 20

*McSwain v. Vilsack,*
    2016 WL 4150036 (N.D. Ga. May 25, 2016) .......................................................................22

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) ............................................................................................................18

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ..............................................................................................4, 10, 11, 14

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
    551 U.S. 644 (2007) ............................................................................................................17

*Nat'l Biodiesel Bd. v. EPA,*
    843 F.3d 1010 (D.C. Cir. 2016) .........................................................................................13

*Nat'l Mining Ass'n v. United Steel Workers,*
    985 F.3d 1309 (11th Cir. 2021) ..........................................................................................14

*NetChoice LLC v. Paxton,*
    121 F.4th 494 (5th Cir. 2024) .............................................................................................18

*Oceana, Inc. v. Raimondo,*
    530 F. Supp. 3d 16 (D.D.C. 2021), *aff'd*, 35 F.4th 904 (D.C. Cir. 2022) ...................... 7, 8

*Olabisiomotosho v. City of Hous.,*
    185 F.3d 521 (5th Cir. 1999) .............................................................................................12

*Palazzolo v. Rhode Island,*
    533 U.S. 606 (2001) ...........................................................................................................12

*Richards v. McLane,*
    No. 21-20450, 2023 WL 6533453 (5th Cir. Oct. 6, 2023) ........................................... 20, 21

*Roark & Hardy LP v. City of Austin*,
   522 F.3d 533 (5th Cir. 2008) ..............................................................................................18

*Securities & Exchange Commission v. Chenery Corp.*,
   318 U.S. 80 (1943) ................................................................................................... 12, 17

*Tex. Tech. Physicians Assocs. v. U.S. Dep't of Health & Hum. Servs.*,
   917 F.3d 837 (5th Cir. 2019) ................................................................................................1

*Texas v. Biden*,
   20 F.4th 928 (5th Cir. 2021), *as revised* (Dec. 21, 2021), *rev'd on separate grounds and remanded*,
   597 U.S. 785 (2022) ............................................................................................................30

*Texas v. EPA*,
   91 F.4th 280 (5th Cir. 2024) ..............................................................................................11

*Thompson v. Fresh Prods., LLC*,
   985 F.3d 509 (6th Cir. 2021) ..............................................................................................10

*United States v. Texas*,
   599 U.S. 670 (2023) ............................................................................................................30

*Universal Camera Corp. v. Nat'l Lab. Rels. Bd.*,
   340 U.S. 474 (1951) ..............................................................................................................5

**Statutes**

15 U.S.C. § 1821 ......................................................................................................3, 4, 16, 19

15 U.S.C. § 1823 ............................................................................................................20, 23

15 U.S.C. § 1824 ............................................................................................................*passim*

15 U.S.C. § 1828 ......................................................................................................2, 3, 13

**Regulations**

9 C.F.R. § 11.2 ..............................................................................................................15

9 C.F.R. § 11.4 ..............................................................................................................22

9 C.F.R. § 11.5 ........................................................................................................22, 23

9 C.F.R. § 11.6 ................................................................................................................3

9 C.F.R. § 11.7 ........................................................................................................15, 16, 19

9 C.F.R. § 11.8 ................................................................................................................ 20, 21

9 C.F.R. § 11.10 ...................................................................................................................... 21

9 C.F.R. § 11.19 ...................................................................................................... 17, 23, 26

44 Fed. Reg. 1558 (Jan. 5, 1979) .......................................................................................... 14

88 Fed. Reg. 56,924 (Aug. 21, 2023) ................................................................................ 11, 13

89 Fed. Reg. 39,194 (May 8, 2024) .................................................................................. *passim*

## **Other Authorites**

Tennessee Walking Horse National Celebration,
   https://twhnc.com/celebration/ ........................................................................................ 24

## INTRODUCTION

In their opposition, Plaintiffs primarily recycle arguments from their opening brief, each as unpersuasive as the first time around. They continue to press their claims that the challenged provisions of the Rule are either contrary to the Horse Protection Act ("HPA"), 15 U.S.C. § 1821 *et seq.*, arbitrary and capricious, unconstitutionally vague, violative of due process, or some combination thereof. At bottom, these arguments amount to Plaintiffs' preference that APHIS had reached different policy decisions; but Plaintiffs do not show, as they must, that APHIS's decisions or the process by which APHIS reached those decisions are unlawful. Nor do Plaintiffs meaningfully engage with the relevant APA standards that require courts to uphold an agency's decisions where those decisions are, as here, supported by substantial evidence and reasonable explanation. APHIS has met that threshold by issuing regulations to implement the HPA that are backed by science, record evidence, and sound reasoning.

Accordingly, and for the reasons explained in Defendants' opening brief and herein, Plaintiffs' motion for summary judgment should be denied, and Defendants' motion for summary judgment should be granted.

## ARGUMENT

### I.    The Prohibition of Action Devices and Pads is Consistent With the HPA and is Reasonable and Reasonably Explained (Counts I-III).

Under the APA, the reviewing court "defer[s] to an agency's decision and presume[s] it to be valid," "[t]he plaintiff bears the burden of showing otherwise," and the court "defer[s] to the agency's findings of fact if they are supported by substantial evidence." *Hendrick Med. Ctr. v.* Azar, 950 F.3d 323, 326 (5th Cir. 2020) (quoting *Tex. Tech. Physicians Assocs. v. U.S. Dep't of Health & Hum. Servs.*, 917 F.3d 837, 844 (5th Cir. 2019)).[1] Plaintiffs do not rebut this presumption, nor do they rebut the agency's factual determinations that substantial evidence supports the conclusion that action devices and pads can cause soring *and* are highly correlated with findings of soring—which underpinned the Rule. These factual conclusions therefore are entitled to deference and the agency's actions were well within

---

[1] Internal citations and quotations have been omitted in this brief unless otherwise indicated.

APHIS's statutory authority to ban devices necessary to prevent the soring of horses, 15 U.S.C. §§ 1824(7), 1828. Plaintiffs therefore fall short of their burden to establish that the prohibition of action devices and pads exceeds the agency's authority and is arbitrary and capricious.

### A.     The Prohibition of Action Devices and Pads is Consistent With the HPA.

In their opposition, Plaintiffs confirm that their "statutory authority" argument is instead a factual challenge to APHIS's evidentiary conclusion that action devices and pads can cause soring. *See* Pls.' Consolidated Opp'n to Defs.' Mot. for Summ. J. & Reply in Supp. of Pls.' Mot. for Summ. J. at 10, ECF No. 48 ("Pls.' Resp.") ("The ban on action devices and pads exceeds USDA's statutory authority *because there was no evidence* that such equipment causes soring." (capitalization altered and emphasis added)). But Plaintiffs disregard Defendants' arguments in an effort to make this claim. First, APHIS reasonably concluded that action devices and pads can cause soring. *See* Br. in Supp. of Pls.' Mot. for Summ.J. at 7-20, ECF No. 29 ("PMSJ"). Plaintiffs' claim that the Rule does not make the factual conclusion that action devices and pads can cause soring, Pls.' Resp. at 10-11, is false.[2] *See, e.g.,* Horse Protection Amendments, 89 Fed. Reg. 39,194, 39,210 (May 8, 2024) ("[P]ads, wedges, and action devices can, on their own or in conjunction with other substances and practices, cause soring"); *id.* at 39,211 ("[W]e advanced two bases for the proposed prohibition on the use of pads, wedges, and action devices for Tennessee Walking Horses and racking horses: [1] that pads, wedges, and action devices may, under certain circumstances, and particularly in conjunction with other substances and practices, cause soring; and [2] that the use of pads, wedges, and action devices among Tennessee Walking Horses and racking horses is strongly associated with soring."); *id.* at 39,2000 (the "specific application and use [of action devices and pads] in training of a horse" can "cause soring"). For example, APHIS concluded that action devices and pads can cause a horse to experience "physical pain or distress, inflammation, or lameness when walking, trotting, or otherwise moving"—*i.e.*, to be

---

[2] Contrary to Plaintiffs' assertion that Defendants "retreat[]" from their claim that action devices and pads cause soring, Pls.' Resp. at 11, Defendants' position is consistent in each of the quotations that Plaintiffs reference (and consistent with the Rule): APHIS found that action devices and pads are consistently used in a manner that causes soring of Tennessee Walking Horses and racking horses competing in the Performance Division.

sore within the meaning of the statute, 15 U.S.C. § 1821(3)—if that horse is trained with heavier chains or an irritant is applied to the horse's limbs during training. *See id.* at 39,210. Regardless of whether the use of pads and action devices are used in conjunction with another practice or alone, their use nevertheless *causes* physical pain or inflammation and therefore causes a horse to be sore.[3] Second, based on these factual findings, APHIS has authority to regulate because sections 1824(7) and 1828 confer significant discretion on the agency to make appropriate regulations in response to its factual conclusions, *see id.* § 1828 (Secretary authorized to "issue such rules and regulations *as he deems necessary*") (emphasis added); *see also Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024) (a statute authorizes an agency to exercise discretion where it empowers the agency to "regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility'").

But even if the Court does not agree that APHIS reasonably concluded that action devices and pads cause soring directly, APHIS nevertheless reasonably concluded that the prohibition of action devices and pads was necessary to prevent soring, which is the relevant statutory inquiry. As Defendants previously explained, Defs.' Consol. Br. in Supp. of their Mot. for Summ. J. & in Opp'n to Pls.' Mot. for Summ. J. at 8-9, ECF No. 45 ("DMSJ"), Congress did not ban equipment that *causes* soring; it banned equipment that the Secretary determines must be prohibited to *prevent* soring. *See id.* § 1824(7) (prohibiting the showing of "any horse which is wearing or bearing any equipment, device, paraphernalia, or substance which the Secretary by regulation under section 1828 of this title prohibits *to prevent the soring of horses.*" (emphasis added)). Even further, section 1828 of the HPA similarly expansively authorized the Secretary "to issue such rules and regulations *as he deems necessary* to carry out the provisions of this chapter." 15 U.S.C. § 1828 (emphasis added). Plaintiffs' view that "Congress gave USDA a targeted authority to address a particular problem,"[4] Pls.' Resp. at 16-17, and that the

---

[3] Plaintiffs are wrong that APHIS prohibits the use of heavier chains or irritants during training. Pls.' Resp. at 11. HPA regulations prohibit use of heavier chains and irritants only in "any horse show, horse exhibition, horse sale, or horse auction." *See* 9 C.F.R. § 11.6(a).

[4] Plaintiffs inaccurately represent that the problem identified by Congress is "practices that sore horses," Pls.' Resp. at 16–17, yet, it is practices that do or "can reasonably be expected to" cause the horse to "suffer . . . physical pain or distress, inflammation, or lameness when walking, trotting, or

HPA requires a direct causal connection between the prohibited practice and soring, is without any basis in the statutory text. Nor do Plaintiffs offer any plausible explanation of how to read the statutory text differently (and indeed, their atextual limitation would prohibit the agency from banning substances that entirely mask soring, thus allowing it to continue unabated). Instead, Plaintiffs argue that APHIS cannot have the authority to "shut down competitions entirely." *Id.* at 16, 17. But, as Defendants have explained, DMSJ at 18, 24-25, 57, this hyperbolic claim is inaccurate and lacks any evidence.

### B. The Prohibition of Action Devices and Pads is Reasonable and Reasonably Explained.

#### 1. APHIS's Decision is Well-Supported By Evidence and a Reasoned Explanation.

Contrary to Plaintiffs' assertion, Pls.' Resp. at 17, APHIS readily meets the APA's threshold to "explain the evidence which is available, and . . . offer a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). In their opposition, Plaintiffs do not meaningfully engage with the substantial breadth of evidence in support of the Rule, explained in detail in Defendants' opening brief, DMSJ at 9-26, but merely repeat their previously advanced arguments. Additionally, Plaintiffs appear to imply that each piece of evidence exists in isolation; this willfully ignores the reality that available scientific studies and materials, statements from the relevant experts, and records of APHIS and DQP inspections of all horse breeds at HPA-covered events in recent years all build upon one another to tell the same story: action devices and pads can cause soring, action devices and pads are highly correlated with incidences of soring, and—the ultimate statutory inquiry—the prohibition of action devices and pads will prevent soring. *See* 15 U.S.C. § 1824(7) (agency may regulate devices that are prohibited to "prevent the soring of horses").

In Plaintiffs' effort to advance their claim that APHIS "reverses [its] prior position," Pls.' Resp. at 17, they ignore the evidence that APHIS has acknowledged that action devices and pads may

---

otherwise moving," 15 U.S.C. § 1821(3). Plaintiffs elide these concepts in an attempt to paint Congress's broad prohibition as a narrow one.

contribute to soring in no fewer than five separate rulemakings since 1979, *see* DMSJ at 17. To support their arbitrary-and-capricious claim, Plaintiffs continue to claim that "at least 75% of owners and trainers are not doing anything to cause soring," Pls.' Resp. at 18-19, but in doing so ignore Defendants' basic arithmetic explanation that the fact that approximately 25.1% of *horses* are non-compliant does not mean that 25.1% of *owners* are non-compliant when owners do, as Plaintiffs do here, own multiple horses.[5] *See* DMSJ at 18 n.8. In the alternative, Plaintiffs appear to argue that APHIS must know the number of owners that have sored horses, instead of the number of HPA violations. It is unclear to Defendants why that would be the case (nor do Plaintiffs explain why), given that APHIS's decision to prohibit action devices and pads is based on evidence that the ban will prevent sore *horses* from competing in HPA-covered events, and is not a ban of the owners of sore horses. And Plaintiffs ignore, Pls.' Resp. at 19, that the correlation between Tennessee Walking Horses and racking horses wearing action devices and pads and incidences of soring is not without factual and logical context: chains and pads can cause—or conceal—soring, especially in conjunction with other substances or practices, and the inspection data is consistent with this well-supported conclusion.[6] *See* DMSJ at 9-20.

### 2.    APHIS Considered Reliable Data in Prohibiting Action Devices and Pads.

"A court must affirm if the agency's findings are supported by 'substantial evidence' and there is a 'rational connection between the facts found and the choice made.'" *Fulmen Co. v. Off. of Foreign Assets Control*, 547 F. Supp. 3d 13, 23 (D.D.C. 2020) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. Nat'l Lab. Rels. Bd.*, 340 U.S.

---

[5] While 25.1% refers to the rate of non-compliances, there were 1.1 to 1.2 non-compliances (depending on the year) per non-compliant horse. *See* DMSJ at 22.

[6] Plaintiffs take this misunderstanding one step further by arguing that Defendants now claim that the data, by itself, proves that action devices and pads cause soring. That misrepresents Defendants' position, consistent with the Rule, that the data "support[s] [APHIS's] conclusion—derived from . . . independent evidence—that this equipment caused soring (and thus that banning the equipment would prevent soring)." DMSJ at 13; *see also id.* at 19 ("data supports—but is not the sole rationale—for APHIS's decision").

474, 477 (1951). APHIS's analysis easily satisfies this low bar. In an effort to undercut one of multiple bases for APHIS's decision to prohibit action devices and pads, Plaintiffs repeatedly protest that APHIS did not collect enough data or that the data collected was not sufficiently random. But neither of these arguments supports Plaintiffs' claim that APHIS's decision to consider the existing data in its decisionmaking was arbitrary and capricious. Plaintiffs' preferences that APHIS VMOs conducted additional inspections and that APHIS had additional data points to consider does *not* call into question the clear import of the existing data: that soring persists and is concentrated in Tennessee Walking Horses and racking horses competing in the Performance Division.

While Plaintiffs insist that there is a "flaw in USDA's data" because it is not based on a random sample, Pls.' Resp. at 4, they make no argument as to the accuracy or reliability of the number of non-compliances or any individual finding of non-compliance contained in the FY 2017 to FY 2022 inspection data. Plaintiffs therefore do not and cannot contest that six years of inspection data clearly show that soring persists in significant numbers in the Performance Division compared to the Pleasure Division, and with Tennessee Walking Horses and racking horses compared to other horse breeds. Instead, Plaintiffs contest only that APHIS may not rely on the "*rate* of violations." *Id.* That argument is a red herring. Plaintiffs' issue with the "*rate* of violations" obfuscates the reality that, for example, in 2022, APHIS VMOs inspected 930 Performance Division horses and, of those horses, approximately 264 horses were non-compliant with the HPA, and in the same year, APHIS VMOs inspected 357 Pleasure Division horses and, of those horses, roughly 5 were non-compliant with the HPA.[7] Plaintiffs do not dispute that this data is accurate, only that it should not be calculated and relied upon in "rate" form—because, they say, inspections are more likely to be of horses suspected of being sore in the first place (however, Plaintiffs do not explain why they are concerned by the

_____

[7] In 2022, APHIS VMOs identified 317 non-compliances and 1.2 non-compliances per non-compliant horse for Tennessee Walking Horses and racking horses in the Performance Division at HPA-covered events. *See* DMSJ at 22–23; AR-00004148 (row 43). That equates to approximately 264 horses, in aggregate. That same year, APHIS VMOs identified 6 non-compliances and 1.2 non-compliances per non-compliant horse for Tennessee Walking Horses and racking horses in the Pleasure Division at HPA-covered events. *See* DMSJ at 22–23; AR-00004148 (row 43). That equates to approximately 5 horses.

possibility of over-representative non-compliances in the Performance Division, but not the Pleasure Division). But, as explained in Defendants' opening brief, DMSJ at 13, the agency considered the horse inspection results—in its raw form—in its decisionmaking. Moreover, the Rule is clear that any "violation rates" that APHIS calculated from the inspection results are probative of the agency's conclusion that soring persists at significantly higher rates for Tennessee Walking Horses or racking horses in Performance Division events, and are intended to provide the rates of non-compliances *out of the inspections that APHIS VMOs performed*—they are not intended to provide an overall rate of non-compliances out of every horse entered into any competition (which, as APHIS explained, would not be possible). *See* 89 Fed. Reg. 39,197-78 ("We have never claimed that inspections of horses for soring are randomized, although we also inspect horses showing no indications of soring . . . After 50 years of enforcing the HPA, APHIS has amassed an aggregate body of data indicating the Tennessee Walking Horse and racking horse industry is disproportionately likely to sore their horses");[8] *see also* DMSJ at 20-23. Because Plaintiffs do not take issue with the accuracy of the raw data, Plaintiffs' citations to cases about "statistical invalidities," Pls.' Resp. at 4, or "a flawed, inaccurate, or misapplied study," *id.*, are inapposite. And, as Defendants have explained, "*[m]ost* horses inspected by APHIS officials at these events were chosen at random," and APHIS officials directed their limited resources to inspect horses that showed signs of soring in only *some* instances so that APHIS complied with its statutory mandate. DMSJ at 21 (emphasis added).

Plaintiffs continue to rely on *Oceana, Inc. v. Raimondo* to prop up their unsupported claim that APHIS cannot rely on data that is not completely random. 530 F. Supp. 3d 16 (D.D.C. 2021), *aff'd*, 35 F.4th 904 (D.C. Cir. 2022). But the primary question in *Oceana* is not whether the agency used the best methodology to consider data—it's whether the agency "acted reasonably and consistently" in deciding how to draw conclusions from that *specific* data. *Id.* at 40. Here, APHIS reasonably and

---

[8] Plaintiffs take issue with Defendants' reference to 50 years of aggregate data, arguing that that data is not in the administrative record. *See* Pls.' Resp. at 7. But that is not true. The decades of aggregate data refers to the number of HPA regulations since 1979 and the evidence discussed in those proposed and final rules, all of which are part of this administrative record. *See* DMSJ at 17.

consistently relied on accurate and available data; that alone is sufficient to comply with the APA. Regardless, Plaintiffs are incorrect that *Oceana* suggests that APHIS cannot rely on data that is not random. The court in *Oceana* held that the agency, NMFS, could rely on raw, non-random data rather than multiply the non-random data to arrive at a new estimate. *Id.* Plaintiffs therefore miscomprehend that the agency in *Oceana* necessarily relies on non-random data whether it uses extrapolation or not. Plaintiffs appear to confuse "extrapolate" in the colloquial sense—by suggesting that the agency could not draw any conclusions from the raw data—with the term of art used in *Oceana* (*i.e.*, to arrive at certain numbers through calculations that would estimate the total dusky shark bycatch). *Id.*

Next, Plaintiffs repeat their argument that APHIS's data was obtained by "a subjective inspection protocol that cannot yield reproducible results." Pls.' Resp. at 8; PMSJ at 16. But Plaintiffs put forward no argument or case citation to support the novel proposition that APHIS may not consider its own inspection data (and the only data available) because it relies on experts' informed judgments, rather than scientific methods in a laboratory. The substantial evidence standard applicable here does not impose such a requirement. As an initial matter, the evidence relied upon by Plaintiffs does not concern the Scar Rule specifically, *contra* Pls.' Resp. at 8 (arguing that "[t]he data used to support the rule was generated by applying the *existing* Scar Rule"). The administrative proceeding Plaintiffs reference, *In re: Justin Jenne*, No. 13-0080, 2014 WL 4948794 (U.S.D.A. July 29, 2014), involved a horse that was found unilaterally sore on palpation (*i.e.*, evaluating for sensitivity and/or pain) first by two different DQPs and then bilaterally sore by the VMO (all three inspectors agreed that the horse was sore). Accordingly, this case was about palpitation, *not* the Scar Rule. [9] The Scar Rule necessarily includes subjective elements because the statute it interprets does not put forward an objective measure; any suggestion that two inspectors have reached different conclusions in certain instances in no way means that the overall data trends showing dramatically higher incidences of

---

[9] Plaintiffs contradict their own argument about the underlying facts in *In re: Justin Jenne* elsewhere in their brief. Plaintiffs refer to a subsequent decision in *In re: Justin Jenne* as "nearly a decade old," acknowledge it is about a soring violation rather than a Scar Rule violation, and state that "the two DQPs who analyzed the horse involved in that decision actually found that the horse was sore, a finding that was upheld by the VMO." Pls.' Resp. at 41.

violations in Tennessee Walking Horses and racking horses competing in the Performance Division are inaccurate.[10] Plaintiffs do not suggest that there is some way that the subjective nature of the Scar Rule test somehow makes it likelier that inspectors will find a violation for a Tennessee Walking Horse competing in the Performance Division compared to horses in other divisions or of other breeds, but merely suggest that APHIS cannot draw any conclusions from its own inspection data. Indeed, it would be an absurd result if APHIS could not consider the results of its inspections in order to improve regulations to prevent sore horses from competing in shows. And while, as Plaintiffs note, the NAS Study explained that "the number of horses found to be unilaterally or bilaterally sore dramatically declined" since 2016, there is no evidence to support that any such decline was due to re-inspections by second VMOs.[11] Pls.' Resp. at 8.

Plaintiffs' through line in these arguments is that APHIS was required to have perfect information and conduct its own randomized study, which would necessarily involve APHIS intentionally soring horses, in order to establish a causal link between soring and action devices or pads. *See* DMSJ at 16. That is not what the APA requires, and it is indeed what the HPA forbids. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021) (the "APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies").

Plaintiffs also argue that APHIS "did not collect any data concerning soring rates in other breeds to justify this differential treatment" and that "USDA does not deny that it lacked any such data." Pls.' Resp. at 9. That is incorrect. As Defendants explained in their opening brief, APHIS inspected 88 horses of other breeds in HPA-covered events from FY 2017 to FY 2022 and found an

---

[10] The NAS Study concluded that "[t]he requirement that two VMOs must make exactly the same findings (i.e., sensitive on the lateral pastern but not bulbs of heels or medial pastern) does not consider changes that may occur over time between examinations, how the horse may respond to repeated palpation, or how the presence of foreign substances either parenterally or topically may influence findings over time" and therefore re-examination should "only be granted if the show veterinarian (not the competitor or any other persons) finds sufficient cause." AR-00001110–11.

[11] Plaintiffs effectively argue that Defendants conceded that they replaced the Scar Rule with the DCIS provision "to minimize inaccurate results." Pls.' Resp. at 8 (quoting DMSJ at 34). But Plaintiffs take this line out of context from Defendants' brief from a paragraph that does not mention the Scar Rule.

average non-compliance rate of under 1%. DMSJ at 19. Across six years, 2 of the 88 horses inspected were found to be sore, *see* AR-00004043, compared to a 34% rate of non-compliance found by APHIS VMOs in inspections of Performance Division Tennessee Walking Horses in 2022 alone. DMSJ at 19. APHIS's inspection data makes clear that soring is rare in other breeds; and Plaintiffs do not suggest that soring is *not* rare in other breeds.

Even so, Plaintiffs' strained argument that APHIS cannot rely on data showing that 2 of 88 horses of other breeds were deemed sore across six recent years because APHIS should have inspected more horses has no basis in the APA. Plaintiffs point only to a single out-of-circuit, non-APA case in which the court held that the termination of five employees over 40-years-old was not sufficient evidence to prove that the plaintiff was terminated because of her age where she relied on statistical evidence to support her discrimination claim under the ADEA. *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 526 (6th Cir. 2021). The Sixth Circuit's decision in *Thompson* has no bearing here, where Plaintiffs must prove that there is no "rational connection between the facts found and the choice[s] made," *State Farm*, 463 U.S. at 52 (emphasis added), and where those facts include, among other things, that APHIS has rarely found soring in other breeds.

As Defendants explained, APHIS's data analysis is supported by other evidence, including that soring does not confer a significant performance advantage in breeds other than Tennessee Walking Horses and racking horses, and the NAS Study's finding that skin changes seen on Tennessee Walking Horses and racking horses that were non-compliant with the Scar Rule were not observed on other breeds. *See* DMSJ at 20. In their opposition, Plaintiffs argue that "NAS expressly stated that it *could not determine* whether the noted skin changes (or 'lichenification') bore any connection to actual soring," Pls.' Resp. at 10, but that is inaccurate; NAS stated that "lichenification [is] a pathologic change most often caused by rubbing, scratching, or some other repeated trauma to the skin" and "[t]hese skin changes are not incidental or insignificant and do not represent the normal character of the palmar aspect of the horse's pastern" and "do not normally occur without a previously inflicted injury on the pasterns," which would meet the statutory definition of soring. AR-00001186, AR-00001188.

Plaintiffs also ignore Defendants' point that APHIS sought additional evidence on soring in other breeds, inviting public comments on the Proposed Rule "on any observations persons may have regarding soring in other breeds," but did not receive any significant information to indicate that soring is a prevalent issue in other breeds.  Horse Protection, 88 Fed. Reg. 56,924, 56,937 (Aug. 21, 2023).

### 3.  APHIS Considered Whether the Prohibition of Action Devices and Pads Constituted a Regulatory Taking and Concluded It Did Not.

Plaintiffs argue that APHIS failed "to consider the fact that its ban would amount to a regulatory taking."  Pls.' Resp. at 20-21.  As a threshold matter, APHIS *did* address the concern that the prohibition will amount to a taking and require just compensation, however, APHIS rejected these concerns with adequate explanation.  APHIS explained: "based on the statements provided, there is no basis to conclude that the value of Tennessee Walking Horses competing in the Performance division—that is, trained to perform in stacked pads and action devices—would necessarily be reduced if they cannot compete wearing these items."  89 Fed. Reg. at 39,217-18.  For this reason alone, Plaintiffs cannot prevail on their claim that APHIS "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, PMSJ at 30, because "[b]y addressing the [plaintiffs'] concerns and explaining why they were not merited with a plausible explanation, the [agency] did not 'fail[ ] to consider an important aspect of the problem.'"  *Texas v. EPA*, 91 F.4th 280, 293 (5th Cir. 2024).

Even if this were not the case, as Defendants explained in their opening brief, *see* DMSJ at 24-26, Plaintiffs can only succeed on this claim if they present evidence to prove as a matter of law that horses trained with pads and action devices will be worthless if they compete without them and the agency's conclusion to the contrary was arbitrary and capricious.  Plaintiffs do not (and cannot) do that here.  First, APHIS provided a rational basis for its conclusion that the Performance Division of Tennessee Walking Horse and racking horse competitions would not be eliminated.  *See id.* at 24-25.  And Plaintiffs do not prove that the Performance Division will be eliminated when the Rule takes effect.  In their opposition, Plaintiffs offer mere conjecture that horse shows will eliminate a division of their competitions despite evidence that "flat-shod horses can achieve the animated 'big lick' step

[that is the basis of the Performance Division] with proper training."[12]  89 Fed. Reg. at 39,217.
Plaintiffs reference a "preeminent HIO" that requires that horses in the Performance Division wear
pads and action devices.  Pls.' Resp. at 20.  But the rule book of one HIO does not prove much of
anything, much less prove that horse shows will not adjust their guidelines for competition to adapt
to new regulations and instead choose to shutter those divisions of competition.  Nor do Plaintiffs
provide the proof required at summary judgment—or more to the point, in the administrative
record—to show that "the Performance Division is the primary economic driver at large shows," *id.*
at 20, and indeed, the Rule found that "[i]nterest in flat-shod shows is growing nationwide," 89 Fed.
Reg. at 39,218.  Second, APHIS provided evidence for its conclusion that horses can be retrained to
show without action devices or pads, *see* DMSJ at 25-26, and Plaintiffs do not prove otherwise.  APHIS
concluded that commenters "provided no specific evidence that Performance division horses trained
to perform with the use of pads and action devices cannot perform well without them," 89 Fed. Reg.
at 39,217, and reasonably credited the Tennessee Walking Horse industry's statement that flat-shod
and padded horses employ the same "natural, inherited gaits," *id.*, as well as statements from equine
veterinarians that "transitioning the horse from padded to flat shod is a matter of mechanics,"[13] AR-
00000098.  Plaintiffs therefore do not come close to showing that the Rule "denies all economically
beneficial or productive use" of their property, the standard for a regulatory taking, *Palazzolo v. Rhode
Island*, 533 U.S. 606, 617 (2001), much less that APHIS did not meet the APA's requirements by
providing a reasonable explanation of its decision to ban action devices and pads.

---

[12] Plaintiffs' referenced declarations are speculative and offer no evidence that horse shows will choose
to eliminate the Performance Division if the Rule takes effect.  *See, e.g.,* PMSJ at 55 ("These horse
show owners indicate that their shows *will likely* be forced to cease operations with the ban on action
devices and pads in effect." (emphasis added)).   "Conclusory allegations, speculation, and
unsubstantiated assertions are not evidence."  *Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 525 (5th
Cir. 1999).  And, as stated in Defendants' opening brief, any injury stemming from the industry's
decision to alter or eliminate the Performance Division is not traceable to APHIS.  DMSJ at 24 n.12.

[13] Plaintiffs invoke *Securities & Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 87 (1943), to ask the
Court to ignore Defendants' reference to two public comments authored by AAEP and AVMA.  *See*
Pls.' Resp. at 21.  But APHIS explained in the rule that "evidence we obtained from some commenters
and the industry website discussed above, suggests they can be retrained."  89 Fed. Reg. at 39,217.

For these additional reasons, Plaintiffs' statutory and arbitrary-and-capricious claims fail.

## II.    The Prohibition of Substances is Consistent With the HPA and is Reasonable and Reasonably Explained (Counts IV-V).

APHIS based its conclusion that lubricants can mask and impede efforts to detect soring through inspections on substantial evidence and Plaintiffs do not establish otherwise. These factual conclusions are therefore reasonable and the Rule based upon them was well within APHIS's statutory authority to ban substances necessary to prevent the soring [t] horses, 15 U.S.C. §§ 1824(7), 1828. Plaintiffs therefore fall short of their burden to establish that the prohibition of lubricants exceeds the agency's authority and is arbitrary and capricious.

### A.    The Prohibition of Substances is Consistent With the HPA.

Here, Plaintiffs repeat their statutory argument as to action devices and pads, again confirming that their "statutory authority" argument is instead a factual challenge to APHIS's conclusion that the ban of lubricants will prevent soring.[14] But that factual conclusion was reasonable and fell well within Congress's grant of statutory authority. *Loper Bright Enters.*, 144 S. Ct. at 2267 (courts should review an agency's fact-finding with deference where that fact-finding is within the agency's area of expertise). As Defendants have previously explained, DMSJ at 8-9, 27, *supra* at 3-4, sections 1824(7) and 1828 confer significant discretion on the agency to make appropriate regulations in response to its factual conclusions, and the agency reasonably concluded that certain substances cause soring and other substances, like lubricants, can mask efforts to detect soring through inspections, such that the banning of that latter category is necessary to prevent masked inspection that can allow soring to

---

[14] Defendants are confused as to how Plaintiffs' arguments about lubricants, as they claim, Pls.' Resp. at 22, can be read to apply to non-lubricant substances, and what those non-lubricant substances may be. As explained in Defendants' opening brief, previously enacted HPA regulations already prohibit all substances, *except for lubricants*. *See* DMSJ at 27. This Rule did not reopen the question of whether non-lubricant substances should be banned. *See* 88 Fed. Reg. at 56,939 (observing that "[c]urrent § 11.2(c) prohibits all substances . . . except lubricants" and "[t]herefore, in proposed § 11.6(c)(4), we would prohibit all substances."); *see also Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1017 (D.C. Cir. 2016) (explaining that plaintiff cannot challenge an agency action past the ordinary timeline unless the agency substantively reconsiders the original action in a subsequent decision).

13

proliferate. *See id.* at 27-32. As discussed above, *supra* at Part I.A, Plaintiffs do not offer any plausible explanation of how to read the statutory text any differently.

    **B.**    **The Prohibition of Substances is Reasonable and Reasonably Explained.**

    Contrary to Plaintiffs' arguments, Pls.' Resp. at 22-24, APHIS readily meets the APA's threshold to "explain the evidence which is available, and . . . offer a 'rational connection between the facts found and the choice made'" to prohibit all substances. *State Farm*, 463 U.S. at 52 (1983). As Defendants explained, APHIS found that lubricants can mask and impede efforts to detect soring through inspections, either by conditioning sored skin or by illicitly containing numbing or other agents to reduce the painful effects of soring, and therefore need to be prohibited to prevent soring. *See* DMSJ at 30; 89 Fed. Reg. at 39,220. While Plaintiffs argue that "USDA still cannot point to a single bit of evidence in the record showing an instance in which [the use of lubricants to hide anesthetics] has occurred," Pls.' Resp. at 22, APHIS explained in the Rule that this practice can occur, 89 Fed. Reg. at 39,219-20, and that it would be difficult to identify in an inspection because "[b]ased on the color, texture, and smell during a gross inspection, many seemingly benign products are indistinguishable from numbing, irritating, or caustic substances."[15] *Id.* at 39,220. "Agencies are permitted to rely on their experience in the regulated field, so long as they explain what their experience is and how that experience informs the agency's conclusion," *Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1322 (11th Cir. 2021), as APHIS has done here. This is consistent with APHIS's long-standing position since 1975 that "substances, as well as lubricants, can act as vehicles for soring agents." 44 Fed. Reg. 1558, 1559 (Jan. 5, 1979).

    Plaintiffs also argue that APHIS has not "identified any reliable evidence indicating" the widespread practice of applying irritating or caustic substances to Tennessee Walking Horses and racking horses. Pls.' Resp. at 24. But APHIS relied on six years of inspection data showing that a significant number of horses tested positive for prohibited substances, with nearly all of them being Tennessee Walking Horses and racking horses in the Performance Division, *see* DMSJ at 28-29 (citing

---

[15] Defendants' citation to AR-00001141 in their opening brief was an inadvertent error. The correct citation is 89 Fed. Reg. at 39,221.

AR-00004048 (Table 3), AR-00004049 (columns KM)), and that masking and numbing agents constituted about 36% of the prohibited substances detected on all horses tested over the six-year period, *see id.* at 29 (citing AR-00004042-43 (HPA-regulated Event Data tab rows 65-77)).

Plaintiffs also claim that APHIS "does not address [9 C.F.R. § 11.2(c)], much less explain how individual trainers would circumvent those procedures to use a lubricant to hide an anesthetizing agent," Pls.' Resp. at 23, however, Defendants responded to Plaintiffs' invocation of 9 C.F.R. § 11.2(c) and their claim that the use of lubricants to mask soring would be "easy for USDA to detect," PMSJ at 34, by explaining that "APHIS determined that horse owners or trainers may put an illegal substance on the horse after inspection, and if the horse is inspected post-show, APHIS cannot distinguish an illegal substance on the pasterns from an approved lubricant without sampling." DMSJ at 29 n.14.

Finally, for the first time, Plaintiffs now argue that APHIS's decision to extend the substance ban to lubricants is an "about-face" and requires APHIS to "point to evidence rationally supporting a decision that the current system does not work and requires change." Pls.' Resp. at 23. This is incorrect (and, in any event, an inaccurate statement of *State Farm*'s requirements) because, as Defendants previously explained, lubricants were previously allowed to the extent that they prevented pain or damage inflicted by chains or other action devices that the Rule now prohibits. DMSJ at 28. Nor do Plaintiffs appear to dispute APHIS's conclusion that there is no legitimate use for any substances, including lubricants, in the absence of the use of chains and action devices. *Id.* at 27-28.

For these additional reasons, Plaintiffs' statutory and arbitrary-and-capricious claims fail.

## III.   The "Dermatologic Conditions Indicative of Soring" ("DCIS") Provision is Reasonable, Reasonably Explained, and Clear (Counts VI-VII).

Defendants demonstrated in their motion that the DCIS provision, 9 C.F.R. § 11.7, is a reasonable and clear means of implementing the HPA's prohibition on soring. *See id.* at 32-40. The provision is reasonable because it was designed to bolster the accuracy of inspection decisions by requiring that inspectors make informed judgments, based on their specialized equine training and experience, about whether certain skin conditions on a horse's limbs were caused by a person and can reasonably be expected to make the horse suffer, the same standard directly imposed by the statute

itself. *See* 15 U.S.C. § 1821(3); DMSJ at 33-35. The skin conditions listed in the provision—*i.e.* irritation, moisture, edema, swelling, redness, epidermal thickening, and loss of hair (patchy or diffuse)—are supported by record evidence as reliable criteria for evaluating horses for soreness. *See* DMSJ at 36-38. Moreover, the DCIS provision is clear because it uses simple language that fairly notifies the regulated community of the conditions on a horse that may lead to a rebuttable presumption that the horse is sore. *See id.* at 39-41. None of the arguments Plaintiffs raise in their rebuttal entitles them to summary judgment on their challenges to the DCIS provision.

### A. The DCIS Provision is Reasonable and Reasonably Explained.

Beginning with their arbitrary-and-capricious challenge, Plaintiffs acknowledge that the HPA's definition of "sore" "provides a clear description of the conduct that is prohibited" and assert that there is a "critical distinction" between the *conduct* prohibited under the statute and the *criteria* provided in the DCIS provision for determining whether prohibited conduct has occurred. *See* Pls.' Resp. at 25-27. On that basis, Plaintiffs state that "USDA cannot salvage the [DCIS provision] by arguing that it is essentially circular and points back to the statute." *Id.* at 25. But Defendants do not suggest that the DCIS provision is merely repetitive of the HPA statute. Rather, Defendants explained that the DCIS provision "is independently reasonable and of independent benefit," and that incorporating the statutory definition is one of several ways that the provision promotes accurate soring determinations, because it requires inspectors to rule out non-soring-related causes of a skin condition before they may diagnose a horse as sore. *See* DMSJ at 33. Thus, Plaintiffs' discussion of *Fleming*—which Defendants do not dispute analyzed a challenge to the HPA's definition of "sore" separately from a challenge to the criteria for post-show soreness inspections (and rejected both challenges)—misses the mark. *See* Pls.' Resp. at 25-27 (discussing *Fleming v. USDA*, 713 F.2d 179 (6th Cir. 1983)).

As to the record evidence supporting the DCIS provision, Defendants explained that the NAS Study proposed regulatory language that included essentially the same skin conditions as those in the DCIS provision, which strongly suggests that the NAS Study authors considered those conditions to be useful indicators of soreness. *Compare* 9 C.F.R. § 11.7 (DCIS provision listing "irritation, moisture, edema, swelling, redness, epidermal thickening, and loss of hair (patchy or diffuse")), *with* AR-

00001191 (NAS Study listing "loss of hair, patchy or diffuse . . . swelling, redness, excoriation, erosions, ulcers, seeping of fluids, or signs of a response to chronic injury such as epidermal thickening or presence of scales"); *see also* DMSJ at 37 (discussing this overlap).  Defendants also pointed to overlap in the DCIS skin conditions and conditions linked to soring in the Auburn Study to further demonstrate an evidentiary basis for the DCIS provision.  *See id.* (explaining that the Auburn Study linked soring to edema, swelling, and hair loss, which are also DCIS skin conditions).

Citing *Securities & Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 87 (1943), Plaintiffs ask the Court to ignore Defendants' reasoning by asserting that APHIS did not rely on it in the rulemaking. *See* Pls.' Resp. at 27, 29.  But "*Chenery* does not bar an agency's counsel from merely elaborating on the consistent stance the agency articulated below." *Chiquita Brands Int'l Inc. v. SEC*, 805 F.3d 289, 299 (D.C. Cir. 2015).  Defendants' reasoning is consistent with APHIS's stance on the DCIS provision in the rulemaking, and in particular its explanation that "[e]ach of the conditions listed in the [DCIS provision] has been identified with soring in certain instances." *See* 89 Fed. Reg. at 39,222.  Moreover, APHIS repeatedly relied on the NAS Study to support its decision to adopt the DCIS provision. *See, e.g.*, *id.* at 39,224 ("Our revisions to the current scar rule are based on the NAS study observation that epidermal thickening can be indicative of a response to chronic injury consistent with soring.").  Thus, at minimum, the path from the Rule to Defendants' position in this litigation "may reasonably be discerned," sufficiently previewing the agency's reasoning for judicial review purposes. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007); *Bruckner Truck Sales, Inc. v. Guzman*, No. 2:23-CV-097, 2024 WL 903441, at *2 (N.D. Tex. Feb. 27, 2024) (rejecting similar *Chenery* argument).

Plaintiffs' remaining arguments boil down to their recycled complaint that the DCIS provision improperly affords inspectors discretion in making soreness determinations. *See* Pls.' Resp. at 28-29. As Defendants explained, however, inspectors will be guided by their veterinary and equine knowledge, experience, and training as required under 9 C.F.R. §§ 11.19(a)(1)-(2), (b), and the Rule provides several opportunities to challenge soreness determinations, *see infra* Part IV.  In response, Plaintiffs retrace their allegations of inconsistent findings of the to-be-replaced Scar Rule violations, *see* Pls.' Resp. at 29-30, but applications of a different regulation in prior years do not demonstrate that

17

the new DCIS provision—which has not yet ever been applied and will be carried out by new inspectors subject to new training materials—is arbitrary or capricious.  Moreover, Plaintiffs do not address the reality that (i) *any* injury can have more than one possible cause; (ii) injuries from soring are intentionally masked from inspectors, and inspectors cannot monitor a horse throughout its lifetime to determine with absolute certainty the cause of a particular injury; and (iii) inspectors therefore must rely on informed judgment to make the best diagnosis possible in each case.  *Cf. Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972) ("As always, enforcement requires the exercise of some degree of police judgment, but, as confined, that degree of judgment here is permissible.").

Accordingly, Plaintiffs' arbitrary-and-capricious challenge fails.

### B.  The DCIS Provision is Clear.

Plaintiffs' vagueness challenge to the DCIS provision likewise fails.  As Defendants previously explained, Plaintiffs bring a facial challenge to the DCIS provision, arguing that it is unconstitutionally vague, meaning that they must overcome a "heavy burden" and show that the provision will be "impermissibly vague in all of its applications."  *See McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir.), *cert. denied*, 144 S. Ct. 348 (2023); DMSJ at 39, 41.  That is particularly challenging for Plaintiffs to accomplish here, since they bring their facial claim before the DCIS provision has ever been enforced.  *See Roark & Hardy LP v. City of Austin*, 522 F.3d 533, 547 (5th Cir. 2008) ("In the context of pre-enforcement review . . . examining facial vagueness is often difficult, perhaps impossible, because facts are generally scarce.").  Plaintiffs resist this standard, *see* Pls.' Resp. at 32, but they fail to address the Fifth Circuit's application of this standard to facial challenges in *McClelland*, *Roark & Hardy*, or the Supreme Court's and Fifth Circuit's cautionary observation that "facial challenges [are] hard to win."  *See Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024); *NetChoice LLC v. Paxton*, 121 F.4th 494, 497 (5th Cir. 2024) (facial challenges "are difficult to successfully mount").

Applying these principles, Plaintiffs offer only speculation about the future possibility that inspectors will disagree about the application of the DCIS provision—with no factual record to show any impermissible application of that provision.  As Defendants explained, APHIS need not achieve

"meticulous specificity," *see Grayned*, 408 U.S. at 110, and the provision is sufficiently clear because it uses plain language to identify examples of skin conditions that inspectors will look for in evaluating for soreness, which persons of ordinary intelligence—particularly those such as Plaintiffs with specialized industry knowledge—would easily understand, *see* DMSJ at 40. The provision also provides clear notice that those skin conditions will not automatically trigger a disqualification but instead will be part of a differential diagnosis undertaken by inspectors who are specially trained to make such determinations. Moreover, the broader regulatory regime provides multiple avenues for challenging an inspector's decision, thereby further minimizing the risk of arbitrary or discriminatory enforcement. *See infra* Part IV. The rule is therefore constitutionally clear. *See Grayned*, 408 U.S. at 112 (finding anti-noise ordinance not void for vagueness despite a level of discretion in enforcement).

Plaintiffs' hypothetical scenarios offered to show that hair loss "may be evaluated five different ways by five different HPIs" are unpersuasive. *See* Pls.' Resp. at 31. Through those scenarios, Plaintiffs speculate that inspectors may take conflicting positions on whether hair loss is required on both legs of a horse, but the DCIS provision clearly states that a skin condition on "any limb of a horse" may lead to a presumption of soreness, and thus no inspector applying the DCIS provision will require that hair loss appear on both legs in order to find that the horse is sore. *See* 9 C.F.R. § 11.7. This is consistent with the statutory definition of "sore" as pertaining to acts performed on "any limb of a horse." *See* 15 U.S.C. § 1821(3)(A)-(D).

Finally, Plaintiffs cannot overcome the obstacles to their vagueness claim by pointing to a House Oversight Committee subpoena to APHIS and a USDA OIG investigation. *See* Pls.' Resp. at 33-34. Neither the House Oversight Committee nor the USDA OIG has offered any final conclusions regarding the DCIS provision specifically or HPA enforcement more generally—and even if they did, those conclusions would not bind this Court. Those ongoing inquiries therefore provide no basis to conclude that the DCIS provision will be impermissibly vague in every future application.

Plaintiffs' pre-enforcement, facial vagueness challenge to the DCIS provision thus fails.

IV.    **The Rule Affords Adequate Due Process (Count VIII).**

As Defendants have explained, the Rule affords three avenues for due process: (1) a regulation that provides opportunity for pre-deprivation review by allowing individuals to seek immediate re-inspection of an initial soreness finding, *see* 9 C.F.R. § 11.8(h); (2) a regulation that provides post-deprivation review shortly after a show by allowing individuals to appeal a disqualification to the Administrator of APHIS, *see id.* § 11.5; and (3) a statutory provision requiring notice and an opportunity for an evidentiary hearing before any civil penalty may be imposed for an HPA violation, *see* 15 U.S.C. § 1823(b)(1). *See also* DMSJ at 43-47. These layered and self-reinforcing processes are sufficient for purposes of due process because they appropriately mitigate the risk of an erroneous deprivation, and there is no feasible way for APHIS to provide additional, pre-deprivation process without compromising its significant interest in carrying out Congress's prohibition on showing sore horses. *See Mathews v. Eldridge*, 424 U.S. 319 (1976); DMSJ at 41-47. That is especially so given that soreness determinations must be made rapidly in the moments before a show. *See Richards v. McLane*, No. 21-20450, 2023 WL 6533453, at *7 (5th Cir. Oct. 6, 2023) (pre-deprivation process is not required "where a State must act quickly, or where it would be impractical").

In rebuttal, Plaintiffs do not acknowledge that, to succeed on their facial due process claim, they must meet the same "heavy burden" described above to demonstrate that APHIS's procedures violate due process "in all of [their] applications." *See McClelland*, 63 F.4th at 1013; *supra* at 18. Nor do they provide any persuasive reason for the Court to find that burden met.

First, as Defendants explained, owners and trainers may observe inspections and provide inspectors information about their horses, which lessens the risk of erroneous deprivation by allowing an opportunity for owners or trainers to explain to an inspector the cause of a given condition on the horse. *See* DMSJ at 43. Plaintiffs contest this because the cited portion of the Rule states that "owners and trainers are free to record inspections *from a position outside the inspection area*." *See* 89 Fed. Reg. at 39,205 (emphasis added); Pls.' Resp. at 34-35. Merely because a recording must be made from outside the immediate inspection area does not mean that an owner or trainer cannot relay information to an inspector within the inspection area. To the contrary, as Plaintiffs acknowledge, *id.* at 35, each horse

may be accompanied *in the inspection area* by the person having "immediate custody" of the horse, which is presumably the owner, trainer, or another individual with knowledge about the horse. *See* 9 C.F.R. § 11.10(b). Plaintiffs take issue with rules preventing that person from distracting the horse and requiring that the horse's reins be held in a certain manner, but they do not explain how those basic restrictions—which plainly promote orderly inspections—are unreasonable or would impede the flow of information to the inspector. Pls.' Resp. at 35. Nor do Plaintiffs provide support for their assertion that "there is an atmosphere of tension marked by owners' fear [of] speaking up." *See id.*

Next, Plaintiffs retread old ground by criticizing the pre-disqualification process for immediate re-inspection of horses that is available under 9 C.F.R. § 11.8(h). *See id.* at 35-36. They complain that "there is no guaranteed access to re-inspection," *id.* at 35, but due process is "flexible," *Mathews*, 424 U.S. at 334, and does not require a guarantee of pre-deprivation review where "it would be impractical" to provide such review, *see Richards*, 2023 WL 6533453, at *7. Here, it would be impractical for APHIS to guarantee immediate re-inspection of every horse upon request given the need for inspections to be carried out moments before the horse is shown. Granting all demands for re-inspection in every case would also be inconsistent with the NAS Study's conclusion that re-inspection should "only be granted if the show veterinarian (not the competitor or any other persons) finds sufficient cause" since "changes [] may occur over time between examinations." *See* AR-00001110-11. For those same reasons, Plaintiffs' new suggestion that APHIS should "require[] that some neutral party be available to provide a second opinion as to whether a horse is sore" is unworkable and improper, and it is also unclear what "neutral party" Plaintiffs envision, or how APHIS could guarantee that such a party is available to attend every show and is also qualified to render second opinions. Pls.' Resp. at 39. Moreover, Plaintiffs speculate that the decision to provide re-inspection "in most cases would be [made by] the inspector who disqualified the horse in the first instance." *Id.* at 35. Plaintiffs do not provide the "records" that they claim support this assertion, *see id.* at 35 n.15, and they fail to cite a single instance in which one of their horses was denied re-inspection, much less an instance where the same inspector who performed the initial inspection denied re-inspection.

Plaintiffs' recycled reliance on the out-of-circuit, unreported, district court opinion in *McSwain v. Vilsack* is no more persuasive this time around. *See id.* at 36. There, the court entered preliminary injunctive relief—never reaching the merits—on a due process claim related to a single horse's disqualifications under the Scar Rule. *See McSwain v. Vilsack*, 2016 WL 4150036, at *5 (N.D. Ga. May 25, 2016). *McSwain* is inapposite as Defendants have already pointed out—it did not address the adequacy of the re-inspection process and was decided before the post-disqualification appeal process in the HPA Rule existed. *See* DMSJ at 44-45. Most significantly, however, *McSwain* provides no support for Plaintiffs' demand that every horse at every show be guaranteed pre-deprivation process because the pre-deprivation process entered in that case was limited to the one horse at issue there. *See* 2016 WL 4150036, at *6. Plaintiffs acknowledge this key distinction yet claim that "the logic underlying [*McSwain*] applies to all horses subjected to USDA's rules." *See* Pls.' Resp. at 39. The logic of *McSwain* suggests just the opposite. The *McSwain* court emphasized, rather than minimized, that issuing relief as to a single horse would not implicate "the practical difficulties [USDA] would face in providing the owner of each disqualified horse a hearing prior to a show." 2016 WL 4150036, at *6. That is in distinct contrast to the industry-wide relief sought by Plaintiffs here.

Finally, Plaintiffs again argue that "USDA's recordkeeping procedures are insufficient to provide a fair appeals process" because, according to Plaintiffs, USDA is not required to provide specific details about the basis for a soreness determination. *See* Pls.' Resp. at 37. Defendants have already pointed out that, under the new appeal process, APHIS (or an HPI) will provide an "inspection report" to each horse custodian following a disqualification. *See* 9 C.F.R. § 11.5; DMSJ at 46. APHIS defined "inspection report" for purposes of the rulemaking as "a report that details the finding[s] resulting from an inspection to determine compliance with the [HPA] and regulations." *See* 89 Fed. Reg. at 39,204. Plaintiffs' argument on rebuttal is that the inspection report requirement is "not meaningfully different from the current regulations." *See* Pls.' Resp. at 37. But current regulations require only that APHIS inform horse custodians that an alleged HPA violation related to their horse has occurred. *See* 9 C.F.R. § 11.4(f)) (APHIS will inform custodians of "any horse allegedly found to be in violation of the Act or the regulations of such alleged violation or violations"). Current

regulations do not, however, require that APHIS provide written documentation of the details and findings of an inspection for purposes of appealing that inspection. That requirement is found only in the new Rule, *see id.* § 11.5, and Plaintiffs have no basis to speculate that inspection reports which have not yet been issued will somehow be insufficient.

For these additional reasons, Plaintiffs' due process claim in Count VII lacks merit.

## V. The Horse Protection Inspector ("HPI") Program Represents a Lawful Exercise of APHIS's Statutory Authority and is Reasonable (Counts IX and X).

### A. The HPI Program is Authorized Under the HPA.

The HPI program, in which show management may appoint a private inspector who is trained, screened, and authorized by APHIS to inspect horses for HPA compliance, implements the HPA's provision requiring the agency to "prescribe by regulation requirements for the appointment by the management of any horse show . . . of persons qualified to detect and diagnose a horse which is sore." *See* 15 U.S.C. § 1823(c); 9 C.F.R. § 11.19; DMSJ at 51. The program is thus lawful, and Plaintiffs' challenge to it as exceeding statutory authority fails.

In rebuttal, Plaintiffs appropriately retreat from their exclusive reliance on legislative history, which they now assert "merely reinforces what the text of the Act says—Congress intended that most horse inspections would be conducted by inspectors privately hired by show management, not by the Agency." Pls.' Resp. at 39. Critically, however, HPIs *are* inspectors privately hired by show management. *See* 89 Fed. Reg. at 39,201 ("HPIs . . . are not employees of APHIS and not compensated by the Agency, but will be authorized to conduct inspections and will contract as third parties with event management for their services."). Plaintiffs' reliance on 15 U.S.C. § 1823(a) does not help their case but shows how APHIS complied with the statute. That provision states that show management "shall disqualify any horse from being shown . . . if the management has been notified by a person appointed in accordance with regulations under subsection (c) or by the Secretary that the horse is sore." 15 U.S.C. § 1823(a). HPIs are persons appointed—by show management—under subsection (c), and the new Rule does not alter show management's obligation to disqualify a horse where an HPI has notified management that the horse is sore.

23

As for Plaintiffs' projections about the cost of HPIs to show management, as Defendants explained, APHIS plays no part in setting HPIs' rates, which will be negotiated at arms' length between HPIs and show management.  *See* 89 Fed. Reg. at 39,242; DMSJ at 52.  Plaintiffs do not respond to this point, nor do they explain how the mere possibility that HPIs will be cost-prohibitive for "smaller shows" means that the entire HPI program should be found unlawful industry-wide.  *See* Pls.' Resp. at 40.  Indeed, the HPI program does not require any show management to appoint an inspector *at all*, whether HPI or APHIS representative, *see* 15 U.S.C. § 1824(3), and thus the "Hobson's choice" that Plaintiffs claim forces show managers to appoint an APHIS representative does not exist, *see* Pls.' Resp. at 40.  Moreover, it is unclear how hiring an HPI would be cost-prohibitive to Plaintiff TWHNCA, which runs (among other major shows) the National Celebration, where "[n]early a quarter of a million tickets are sold" and occurs on "its own 100-plus-acre equestrian complex . . . including a 30,000 seat outdoor stadium, a 4,500 seat indoor arena, . . . and permanent stalls for more than 1,700 horses."  *See* Tennessee Walking Horse National Celebration, https://twhnc.com /celebration/ (last visited Dec. 20, 2024); *see also* Declaration of Warren Wells ("Wells Decl."), ECF No. 29-1 ¶ 5 (similar).

### B.    The HPI Program is Reasonable and Reasonably Explained.

Defendants provided substantial evidence demonstrating that the HPI program is reasonable because it works to address documented issues with the prior DQP program, wherein industry-appointed private inspectors were not adequately enforcing the HPA by allowing sore horses to show.  *See* DMSJ at 53-55.  In support, Defendants pointed to (i) a 2010 USDA Office of Inspector General ("OIG") Audit; (ii) DQP performance evaluations; (iii) decisions by USDA's Office of the Judicial Officer ("OJO"); (iv) the NAS Study, and (v) APHIS inspection data—which individually and together demonstrate a history of inadequate DQP performances.  *See id.*

Plaintiffs' rebuttal points begin by criticizing the 2010 OIG Audit and the 2015 (and earlier) OJO decisions as "outdated."  Pls.' Resp. at 41.  But Plaintiffs do not point to any more recent evidence undermining the Audit's conclusion that the DQP program is "not adequate to ensure that [horses] are not being abused," *see* AR-00001227, or the OJO decisions that are consistent with OIG's

24

finding and described DQP inspections "to be less probative" than APHIS inspections, *see In re: Justin R. Jenne*, 74 Agric. Dec. 358, 364 n.16 (U.S.D.A. July 17, 2015). Moreover, Plaintiffs' complaints about the age of these materials do not address similar findings from the NAS Study and APHIS's inspection data, which are from 2021 and 2022, respectively. *See* AR-00001113, 1136-39 (NAS Study excerpts); AR-00004042-43, 4046-49, 4052-53, 4179-201, 4203-12 (inspection data). Most notably, the 2021 NAS Study "strongly recommended that use of DQPs for inspections under the current regulations be discontinued." *See* 89 Fed. Reg. at 39,196. Plaintiffs offer no meaningful response to this recommendation, which is consistent with the broad range of evidence discussed above.

Plaintiffs next wedge their challenge to the HPI program into a generalized complaint that "inspectors writ large (including VMOs)" issue inconsistent soring determinations, which supposedly means that DQPs are not a problem. *See* Pls.' Resp. at 41-42. Plaintiffs claim this alleged inconsistency is due to "the inspection method, itself, [being] unreliable." *See id.* at 42. But Plaintiffs acknowledge that, in the most recent cited OJO decision, all three inspectors—two DQPs and one VMO—agreed that the horse at issue was sore. *See In re: Jenne*, 74 Agric. Dec. at 364; Pls.' Resp. at 41. In any event, merely because inspectors may not agree in every case whether a horse is sore says nothing about the probative value of those inspectors' decisions, just as the fact that different judges may disagree about the proper outcome of a case does not destroy the probative value of the judiciary. The best available evidence, consistent with language from Plaintiffs' own citations and the voluminous other record materials cited by Defendants, shows that DQP opinions are less reliable than VMO opinions. *See In re: Justin Jenne*, 2014 WL 4948794, at *7 (U.S.D.A. July 9, 2014) ("The USDA JO has routinely concluded that the opinions of USDA veterinarians as to whether a horse is sore are more persuasive than the opinions of DQPs."); *In re: Timothy Fields and Lori Fields*, 54 Agric. Dec. 215, 219 (U.S.D.A. Jan. 6, 1995) ("[I]t is the Secretary's belief that the opinion of its veterinarians as to whether a horse is sore is more persuasive than the opinion of DQPs.").

Finally, Plaintiffs continue to insist that HPIs who are not veterinarians "will have less equine experience than trainers and farriers in the industry." Pls.' Resp. at 42. As Defendants explained, HPIs will generally be veterinarians, but if not enough veterinarians are available to serve as HPIs, the

Rule provides that "veterinary technicians and persons employed by State and local government agencies to enforce laws or regulations pertaining to animal welfare may also be authorized" as HPIs. *See* 9 C.F.R. § 11.19(a)(1); DMSJ at 50, 52-53. And every HPI, whether a veterinarian or not, will be required to show "sufficient knowledge and experience of equine husbandry and science" and will be trained to perform inspections. *See* 9 C.F.R. § 11.19(a)(2)(i), (b). Plaintiffs' entire argument is premised on the assumption that there will be so few veterinarians available to serve as HPIs that a significant number of HPIs will be non-veterinarians. Plaintiffs unsurprisingly have no support for this assumption, as HPI authorization and training has only recently begun. In any event, even if non-veterinarians ultimately serve as HPIs, Plaintiffs have no basis to suggest that APHIS will violate is own regulation by authorizing individuals who lack sufficient equine knowledge and experience to serve as HPIs. While Plaintiffs may prefer trainers and farriers from within the industry to fill those roles, hiring inspectors from within the industry is precisely what the HPI program is intended to avoid. APHIS explained all of this in the rulemaking, and that explanation is at least rational. *See 10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013) (courts must "uphold an agency's actions 'if its reasons and policy choices satisfy minimum standards of rationality'").

Accordingly, Plaintiffs' challenge to the HPI program should be rejected.

**VI.    APHIS Reasonably Concluded That the Rule's Benefits Justify its Costs (Count XI).**

APHIS's cost-benefit analysis reasonably addresses the Rule's projected impacts on the TWH industry and the greater U.S. economy, and it is based on the most recent, available information. *See* DMSJ at 57-61. The analysis thus provides "a reasonable basis for [APHIS's] decision" and is sufficient. *See Huawei Techs. U.S.A., Inc. v. FCC*, 2 F.4th 421, 452 (5th Cir. 2021).

**A.    The Cost-Benefit Analysis Reasonably Addressed the Rule's Projected Impacts on the Tennessee Walking Horse Industry.**

Where an agency chooses to rely upon a cost-benefit analysis, and where such analyses are judicially reviewed, "courts afford agencies considerable discretion" and must uphold that analysis if

the agency made a "reasonable effort." *See id.*; *see also* DMSJ at 56-57 (explaining that neither the HPA nor the APA requires a cost-benefit analysis in the first place).

Plaintiffs double down on their projection that the Rule "could wipe out the Tennessee Walking Horse [] Industry" because, in Plaintiffs' view, the ban on action devices and pads "effectively outlaws the entire Performance Division of competition." *See* Pls.' Resp. at 1, 45-46. Plaintiffs point to "industry rules" requiring that horses competing in that Division wear action devices and pads, *id.* at 45, but they provide no reason why industry cannot or will not adjust its own rules and allow horses to compete in the Division without such soring-related equipment. Further, APHIS explained that, "with proper training," horses that do not wear such equipment can still "achieve the animated 'big lick' step" that has been associated with the Performance Division. *See* 89 Fed. Red. at 39,217. Plaintiffs point to declarations from horse trainers opining on the difficulty of re-training their own horses, Pls.' Resp. at 46, but those opinions do not demonstrate that other horses cannot be re-trained, and indeed other trainers and commenters have stated that re-training can be successful. *See* 89 Fed. Reg. at 39,217. USDA was entitled to credit the evidence it did under the deferential standard of review. *See Huawei*, 2 F.4th at 452.

Finally, even if Plaintiffs are correct that the Performance Division is currently the "main economic driver" of TWH shows, *see id.* at 3—which is not clear as noted above, *see supra* at Part I.B.3—their assertion that the Rule would cause "many shows [to] shut down, . . . leaving no room for flat shod TWHs to compete," *id.* at 46, is belied by the record data showing that flat-shod entries outnumber Performance Division entries 4:1. *See* AR-00004050; DMSJ at 57.[16] Indeed, as APHIS explained, flat-shod classes "are of growing popularity," *see* 89 Fed. Reg. at 39,217, and the Rule may very well *increase* TWH show attendance and profitability due to increased confidence that the horses being shown are not sore, *see id.* at 39,243. Ultimately, while Plaintiffs disagree with APHIS's conclusions in weighing these economic factors, Plaintiffs fail to establish any "serious flaw" in APHIS's analysis and thus provide no basis to find that the analysis is insufficient. *See Huawei*, 2 F.4th

---

[16] Defendants' citation to AR-00005050 in their opening brief was an inadvertent error. *See* DMSJ at 57. The correct citation is AR-00004050.

at 452; *see also id.* ("[C]ourts of review should be mindful of the many problems inherent in [considering costs] and uphold a reasonable effort made by the Agency.").

**B.    The Cost-Benefit Analysis Reasonably Addressed the Rule's Projected Impacts on the Greater U.S. Economy.**

Plaintiffs raise no new points regarding their claim that APHIS did not account for the Rule's impacts on the greater U.S. economy.  *See* Pls.' Resp. at 47.  As Defendants explained, APHIS acted appropriately because it addressed the Rule's potential downstream impacts and explained that TWH shows will continue under the Rule.  *See* DMSJ at 59; AR-00004023.  Plaintiffs' complaints about this conclusion are the same as their complaints about the potential impacts on the TWH industry, which are erroneous for the same reasons Defendants have explained.  *See* DMSJ at 57-50; *supra* at Part VI.A.

**C.    The Cost-Benefit Analysis Appropriately Relied on the Most Recent, Available Information.**

Plaintiffs' rebuttal arguments about the reliability of the data underlying APHIS's analysis are similarly misguided.  Plaintiffs assert that the dollar amounts in the analysis, which were updated to 2021 figures based on the Consumer Price Index ("CPI"), are unreliable because the CPI measures "the prices paid by urban consumers" rather than rural entities.  Pls.' Resp. at 43-44.  Plaintiffs offer no superior available measure of those figures, nor do they specify a single inaccuracy in APHIS's figures that could render the entire analysis unreliable.

As for Plaintiffs' complaints about APHIS's reliance on data from 2012 illustrating the number of horses and owners that participate in TWH shows, Plaintiffs state in generalized fashion that "there is every reason to expect that the Industry has changed over the past ten years."  *Id.* at 44.  Were that true, one might wonder why Plaintiff TWHNCA, which runs "America's largest event featuring the Tennessee Walking Horse breed," Wells Decl. ¶ 3, did not provide a single example of a relevant industry change during the rulemaking process (or even, though it could not be considered, in litigation), much less an example that would call into question APHIS's data approximating the number of horses and owners in the industry.  In any event, even if the numbers from 2012 vary from today, Plaintiffs' concern with the economic impact of the Rule is not that the size of the industry will change at the margins; it is that Plaintiffs believe the Rule will "wipe out" the entire TWH industry.

*Id.* at 1. While that assertion is unfounded for the reasons Defendants have explained, it reduces the significance of the precise number of horses and owners in the industry at a given time.

Plaintiffs' challenge to the economic analysis in Count XI thus fails.

## VII.    The Rule is Consistent With the Regulatory Flexibility Act (Count XII).

As Defendants have explained, the Regulatory Flexibility Act ("RFA") is a "procedural rather than substantive agency mandate," and the question for review is limited to whether the "agency has made a reasonable, good-faith effort to carry out" that procedural mandate. *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 625 (5th Cir. 2000); DMSJ at 61-62. APHIS undertook each procedural step required: it considered the Rule's expected impacts on small entities, considered alternatives to the rule, and made its analysis available for public comment. *See* AR-00004020-35; *see also Grocery Servs., Inc. v. USDA Food & Nutrition Serv.*, 2007 WL 2872876, at *10 (S.D. Tex. Sept. 27, 2007) (listing these procedural steps). Plaintiffs offer no new substantive points in support of their RFA claim and instead refer to their arguments concerning APHIS's economic analysis. *See* Pls.' Resp. at 47-48. Plaintiffs' RFA claim thus lacks merit for the same reasons Defendants have provided in response to their challenge to the economic analysis. *See supra* Part VI.

## VIII.    To The Extent Plaintiffs Are Entitled to any Relief, that Relief Should Be Limited to Plaintiffs and to the Provisions of the Rule that the Court Concludes Are Unlawful.

First, any relief entered should only extend to the provisions of the Rule that Plaintiffs challenge. This is consistent with Plaintiffs' Motion for Summary Judgment and Proposed Order, ECF Nos. 28, 28-1 (seeking to vacate only the challenged provision), and is inconsistent with Plaintiffs' late-breaking suggestion via footnote that they "take no position on whether the Court should vacate only the challenged provisions or the entire 2024 Rule." Pls.' Resp. at 50 n.21. Even so, the Court should vacate only those provisions of the Rule that it concludes are flawed because, as Defendants explained in their opening brief, DMSJ at 63, the Rule contains a severability clause, 89 Fed. Reg. at 39,234, and the parts of the Rule that remain "function sensibly without the stricken provision," *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019). Plaintiffs do not challenge the agency's severability analysis in their response.

Second, if the Court finds that Plaintiffs have succeeded on the merits, rather than vacate the challenged provisions nationwide, it should only enjoin Defendants from enforcing the provisions as applied to Plaintiffs. Even assuming *arguendo* that vacatur is authorized by the APA, *contra* DMSJ 64, it certainly is not required in every circumstance. *See Texas v. Biden*, 20 F.4th 928, 1000 (5th Cir. 2021), *as revised* (Dec. 21, 2021) (explaining vacatur depends on "the seriousness of the deficiencies of the action" and "the disruptive consequences of vacatur"), *rev'd on separate grounds and remanded*, 597 U.S. 785 (2022). Vacatur would be inappropriate here because party-specific injunctive relief would redress any injuries Plaintiffs claim to have suffered. Yet, Plaintiffs argue that this Court's ruling should be extended to horse owners, trainers, show associations, and others not before the Court. Pls.' Resp. at 48-50. However, "a plaintiff must demonstrate standing separately for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

In addition, nationwide relief would sweep in the many "nonparties who may not wish to receive the benefit of the court's decision." *United States v. Texas*, 599 U.S. 670, 703 (2023) (Gorsuch, J., concurring). For example, some horse owners or trainers may not use substances on their horses and would be disadvantaged by the increased likelihood of soring absent the substance ban provision of the Rule; some owners or trainers may want to utilize the Rule's appeal process for challenging soring determinations; or some horse owners or trainers may prefer that the DCIS provision take effect so that their horses will not be disqualified notwithstanding that their horse's conditions do not indicate soreness as that term is statutorily defined. Plaintiffs, after all, have not sought to certify a class to speak on those persons' behalf. These potential disagreements can be addressed more equitably by an injunction limited to Plaintiffs.

## CONCLUSION

Accordingly, the Court should deny Plaintiffs' motion for summary judgment and enter summary judgment in favor of Defendants on all of the claims.

Dated: December 20, 2024                    Respectfully submitted,

                                            BRIAN M. BOYNTON

30

Principal Deputy Assistant Attorney General

JOSEPH E. BORSON
Assistant Branch Director

*/s/ Allyson R. Scher*
ALLYSON R. SCHER (DC Bar No. 1616379)
CRISTEN C. HANDLEY (MO Bar No. 69114)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, D.C. 20005
Telephone: (202) 514-9836
Facsimile: (202) 616-8460
E-mail: allyson.r.scher@usdoj.gov

*Counsel for Defendants*

31