IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

THE TENNESSEE WALKING HORSE
NATIONAL CELEBRATION
ASSOCIATION, *et al.*,

     Plaintiffs,

v.                                                                2:24-CV-143-Z

UNITED STATES DEPARTMENT
OF AGRICULTURE, *et al.*,

     Defendants.

## MEMORANDUM OPINION
## AND ORDER

### INTRODUCTION

The Congress, USDA, and equine organizations like Plaintiffs all agree on the objective of

the Horse Protection Act ("HPA"): to end "soring," the cruel and inhumane[1] practice of

intentionally injuring a horse to accentuate its gait and thereby gain advantage in shows,

exhibitions, sales, or auctions. *See* ANIMAL AND PLANT HEALTH INSPECTION SERV., U.S. DEP'T.

AG., https://www.aphis.usda.gov/hpa (last modified Jan. 24, 2025) ("A horse that has been sored

will pick up its feet higher and faster, creating a highly animated gait that is desired in specific

breed classes . . . ."); ECF Nos. 29, 45, 41, 47. But here, Plaintiffs and Defendants disagree on the

reading and reach of a new 2024 Rule designed to further enforce the HPA.

---

[1] "If you have men who will exclude any of God's creatures from the shelter of compassion and pity, you will have men who will deal likewise with their fellow men." Saint Francis of Assisi, *St. Francis and Earth Day Call us to See Our Connectedness to All of Creation*, FRANCISCAN SISTERS OF CHRISTIAN CHARITY (Apr. 20, 2020), https://fscc-calledtobe.org/2020/04/20/st-francis-and-earth-day-call-us-to-see-our-connectedness-to-all-of-creation/.

Before the Court are Plaintiffs' and Defendants' Cross-Motions for Summary Judgment. ECF Nos. 28, 44. All parties agree that Plaintiffs' claims "are properly resolved on cross-motions for summary judgment on [the] basis of the administrative record." ECF No. 11 at 1. For this reason, and having considered the briefing and relevant law, the Motions are **GRANTED IN PART** and **DENIED IN PART**. The Court **HOLDS** that: (1) USDA exceeded its statutory authority by promulgating a blanket prohibition on action devices, pads, and substances; (2) the DCIS provision replacing the Scar Rule fails to provide adequate due process; and (3) the lack of genuine pre- and post-deprivation review in the 2024 Rule fails to provide adequate due process. However, the 2024 Rule provision regarding the DQP program does not constitute an excess of statutory authority, arbitrary or capricious decision-making, or a violation of the Regulatory Flexibility Act.

### BACKGROUND

Over 50 years ago, Congress passed the HPA to prohibit the practice of "soring" horses — that is, intentionally inflicting pain to a horse's legs or hooves by physical or chemical means to exaggerate the horse's gait and thereby gain an unfair advantage at horse shows. 15 U.S.C. § 1821 *et seq*. Soring has primarily been used on Tennessee Walking Horses, known for their distinctive, high-stepping gait, as the pain forces the horse to quickly lift its legs to avoid discomfort and causes a more pronounced walk that improves competitive performance. Accordingly, the Secretary of the United States Department of Agriculture ("USDA" or "Agency") is "authorized to issue such rules and regulations as he deems necessary to carry out the provisions" of the HPA — including rules and regulations promulgated for the purpose of prohibiting soring. *Id.* at § 1828.

Exercising this power, the Secretary, through the Department's Animal and Plant Health Inspection Service ("APHIS"), issued regulations implementing the HPA. Horse Protection Regulations, 37 Fed. Reg. 2426–29 (Feb. 1, 1972). APHIS now seeks to amend these regulations

2

(the "2024 Rule") with the stated goal of "strengthen[ing] the Agency's efforts to protect horses from the cruel and inhumane practice of soring as the Act requires." 89 Fed. Reg. 39194 (May 8, 2024) (amending 9 C.F.R. pt. 11). The Tennessee Walking Horse National Celebration Association (together with Ms. Kimberly Lewis and Mr. Tom Gould, the "Plaintiffs") voiced their concerns about the proposed rule during the notice-and-comment period required under the Administrative Procedure Act ("APA"). *See generally* 88 Fed. Reg. 56924 (containing the proposed rule); 89 Fed. Reg. 39197 (containing a discussion of solicited comments). USDA then issued the final 2024 Rule. 89 Fed. Reg. 39194.[2]

Next, Plaintiffs filed this suit raising pre-enforcement challenges to five specific aspects of the 2024 Rule: (1) the prohibition of all action devices and pads worn between the hoof and horseshoe; (2) the prohibition of all substances applied above the hoof; (3) the replacement of the former "Scar Rule" provision with the "Dermatologic Conditions Indicative of Soring" ("DCIS") provision; (4) the process created for appealing soreness determinations before and after competition; and (5) the replacement of third-party Designated Qualified Persons ("DQPs") with APHIS-authorized inspectors. 89 Fed. Reg. 39245–48 (to be codified at 9 C.F.R. §§ 11.5, 11.6(c), 11.7, and 11.8(h)); ECF No. 29 at 10–13. Plaintiffs assert that these changes "bear no rational connection" to achieving the goal of eliminating soring and "exceed[] the Agency's authority under the [HPA]." ECF Nos. 29 at 10, 48 at 9. They challenge the proposed amendments under the APA (5 U.S.C. § 551 *et seq.*), the Fifth Amendment, and the Regulatory Flexibility Act (5 U.S.C. § 601 *et seq.*). ECF No. 29 at 10–13.

---

[2] All proposed provisions of the 2024 Rule — except for section 11.19 ("Authorization and Training of Horse Protection Inspectors"), which went into effect on June 7, 2024 — will take full effect on April 2, 2025. *See* ECF No. 56 (postponing the final effective date from February 1, 2025, to April 2, 2025, in light of the instant litigation).

LEGAL STANDARD

## I. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if its existence or nonexistence "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is "genuine" when the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The moving party must identify the basis for granting summary judgment and identify the evidence that demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. All evidence must be viewed in the light most favorable to the non-moving party. *Id.* at 255.

## II. Review of Agency Decisions

The APA "authorizes suit by '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the statute.'" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61 (2004) (alteration in original) (quoting 5 U.S.C. § 702). As required by the APA, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). By ensuring that an agency has engaged in reasoned decision making — holding unlawful and setting aside agency action that is "in excess of statutory authority" or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" — the court has fulfilled its role. 5 U.S.C. § 706(2)(A), (C). "When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always,

to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Loper Bright Enters.*, 603 U.S. at 395. To conduct this interpretation, courts must begin with the statute's text; the plain, "ordinary meaning and structure of the law itself" governs. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019).

### ANALYSIS

Plaintiffs contend that USDA's proposed rule is an unlawful expansion of the Agency's authority, is arbitrary and capricious, and runs contrary to the mandates of the Due Process Clause and the Regulatory Flexibility Act.

### I. Prohibition of Action Devices and Pads

The 2024 Rule bans the use of all action devices (small weights placed on a horse's legs) and pads worn between the hoof and horseshoe — types of equipment worn by Tennessee Walking Horses while training for and competing in the Performance Division of competition. 89 Fed. Reg. 39246 (to be codified at 9 C.F.R. § 11.6(c)). Action devices and pads are commonly used to accentuate the gait of the horse during competition. *Id.*

#### a. Excess of statutory authority

Plaintiffs argue that this ban amounts to an overreach of the Agency's statutory authority for two reasons. First, the HPA only permits USDA to ban practices that cause soring or can be reasonably expected to cause soring, and the Agency has put forth no evidence that action devices and pads do so. ECF No. 29 at 31. Second, banning action devices and pads would effectively eliminate the entire Performance Division of competition. Why? Because horses in the Performance Division extensively train and compete while wearing action devices and pads, unlike the horses in the flat-shod Pleasure Division. ECF Nos. 29 at 14, 48 at 28.

Defendants disagree, arguing that "Congress did not ban equipment that *causes* soring; it banned equipment that the Secretary determines must be prohibited to *prevent* soring—a much broader connection that includes, for example, practices that can hide evidence of soring." ECF No. 45 at 18 (emphasis in original); 15 U.S.C. § 1824(7). Thus, Defendants assert that APHIS merely prohibited equipment deemed necessary to prevent the soring of horses as permitted under Section 1828's grant of rulemaking authority.

Statutory interpretation begins with the text, and the text of the HPA is clear: it is prohibited to show, sell, or transport any horse "which is wearing or bearing any equipment, device, paraphernalia, or substance which the Secretary by regulation under section 1828 of this title prohibits to *prevent* the soring of horses." 15 U.S.C. § 1824 (emphasis added). Pursuant to that goal, the Secretary of USDA is "authorized to issue such rules and regulations as he deems necessary" to prevent such soring. 15 U.S.C. § 1828. Although Congress bestowed a broad grant of authority to the Secretary, this delegation is not unlimited. Defendants' textual argument is a red herring; *preventing* the occurrence of an issue naturally requires the prohibition of whatever directly *causes* that issue. But prevention transforms into unfettered discretion where a prohibition encompasses all combinations of practices or items that display any tenuous connection to the issue. Just so here.

USDA does not dispute that action devices and pads, in themselves, do not cause soring and can be used in an appropriate way. *See* ECF No. 45 at 22 ("APHIS reasonably found that action devices *combined with other techniques* cause soring—even when use of the action devices by themselves may not . . . .") (emphasis added); 89 Fed. Reg. 39216 ("[W]e are not banning [pads] . . . because they always and *per se* cause soring, which they do not."). A 1982 study conducted by the Auburn University School of Veterinary Medicine (the "Auburn Study") unequivocally

6

stated that the "[u]se of 2, 4, and 6 oz. chains did not cause any detectable pain, [or] tissue damage," a conclusion further supported by a study conducted by the National Academy of Sciences (the "NAS Report"). *See, e.g.*, AR-00001488 (discussing the Auburn Study); AR-00001187 (discussing the NAS Report, which found no evidence of soring resulting from action devices weighing six ounces or less). There is also no evidence supporting the claim that pads are "the cause of soring." ECF No. 51-1 at 128 (discussing how the author of the Auburn Study, Dr. Ram C. Purohit, conceded that examination of horses wearing pads "did not provide any evidence of soreness or induced inflammation"); *Id.* at 102–06 (describing how no currently published scientific studies conclude that pads themselves cause soring). The current Horse Protection Amendments align with these findings, already prohibiting action devices weighing more than six ounces each and pads that elevate or change the angle of a horse's hoof by more than one inch. 9 C.F.R. § 11.2(b). These current restrictions, when properly adhered to, ensure that no soring is *caused* by action devices or pads. Banning all action devices and pads only punishes owners and trainers already in compliance with existing regulations and fails to alter the behavior of incorrigible offenders.

The history of the HPA itself offers further support for the Court's conclusion. Congress passed the HPA with parallel goals: to prevent soring while also protecting and enhancing fair competition. 15 U.S.C. § 1822(1), (2). To implement the 2024 Rule would neither prevent harmful soring practices nor preserve competition, as action devices and pads do not, in themselves, cause soring — and compliance would effectively eliminate the Performance Division of competition. The Performance Division remains the primary attraction for spectators, containing nearly 70% of the total entrants at major horse shows. ECF No. 51-1 at 135–141. As Plaintiffs correctly analogize, "USDA's approach is akin to a regulator assigned the task of regulating and prohibiting doping in

Alpine skiing competitions looking at data suggesting that 25% of competitors in Giant Slalom have engaged in doping and deciding that all Giant Slalom events should be banned to eliminate doping." ECF No. 29 at 34–35. Here, such a drastic measure certainly amounts to agency overregulation.

A *reductio ad absurdum* argument elucidates the Court's analysis. Assume, arguendo, that Defendants are correct: the authority to prohibit equipment or substances is expansive, permitting prohibitions on both causes of and corollaries to soring. If this interpretation of "prevent," as used in 15 U.S.C. Section 1824, were carried to its logical conclusion, all of the following actions by USDA would be permissible: (1) the punishment or removal of all horse trainers or owners, as many have provably sored hores; (2) a complete ban of all training equipment that, in conjunction with other techniques or substances, could cause soring; (3) prohibition of any formal show gear or competition apparel that, when used in conjunction with other irritants, could cause soring; and (4) the complete disintegration of the Performance Division of competition, as this Division contains the highest instances of soring. This argument is untenable. USDA is not entitled to prohibit action devices and pads, which *may* cause soring when used in conjunction with illicit substances or prohibited practices, in order to prevent soring. *See Comer v. Davis*, 107 F.2d 355, 358 (5th Cir. 1939) (finding that extending a rule "to a reductio ad absurdum is, in short, to run it into the ground").

Thus, the Court **HOLDS** that the 2024 Rule's ban on action devices and pads constitutes an excess of the Agency's authority based on the plain text and enactment goals of the HPA. Accordingly, Plaintiffs' Motion for Summary Judgment on this provision is **GRANTED** and, conversely, Defendants' corresponding Motion is **DENIED**.

8

### *b. Arbitrary and capricious*

Because the Agency has acted in excess of statutory authority, the Court does not consider the parties' remaining arguments regarding arbitrary and capricious rulemaking. *See Nat'l Ass'n of Priv. Fund Managers v. Sec. & Exch. Comm'n*, No. 4:24-CV-250, 2024 WL 4858589, at *8 (N.D. Tex. Nov. 21, 2024) (disregarding plaintiffs' remaining arguments based on a prior determination that statutory authority was exceeded).

### II. Prohibition of Substances

In addition to action devices and pads, the 2024 Rule prohibits the use of all substances on a horse's extremities above the hoof, unless approved in writing by a licensed veterinarian. 89 Fed. Reg. 39246 (to be codified at 9 C.F.R. § 11.6(c)(4)). Such banned substances include shampoos, conditioners, polishes, insect repellants, and now, lubricants.[3] 88 Fed. Reg. 56939; 89 Fed. Reg. 39221.

### *a. Excess of statutory authority*

Plaintiffs argue that the prohibition of all substances without regard for whether they cause soring exceeds statutory authority; specifically, that banning the use of lubricants that do not cause soring and can help "reduce friction and soring from the movement of action devices" is inconsistent with the HPA. ECF No. 29 at 41–42. Defendants disagree, reiterating that Congress banned substances deemed necessary by the Secretary to *prevent* the soring of horses. ECF No. 45 at 37. Pursuant to this broad grant of authority, Defendants argue, the agency permissibly

---

[3] The existing rule prohibits all substances on the extremities above the hoof, with the exception of "lubricants such as glycerine, petrolatum, and mineral oil, or mixtures thereof," provided that such substances are furnished by show management, are applied only after inspection by and under the supervision of management, and are made available for random sampling as necessary. 9 C.F.R. § 11.2(c).

concluded that certain substances "can mask efforts to detect soring through inspections, such that banning of that latter category is necessary to prevent masked inspection." *Id.*

The plain language of the HPA again provides a straightforward prohibition on the use of any "substance which the Secretary by regulation under section 1828 of this title prohibits to prevent the soring of horses." 15 U.S.C. § 1824(7). Lubricants, when provided by show management, were previously exempted from this ban, as they "do not cause soring" and "may greatly decrease the possibility of friction or damage to a horse's leg" caused by action devices. 89 Fed. Reg. 39221; 40 Fed. Reg. 6978. The use of lubricants furnished by show management squarely aligns with the HPA's goal of preventing soring and remains necessary with the continued, statutorily permitted uses of action devices and pads. *Cf.* 89 Fed. Reg. 39221 ("With the prohibition of action devices . . . the need for lubricants becomes unnecessary.").

Defendants posit that the Agency "reasonably concluded" that lubricants can act as a vehicle for illicit anesthetizing and soring agents. ECF No. 45 at 37. Although Defendants fill nearly a full page with instances of Tennessee Walking Horses testing positive for prohibited substances (often masking and numbing agents), such evidence only re-addresses the known issue that bad actors will continue using prohibited substances in competition. *Id.* at 38–39. A blanket ban is not the solution. Further, the Court cannot locate in Defendants' briefing any particular, documented instance of a lubricant being used to mask soring. USDA acknowledges that it "received comments asking whether APHIS has evidence of masking soring in Tennessee Walking Horses," but provides no reply other than referring to previously detected uses of anesthetizing agents. 89 Fed. Reg. 39220. Although it may be true that "a strong association remains between the application of substances and soring," Defendants fail to properly substantiate their conclusion that such association includes lubricants. *Id.* For the above reasons, the Court **HOLDS** that the

2024 Rule's ban of all substances constitutes an excess of the Agency's authority. Accordingly, Plaintiffs' Motion for Summary Judgment on this provision is **GRANTED** and, conversely, Defendants' corresponding Motion is **DENIED**.

### b. Arbitrary and Capricious

As discussed *supra* in Section I(b), the Court does not consider the parties' remaining arguments regarding arbitrary and capricious rulemaking based on its determination that the Agency acted in excess of statutory authority.

### III. The DCIS Provision

The 2024 Rule contains a "Dermatologic Conditions Indicative of Soring" ("DCIS") provision, designed to help inspectors determine whether a horse is sore and clarify the process for reaching that conclusion. 89 Fed. Reg. 39247 (to be codified at 9 C.F.R. § 11.7). The DCIS provision replaces the disreputable and unscientific Scar Rule, a relic of a bygone era in which "[s]cars were very likely present in the lesions seen on sore [Tennessee Walking Horses]." NAT'L ACADS. OF SCIS., ENG'G, AND MED., A REVIEW OF METHODS FOR DETECTING SORENESS IN HORSES 84 (2021), https://doi.org/10.17226/25949.

Specifically, the Scar Rule requires inspectors to disqualify horses as sore if they observe "granulomas," "evidence of inflammation," or "excessive loss of hair" on the horse's skin. 9 C.F.R. § 11.3; 15 U.S.C. § 1823(a). These characteristics run contrary to the HPA, in which a finding of soreness requires that a person take specific actions causing a horse to "suffer" or "reasonably expect[] to suffer, physical pain or distress, inflammation, or lameness when walking, trotting, or otherwise moving." 15 U.S.C. § 1821(3). In essence, a horse could be disqualified as sore under the Scar Rule without any proof of specific misconduct or soring inflicted by artificial means; certainly, something like hair loss can be naturally occurring. *Martin v. U.S. Dep't of*

*Agric.*, 57 F.3d 1070, at *6 (6th Cir. 1995) (holding that the HPA requires soring "be caused by artificial means"). Such subjective disqualifications are indeed problematic; yet, the DCIS provision fails to provide a remedy.

### a. Due Process

Plaintiffs maintain that the DCIS provision "deprives horse owners, trainers, and show management of [the] constitutionally protected interest" of being able to show horses without undue government interference. ECF No. 29 at 50. Specifically, Plaintiffs argue that the DCIS provision fails to satisfy both prongs of the void for vagueness test, as it (1) "does not give owners and trainers fair notice of the skin conditions that will result in a horse being deemed sore," and (2) "lacks any limiting criteria that distinguish a sore horse from a healthy horse." *Id.* at 50–51.

Defendants argue that the DCIS provision, incorporating a clear statutory definition of "sore," is sufficient to apprise people possessing "common understanding and intelligence" of prohibited conduct. ECF No. 45 at 49. In addition, the provision gives examples of skin conditions that inspectors can look to when determining if soring has occurred. 89 Fed. Reg. 39247 (listing "irritation, moisture, edema, swelling, redness, epidermal thickening, and loss of hair (patchy or diffuse)").

Just as a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," a court must also strike down agency action that is "contrary to constitutional right." 5 U.S.C. § 706(2)(A), (B). Agency action that fails to provide due process is contrary to constitutional right. It is "[a] fundamental principle in our legal system . . . that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required . . . . This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth

12

Amendment." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). To that end, a regulation impacting a protected liberty or property interest is considered "unconstitutionally vague if it (1) fails to provide those targeted by the [law] a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 421 (5th Cir. 2011).

The DCIS provision lacks clarity and instead embraces subjectivity, failing to provide owners and trainers fair notice of skin conditions that will deem a horse sore and lacking meaningful, limiting criteria to guide inspectors in making that determination. The text of the DCIS provision fails to list any specific criteria that must be present for a horse to be deemed sore; instead, the rule provides only "*examples* of dermatologic conditions that will be evaluated in determining whether a horse is sore," including but not limited to "irritation, moisture, edema, swelling, redness, epidermal thickening, and loss of hair (patchy or diffuse)." 89 Fed. Reg. 39247 (emphasis added). USDA, however, noted that these dermatologic conditions "are not, in and of themselves, always necessarily indicative of soring" because they may result from other causes. *Id.* at 39222.

Compounding this vagueness, the DCIS provision relies solely on the personal discretion of each inspector to identify "dermatologic conditions that *they* determine are indicative of soring." *Id.* at 39247 (emphasis added). Despite the expertise that HPIs or APHIS inspectors possess, their discretion alone — coupled with mere examples of dermatologic conditions that, standing alone, are not always indicative of soring — is deficient in providing notice to owners and trainers as to what conduct "is forbidden or required." *Fox Television Stations*, 567 U.S. at 253 (quoting *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926)) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily

13

guess at its meaning and differ as to its application, violates the first essential of due process law."). The DCIS provision's incorporation of the statutory definition of "sore" has little practical effect, as this definition merely describes the *condition* of being sore rather than defining what *criteria* is present to determine the presence of the condition. Due process requires more than what the eye of each individual beholder deems sufficient. Thus, the Court **HOLDS** that the 2024 Rule's DCIS provision fails to provide adequate due process. Accordingly, Plaintiffs' Motion for Summary Judgment on this provision is **GRANTED** and, conversely, Defendants' corresponding Motion is **DENIED**.

### *b. Arbitrary and Capricious*

The Court does not reach the parties' remaining arguments regarding arbitrary and capricious rulemaking based on its determination that the Agency's actions fail to provide adequate due process.

### IV. Pre- and Post-Deprivation Review of Inspector Decisions

The 2024 Rule contains two provisions regarding disqualification decisions. First, that the person having custody or responsibility for any disqualified horse "may request re-inspection and testing of said horse within a 24-hour period," provided that three requirements are satisfied: (1) the request is made immediately after the horse has been inspected and before removal from the inspection facility; (2) an APHIS representative determines that "sufficient cause for re-inspection" exists; and (3) the disqualified horse is maintained under APHIS custody until re-inspection is complete. 89 Fed. Reg. 39248 (to be codified at 9 C.F.R. § 11.8(h)). Second, that any horse owner, trainer, exhibitor, custodian, or transporter may appeal a disqualification within twenty-one days of the date such disqualification is received. *Id.* at 39245–46 (to be codified at 9 C.F.R. § 11.5).

14

Plaintiffs assert that the 2024 Rule does not provide any true opportunity to seek review of an inspector's decision that a horse be disqualified and prevented from competing. ECF No. 29 at 52. Plaintiffs state this is because no genuine pre-deprivation mechanism for review of an inspector's disqualification exists, as such re-inspection is "wholly discretionary." *Id.* at 52–55. When no type of hearing is provided prior to a horse being disqualified from competition, only the "mere *possibility* of due process" is provided. *Id.* at 55 (emphasis in original).

Defendants, on the other hand, believe that the 2024 Rule provides three fail-safes preventing due process violation: (1) re-inspection of a horse after a failed inspection but before competition, where certain requirements are met; (2) ability to appeal a disqualification directly to the APHIS Administrator within twenty-one days of disqualification before a new decision-maker; and (3) requiring notice and an opportunity for an administrative hearing prior to the imposition of civil penalties for HPA violations. 89 Fed. Reg. 39245–6, 39248 (to be codified at 9 C.F.R. §§ 11.5, 11.8(h)); 15 U.S.C. 1823(b)(1).

To satisfy the demands of due process, both clarity and adequate process are needed. A government deprivation of property must typically be preceded by adequate process, although post-deprivation process may be acceptable where "necessity of quick action by the State or impracticability of providing any predeprivation process" is needed. *Zinermon v. Burch*, 494 U.S. 113, 132 (1990) (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982)). A three-factor test, balancing the government's interests against the Plaintiffs', governs whether a pre-deprivation hearing is necessary: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens

15

that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976).

USDA does not contest that the first *Mathews* factor weighs in favor of Plaintiffs, and the Court agrees. ECF No. 45 at 52–53. And as the Northern District of Georgia recently held, Tennessee Walking Horse owners and trainers have a property right to show their horses; accordingly, there is "a constitutionally protected interest in showing [Tennessee Walking Horses] without unreasonable government interference." *McSwain v. Vilsack*, No. 1:16-CV-1234, 2016 WL 4150036, at *4 (N.D. Ga. May 25, 2016).

The Court agrees with Plaintiffs that, under the second *Mathews* factor, the risk of erroneous deprivation under the 2024 Rule is high. The inspection process occurs as follows: Horse owners and trainers are provided no clear standards for what dermatologic conditions will disqualify their horse. *See supra* at Part III(a). Once a horse is disqualified, the opportunity for that horse to compete is practically extinguished because inspection occurs "approximately 30 minutes before the horse enters the arena." 88 Fed. Reg. 56936. Appeal of this disqualification, and re-inspection before a show begins, is then contingent upon the time constraints and sole discretion of an APHIS representative. 89 Fed. Reg. 39248 (to be codified at 9 C.F.R. § 11.8(h)). This inspection and appeal process is ripe for causing erroneous deprivation, as there is no true hearing prior to deprivation — the disqualification of a horse from competition.

Analysis of the third *Mathews* factor also weighs in favor of Plaintiffs. Defendants assert that pre-deprivation review is "wholly impracticable" due to tight time constraints, and the Court is inclined to sympathize with Defendants' concern that scheduling inspections too far in advance of a show would create the opportunity for a horse to be sored after inspection but prior to showing. ECF No. 45 at 57–58. However, asserting that pre-show review "is not feasible under the way that

16

shows are currently conducted" and that commenters did not "suggest[] practicable alternatives" does not rise to the level of such review being impossible or even impracticable. ECF No. 45 at 58–59. Defendants seemingly conclude that the current "absence of any feasible additional method of providing further pre-disqualification review" excuses them from implementing a workable solution, yet neglect to specify what particular burdens would result from "imposing additional safeguards." *Id.*; *Mathews*, 434 U.S. at 335. Convenience must not come at the expense of constitutional violation.

Thus, after considering and balancing the three *Mathews* factors, the Court is persuades that pre-deprivation review is required and is not adequately provided by the 2024 Rule. *See Zinermon*, 494 U.S. at 127 ("Applying [the *Mathews*] test, the Court usually has held that the Constitution requires some kind of a hearing before the State deprives a person of liberty or property."). But even if post-deprivation review were found to be more appropriate, the post-deprivation remedies provided by the 2024 Rule are insufficient. Though those responsible for a horse may appeal a disqualification decision directly to the Administrator of APHIS, this process is deficient in its ability to make the horse trainer or owner whole. ECF No. 41 at 16–17; *McSwain*, 2016 WL 4150036, at *6. Winning an appeal and overturning a disqualification still forecloses the ability of a horse to compete, as well as any ability for owners or trainers to claim prize money and notoriety within the industry. This attempt at post-deprivation review remains unsatisfactory.

Thus, after considering and balancing the three *Mathews* factors, the Court **HOLDS** that the lack of genuine pre- and post-deprivation review in the 2024 Rule fails to provide due process. Accordingly, Plaintiffs' Motion for Summary Judgment on this provision is **GRANTED** and, conversely, Defendants' corresponding Motion is **DENIED**.

## V. The DQP Program

Originally, enforcement of the HPA was conducted by APHIS-employed inspectors called Veterinary Medical Officers ("VMOs"). ECF Nos. 29 at 17, 45 at 60. When the practice of soring was more commonplace, Congress amended the HPA in 1976 to permit APHIS to prescribe "by regulation requirements for the appointment by the management of [any] horse show . . . of persons qualified to detect and diagnose a horse which is sore." 15 U.S.C. § 1823(c). APHIS regulations were revised accordingly in 1979, permitting the appointment of qualified private inspectors — Designated Qualified Persons ("DQPs") — by horse-show management, in addition to VMOs. 9 C.F.R. §§ 11.1, 11.7. The regulations required that DQPs be licensed by a horse industry organization (or other equivalent) and be veterinarians with equine experience or "knowledgeable horsemen whose past experience and training would qualify them for positions as horse industry organization or association stewards or judges . . . and who have been formally trained and licensed by DQPs." 9 C.F.R. § 11.7(a)(2).

The 2024 Rule discontinues the use of DQPs, allowing horse-show management to utilize either a free APHIS representative or a privately employed Horse Protection Inspector ("HPI") to inspect horses for evidence of soring and compliance with the HPA. 89 Fed. Reg. 39247 (to be codified at 9 C.F.R. § 11.8(a)). APHIS — instead of horse industry organizations — would assume responsibility for screening, training, and authorizing HPIs. 89 Fed. Reg. 39251 (to be codified at 9 C.F.R. § 11.19). Like DQPs, HPIs must be veterinarians (or, if no veterinarians are available, veterinary technicians or State or local government employees who enforce animal welfare laws). *Id.* HPIs must also "demonstrate sufficient knowledge and experience of equine husbandry and science and applicable principles of equine science, welfare, care, and health," as well as pass a conflicts-of-interest screening. *Id.*

18

### a. Excess of Statutory Authority

Plaintiffs assert two primary issues regarding the removal of the DQP program. First, that the horse industry should remain primarily responsible for ensuring compliance with the HPA — not the government. ECF No. 29 at 56. Second, that the increased cost of retaining HPIs is shifted to horse-show management, forcing a show to choose between a free, APHIS-employed inspector or a private HPI. *Id.* at 55–56. This, Plaintiffs argue, effectively "forces those who cannot afford an HPI to use an APHIS inspector," foreclosing the ability of the industry to police itself as Congress desired. *Id.* at 21; 43 Fed. Reg. 18514 (intending the amendments "to encourage horse industry self-regulatory activity").

Defendants argue that the implementation of the HPI program is lawful, as it aligns with the statutory mandate of the HPA: permitting APHIS to establish regulations to guide horse-show management in appointing qualified individuals to enforce the HPA. ECF No. 45 at 61. HPIs are authorized by APHIS but ultimately appointed by show management. *Id.* This falls within the HPA's grant of statutory authority. *Id.* Further, Defendants disagree that show management will be forced to appoint APHIS inspectors based on HPIs being cost prohibitive. *Id.* at 62. This is purely speculative, as "APHIS plays no role in setting [the] rates" paid to HPIs; rather, the price "will be negotiated at arms' length between each HPI and each show manager." *Id.*

The Court again begins its analysis with the ultimate source of authority: the plain text of the HPA. The grant of authority at issue is straightforward. The HPA states that "[t]he Secretary shall prescribe by regulation requirements for the appointment by the management of any horse show, horse exhibition, or horse sale or auction of persons qualified to detect and diagnose a horse which is sore or to otherwise inspect horses for the purposes of enforcing this chapter." 15 U.S.C. § 1823(c). Once distilled, the statute contains three primary components: (1) a

19

delegation of authority to the Secretary of USDA; (2) a mandate that the Secretary promulgate regulatory requirements for the selection of inspectors; and (3) a specification that horse-show management select those qualified inspectors. The 2024 Rule does not run afoul of any component and is not in excess of statutory authority.

First, the statutory delegation of authority to the Secretary cannot be disputed — this much is clear from the plain language of the HPA. Second, the requirement that the Secretary prescribe requirements to guide inspector selection has also been satisfied. APHIS, through 9 C.F.R. Section 11.19, has set forth clear requirements outlining the authorization and training process for HPIs. 89 Fed. Reg. 39251 (to be codified at § 11.19(a), (b)). The 2024 Rule contains two detailed tiers of HPI qualifications — specifying an HPI's required occupation as well as mandating sufficient and relevant equine knowledge — and requires completion of a formal training program. *Id.* Third, show management remains in charge of HPI selection from a "pool of qualified persons" authorized and trained by APHIS. *Id.* at 39235. To be sure, HPIs are inspectors privately hired by show management. *Id.* at 39201 ("HPIs . . . are not employees of APHIS and not compensated by the Agency, but will be authorized to conduct inspections and will contract as third parties with event management for their services."). The text's requirement that management "disqualify any horse from being shown . . . if the management has been notified by a person appointed in accordance with regulations under subsection (c) or by the Secretary that the horse is sore" also remains undisturbed. 15 U.S.C. § 1823(a). Show management maintains their obligation to disqualify sore horses when notified by HPIs, persons appointed by management.

And there is no indication that the 2024 Rule would force show management to pick APHIS inspectors due to *excessive* cost. Because HPIs' rates will be negotiated between each HPI and show manager, the cost of services provided per show is speculative. 89 Fed. Reg. 39242. While

USDA notes that the cost for HPIs may range from "a few hundred to several thousand dollars," the current cost of DQPs "varies by region and ranges from $350 to $23,000 with the average being $700 to $800 per show." *Id.* The price discrepancy between DQPs and HPIs, based on these ranges, cannot be deemed prohibitive or excessive. Although "it is possible that HPIs will charge more for their inspections than DQPs currently do," this increase in price would surely be commensurate with their additional expertise and specialized skills, necessary to ensure more comprehensive and accurate assessments and further the HPA's goal of eliminating soring. *Id.* Thus, the Court **HOLDS** that the 2024 Rule's HPI program is not in excess of statutory authority.

### b. Arbitrary and Capricious

Plaintiffs assert that USDA's elimination of the DQP program is arbitrary and capricious for two reasons. First, the decision to eliminate the DQP program was based on unreliable data. ECF No. 29 at 58. Plaintiffs argue that the higher rate of violations detected by USDA-employed VMOs, compared to a lower number reported by DQPs, results from the use of an unreliable sample. *Id.* at 58–59. Instead of inspecting a random sample of horses, the sample consists only of horses "chosen because they [were] already suspected of being sore." *Id.* at 59. Second, "by requiring HPIs to have veterinary credentials, it limits the ability of professional horse trainer or farriers to apply." *Id.* And there is no reason to believe that either veterinary technicians or local animal welfare personnel will outperform horse trainers and farriers when inspecting horses for soring. *Id.*

Adopting the HPI provision, Defendants argue, appropriately responds to the issue of DQPs "failing to adequately enforce the HPA by allowing sore horses to show." ECF No. 45 at 63; 89 Fed. Reg. 39195. A 2019 USDA Office of Inspector General's Audit, the USDA Office of the Judicial Officer, and a study conducted by the National Academy of Sciences also reached the

21

same conclusion. 89 Fed. Reg. 39195. Most horses inspected by APHIS officials "were chosen at random, although APHIS chose to inspect some horses for which a suspicion of soring was warranted." *Id.* at 39214. Moreover, Defendants note that "many trainers and farriers working in the industry are not likely to be free of conflicts of interest" — this supports APHIS's choice to limit HPIs to veterinarians, veterinary technicians, and animal welfare officials to avoid impairment due to industry conflicts of interest. ECF. No. 45 at 64; 89 Fed. Reg. 39251 (to be codified at 9 C.F.R. § 11.19(a)(2)(i)).

The arbitrary and capricious standard asks a court to determine "whether the agency has relied on factors which Congress has not intended . . . , entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence[,] or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Tex. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 737 F. Supp. 3d 426, 440 (N.D. Tex. 2024) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). In applying this standard, the Court is limited "to the basis articulated by the agency itself" and will "uphold a decision of less-than-ideal clarity if the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43, 50.

Here, APHIS's decision to adopt the HPI program is supported by the record and a rational connection to the facts found. Implementing the HPI program was a reasoned response to the ongoing problem of industry appointed DQPs allowing sore horses to show. A 2010 USDA Office of Inspector General's Audit determined that DQPs often failed to inspect horses in accordance with the HPA and disqualify sore horses, likely due to conflicts of interest. OFF. OF INSPECTOR GEN., U.S. DEP'T. OF AGRIC., AUDIT REPORT 33601-2-KC, ANIMAL AND PLANT HEALTH INSPECTION SERVICE ADMINISTRATION OF THE HORSE PROTECTION PROGRAM AND THE

SLAUGHTER HORSE TRANSPORT PROGRAM (2010). The USDA Office of the Judicial Officer and the National Academy of Sciences, Engineering, and Medicine issued similar findings, concluding that "DQP examinations are found to be less probative than [USDA] examinations" and that it is "strongly recommended that the use of DQPs for inspections under the current regulations be discontinued." *In re: Justin R. Jenne*, 74 Agric. Dec. 358, 383 n.16 (U.S.D.A. July 17, 2015); 89 Fed. Reg. 39196. Such data may not be perfect, but perfection is not required: only a "rational connection between the facts" and the decision to implement the HPI program. *State Farm*, 463 U.S. at 43; *Fed. Comm's Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021) (neglecting to deem an agency's findings arbitrary and capricious despite a lack of "perfect empirical or statistical data"). Such connection exists here. Further, the argument that a non-random sample was used cannot be maintained; indeed, it is infeasible for APHIS to restrict data to only a random sample, as it would inherently require foregoing inspection of any horses displaying symptoms of soreness. ECF No. 45 at 31. Accordingly, the Court **HOLDS** that the 2024 Rule's HPI program is not arbitrary and capricious.

### c. Regulatory Flexibility Act

Plaintiffs challenge the 2024 Rule on the basis of non-compliance with the Regulatory Flexibility Act ("RFA"). ECF No. 29 at 66. Because the Court has found that all other portions of the 2024 Rule are either in excess of the Agency's statutory authority or present due process concerns, only the portion of the rule pertaining to the DQP program is subject to RFA analysis.

The RFA requires each agency that promulgates a final rule to prepare a final regulatory flexibility analysis, containing a statement of "the need for the rule, a summary of public comments received on regulatory flexibility issues and agency responses to them, a description and estimate of the number of small entities to which the rule will apply, a description of reporting requirements

23

of the rule, a description of alternatives to the rule consistent with the regulatory statutes but imposing less economic burden on small entities, and a statement of why such alternatives were not chosen." 5 U.S.C. § 604(a); *Nat'l Propane Gas Ass'n v. U.S. Dep't of Transp.*, 43 F. Supp. 2d 665, 681 (N.D. Tex. 1999). A "small entity" includes "enterprises that are engaged in the business of . . . farming and agricultural related industries . . . which is independently owned and operated and which is not dominant in its field of operation." 15 U.S.C. § 632(a)(1). The Tennessee Walking Horse National Celebration Association qualifies as a "small organization." ECF No. 29 at 67; ECF No. 51-1 at 134–141.

Courts review an RFA analysis "only to determine whether an agency has made a reasonable, good-faith effort to carry out the mandate of the RFA." *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 625 (5th Cir. 2000). In fact, "[t]he proper question for [the court] is not whether the [agency] reached the 'correct' determination, but whether the agency followed the procedural steps set out in the RFA." *Grocery Servs., Inc. v. USDA Food & Nutrition Serv.*, Civ. A. No. H-06-2354, 2007 WL 2872876, at *10 (S.D. Tex. Sept. 27, 2007). "A cost-benefit analysis or economic modeling is not required." *Id.*, at *12.

Defendants adequately show that APHIS satisfied all procedural steps required by the RFA. Defendants' Final Regulatory Flexibility Analysis contained the following components: (1) a description of the need for, the objectives of, and the legal basis for the 2024 Rule; (2) several pages covering comments received and the Agency's responses; (3) a breakdown showing all potentially affected small entities; (4) a description of all projected reporting, recordkeeping, and other compliance requirements; and (5) a discussion noting that APHIS "does not expect the rule to have significant economic impact on a substantial number of small entities." AR-00004020–35. Although the RFA typically requires "a description of the steps the agency has taken to minimize

the significant economic impact on small entities," this requirement does not apply if the agency "certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. §§ 604(6), 605(b). Defendants have adhered to all such requirements. *Nat'l Propane Gas Ass'n*, 43 F. Supp. 2d at 683 ("[A]n agency can satisfy section 604 as long as it compiles a meaningful, easily understood analysis that covers each requisite component dictated by the statute and makes the end product—whatever form it reasonably may take—readily available to the public.") (quoting *Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 115 (1st Cir. 1997)).

Because APHIS made a "reasonable, good-faith effort" to adhere to the RFA and followed the required procedures, this Court **HOLDS** no violation of the RFA. Because the DQP program is not in excess of statutory authority, arbitrary or capricious, or in violation of the RFA, Defendants' Motion for Summary Judgment on this provision is **GRANTED** and, conversely, Plaintiffs' corresponding Motion is **DENIED**.

### VI. Remedy

Plaintiffs request that the Court vacate the challenged provisions of the 2024 Rule or, "at the very least, remand to USDA to conduct a proper analysis." ECF No. 29 at 69. Where agency action is found to be unlawful, vacatur is the "default rule." *Data Mktg. P'ship*, 45 F.4th at 859–60 (describing vacatur as the default remedy under 5 U.S.C. § 706(2)); *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation."). Where a court finds that an agency rule violates the APA, "it shall—not may—hold unlawful and set aside [the] agency action." *Nat'l Ass'n of Priv. Fund Managers v. SEC*, 103 F.4th 1097, 1114 (5th Cir. 2024) (internal quotation marks and citation omitted).

Remand without vacatur is limited to rare cases and is appropriate only when two conditions are met: (1) when there is "a serious possibility that the agency will be able to correct the rule's defects on remand," and (2) when "vacating the challenged action would produce disruptive consequences." *Tex. v. United States*, No. 23-40653, 2025 WL 227244, at *16 (5th Cir. Jan. 17, 2025) (internal marks omitted). USDA does not address how it would correct any of the 2024 Rule's defects on remand and the Court cannot identify any potential disruptive effect, as the 2024 Rule has not yet gone into effect. *See Texas v. U.S. Dep't of Transp.*, 726 F. Supp. 3d 695, 723–24 (N.D. Tex. 2024) (concluding that vacating an agency rule that was not functionally effective at the time of the court's analysis would not cause any disruptive effects). Moreover, remand to the Agency would also "create[] a risk that [the] agency may drag its feet and keep in place an unlawful agency rule. *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015); *see also Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1264 (D.C. Cir. 2007) ("A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such."). Therefore, vacatur is the appropriate remedy.

Limited vacatur, striking down only particular provisions of an agency rule, can be justified in certain circumstances. A two-prong test guides the Court's severability analysis: "Whether the offending portion[s] of a regulation [are] severable depends upon the intent of the agency and upon whether the remainder of the regulation could function sensibly without the stricken provision[s]." *Texas v. United States*, No. 23-40653, 2025 WL 227244, at *17 (5th Cir. Jan. 17, 2025). The language of a severability clause should be adhered to in the absence of extraordinary circumstances. *Id.*

Regarding the first prong, the 2024 Rule contains a severability clause communicating the Agency's intent that "should a court hold any provisions of this rule to be invalid, such action shall

not affect any other provision of this rule." 89 Fed. Reg. 39234. As for the second prong, there is no indication that the remainder of the 2024 Rule could not function sensibly without the stricken provisions. In fact, USDA lists several examples of how the 2024 Rule provisions can each function independently of each other. ECF No. 45 at 73. Because USDA intended the aspects of the 2024 Rule to be severable and function sensibly standing alone, limited vacatur of select 2024 Rule provisions is appropriate.

CONCLUSION

Plaintiffs' and Defendants' Cross-Motions for Summary Judgment (ECF Nos. 28, 44) are **GRANTED IN PART** and **DENIED IN PART**. It follows from the Court's instant Order that the following portions of the 2024 Rule are unlawful:

- The ban of all action devices and pads, which exceeds USDA's statutory authority (to be codified at 9 C.F.R. § 11.6(c));

- The ban of all substances, which exceeds USDA's statutory authority (to be codified at 9 C.F.R. § 11.6(c));

- The DCIS provision, which fails to provide adequate due process (to be codified at 9 C.F.R. § 11.7); and

- The mechanisms for pre- and post-deprivation review of disqualification decisions, which fail to provide adequate due process (to be codified at 9 C.F.R. §§ 11.5, 11.8(h)).

Therefore, the above provisions of the 2024 Rule are **VACATED**. The Court further **HOLDS** hold that the DQP program does not constitute an excess of statutory authority, arbitrary or capricious decision-making, or a violation of the Regulatory Flexibility Act.

**SO ORDERED**.

January **31**, 2025

_____

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE